1  Rob Bonta
   Attorney General of California
2  Darrell W. Spence
   Supervising Deputy Attorney General
3  Jennifer A. Bunshoft (SBN 197306)
   Emmanuelle S. Soichet (SBN 290754)
4  Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3377
6   Fax:  (415) 703-5480
    E-mail:  Jennifer.Bunshoft@doj.ca.gov
7  *Attorneys for Defendants*

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13  | **CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, PARENTS 1A-9A,** | 8:24-cv-02017 CBM (JDEx) |
    | --- | --- |
    | | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COMPLAINT** |
    | Plaintiffs, | |
    | v. | Date:         Jan. 7, 2025 |
    | | Time:         10:00 a.m. |
    | **GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California; and TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction,** | Courtroom:  8D |
    | | Judge:        The Honorable Consuelo B. Marshall |
    | | Trial Date:  N/A |
    | | Action Filed: 9/17/2024 |
    | Defendants. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction............................................................................................1

Background ...........................................................................................2

    I.     Assembly Bill 1955, The SAFETY Act ..........................................2

    II.    Plaintiffs' Complaint ...................................................................6

Legal Standard .....................................................................................7

Argument .............................................................................................7

    I.     The Court Lacks Subject Matter Jurisdiction .......................................7

        A.   The City Lacks Standing Because It is a Political
            Subdivision of the State ........................................................7

        B.   Parent Plaintiffs Lack Standing to Sue .....................................9

            1.   Parent Plaintiffs Have Not Shown Any Concrete,
                 Imminent Injury ........................................................10

            2.   Parent Plaintiffs Have Not Shown Causation or
                 Redressability ...........................................................13

        C.   The Governor Enjoys Eleventh Amendment Immunity
            and Should Be Dismissed ....................................................15

    II.    The Court Should Dismiss All of Plaintiffs' Claims Because
        They Fail to State Cognizable Claims As a Matter of Law ................16

        A.   Parent Plaintiffs' Substantive Due Process Claims Fail...........16

            1.   Parent Plaintiffs' Facial Challenge Fails Because
                 They Cannot Show the Act Would Be Invalid in
                 Every Circumstance ...................................................16

            2.   Substantive Due Process Does Not Require Schools
                 to Notify Parents of a Student's Gender Identity,
                 Gender Expression, or Sexual Orientation....................18

            3.   The Act Does Not Implicate Parental Rights
                 Related to the Refusal of Medical Care for Their
                 Children ...................................................................21

            4.   The Act Survives Review, Whether Rational Basis
                 or Strict Scrutiny Applies ............................................22

        B.   Parent Plaintiffs' Unconstitutional Conditions Claim Fails
            Because It Is Derivative of Their Failed Due Process
            Claims ..............................................................................24

        C.   The City's Declaratory Relief Claim Fails Because It Is
            Derivative of Parent Plaintiffs' Due Process Claims ..............25

Conclusion ...........................................................................................25

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*
5        503 F.3d 256 (3rd Cir. 2007)............................................................... 19

6

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
7        729 F.3d 937 (9th Cir. 2013) ............................................................... 15

8

*Blair v. Appomattox Cnty. Sch.l Bd.*
9        2024 WL 3165312 (W.D. Va. June 25, 2024) ..................................... 20

10

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*
11        136 F.3d 1360 (9th Cir. 1998)............................................................ 8, 9

12

*C.R. v. Eugene School Dist. 4J*
13        853 F.3d 1142 (9th Cir. 2016)............................................................... 18

14

*Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*
        No. S-CV-0052605, Superior Court of California County of Placer
15        (April 10, 2024),....................................................................................... 3

16

*Central Delta Water Agency v. U.S.*
17        306 F.3d 938 (9th Cir. 2002) ................................................................... 9

18

*City of Huntington Beach v. Newsom*
19        2024 WL 4625289 (9th Cir. Oct. 30, 2024) ........................................... 8

20

*City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*
21        937 F.3d 1278 (9th Cir. 2019) ................................................................ 8

22

*City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*
        625 F.3d 231 (9th Cir. 1980)......................................................... 7, 8, 9

23

*Clapper v. Amnesty Int'l USA*
24        568 U.S. 398 (2013) .............................................................. 10, 11, 13

25

*Coal. to Defend Affirmative Action v. Brown*
26        674 F.3d 1128 (9th Cir. 2012)............................................................... 15

27

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
28        897 F.3d 518 (3rd Cir. 1980)................................................................. 22

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4
*Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*
  2024 WL 706797 (D.N.J. Feb. 21, 2024)................................................20

5
6
*Doe v. Pine-Richland Sch. Dist.*
  2024 WL 2058437 (W.D. Pa. May 7, 2024) .........................................10

7
8
*Fields v. Palmdale Sch. Dist.*
  427 F.3d 1197 (9th Cir. 2005)......................................19, 20, 22, 23

9
*Food & Drug Admin. v. All. for Hippocratic Med.*
  602 U.S. 367 (2024) ............................................................10, 11, 13

10
11
*Foote v. Town of Ludlow*
  2022 WL 18356421 (D. Mass. Dec. 14, 2022) ...............................20, 21

12
13
*Foti v. City of Menlo Park*
  146 F.3d 629 (9th Cir. 1998) ..............................................................17

14
15
*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) ..............................................................22

16
17
*Hammerling v. Google LLC*
  615 F. Supp. 3d 1069 (N.D. Cal. 2022).............................................25

18
19
*In re M.T.*
  2024 WL 4614003 (Cal. Ct. App.)......................................................23

20
21
*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*
  481 F.2d 122 (9th Cir. 1973) ................................................................9

22
*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*
  622 F. Supp. 3d 118 (D. Md. 2022) ....................................................20

23
24
*John and Jane Parents 1 v. Montgomery County Bd. of Educ.*
  78 F.4th 622 (4th Cir. 2023).........................................................10, 12

25
26
*Johnson v. Astrue*
  597 F.3d 409 (1st Cir. 2009) ..............................................................22

27
28
*Kanuszewski v. Michigan Dep't of Health and Hum. Serv.*
  927 F.3d 396 (6th Cir. 2019)..............................................................21

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Kokkonen v. Guardian Life Ins. Co. of Am.*
    511 U.S. 375 (1994) ......................................................... 7

5

6

*Koontz v. St. Johns River Water Mgmt. Dist.*
    570 U.S. 595 (2013) ........................................................ 24

7

8

*Loffman v. California Dep't of Educ.*
    2024 WL 4586970 (9th Cir. Oct. 28, 2024) ...................... 10

9

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ............................................... 9, 10, 13

10

11

12

*Mae M. v. Komrosky*
    No. CVSW2306224, Superior Court of California, County of
    Riverside (Aug. 2, 2023) .................................................. 3

13

14

*Mann v. Cnty. of San Diego*
    907 F.3d 115 (9th Cir. 2018) ........................................... 21

15

16

*Martinez v. Newsom*
    46 F.4th 965 (9th Cir. 2022) ............................................ 25

17

18

*McNeil v. Sherwood Sch. Dist. 88J*
    918 F.3d 700 (9th Cir. 2019) ........................................... 19

19

*Meyer v. Nebraska*
    262 U.S. 390 (1923) ........................................................ 19

20

21

*Moody v. NetChoice, LLC*
    144 S. Ct. 2383 (2024) .................................................... 17

22

23

*Mueller v. Auker*
    700 F.3d 1180 (9th Cir. 2012) ......................................... 21

24

25

*Nat'l Audubon Soc'y, Inc. v. Davis*
    307 F.3d 835 (9th Cir. 2002) ..................................... 15, 16

26

27

*New York v. Ferber*
    58 U.S. 747 (1982) ......................................................... 22

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Ngoun v. Wolf*
    517 F. Supp.2d 1177 (C.D. Cal. 2007)...............................................................23

*Norwood v. Harrison*
    413 U.S. 455 (1973) ..........................................................................................18

*Palomar Pomerado Health Sys. v. Belshe*
    180 F.3d 1104 (9th Cir. 1999)...........................................................................8

*Parents for Priv. v. Barr*
    949 F.3d 1210 (9th Cir. 2020)...................................................................*passim*

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.*
    95 F.4th 501 (7th Cir. 2024) ............................................................................11

*Parham v. J.R.*
    442 U.S. 584 (1979) ..........................................................................................21

*People v. Chino Valley Unified Sch. Dist.*
    No. CIVSB2317301, Superior Court of California, County of
    Riverside (Aug. 23, 2023) ..................................................................................3

*Phyllis v. Superior Ct.*
    183 Cal. App. 3d 1193 (Ct. App. 1986) .............................................................5

*Pierce v. Society of Sisters*
    268 U.S. 510 (1925) ..........................................................................................19

*Regino v. Staley*
    2023 WL 4464845 (E.D. Cal. July 11, 2023) .............................................20, 21

*Reno v. Flores*
    507 U.S. 292 (1993) ..........................................................................................23

*Runyon v. McCrary*
    427 U.S. 160 (1976) ....................................................................................18, 19

*S.B. by & through Kristina B. v. Cal. Dep't of Educ.*
    327 F. Supp. 3d 1218 (E.D. Cal. 2018).............................................................16

**TABLE OF AUTHORITIES**
(continued)

Page

*Shanks v. Blue Cross & Blue Shield of Wis.*
979 F.2d 1232 (7th Cir. 1992)........................................21

*Short v. New Jersey Dep't of Educ.*
2024 WL 3424729 (D. N.J. July 16, 2024)........................10

*Snoeck v. Brussa*
153 F.3d 984 (9th Cir. 1998)........................................15

*Sprewell v. Golden State Warriors*
266 F.3d 979 (9th Cir. 2001)........................................7

*Thomas v. Mundell*
572 F.3d 756 (9th Cir. 2009)........................................8

*United States v. Salerno*
481 U.S. 739 (1987)........................................17, 18

*Warren v. Fox Family Worldwide, Inc.*
328 F.3d 1136 (9th Cir. 2003)........................................7

*Washington Env't Council v. Bellon*
732 F.3d 1131 (9th Cir. 2013)........................................13, 14

*Whitmore v. Ark.*
495 U.S. 149 (1990)........................................10

*Williams v. Kincaid*
45 F.4th 759 (4th Cir. 2022)........................................23

*Ex parte Young*
209 U.S. 123 (1908)........................................15

*Zamani v. Carnes*
491 F.3d 990 (9th Cir. 2007)........................................7

**STATUTES**

20 U.S.C.
§ 1232g(a)(1)(A)........................................5
§ 1232g(a)(4)........................................5

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3
Cal. Ed. Code

4
   § 217 ....................................................................................... 4, 17, 24

   § 220.1 ............................................................................................. 4

5
   § 220.3 ............................................................................................ 23

6
   § 220.3(a) ......................................................................................... 4

   § 220.5 ....................................................................................... 4, 23

7
   § 49602 ...................................................................................... 5, 13

8
   § 51101(a)(10) .................................................................................. 5

9
Family Educational Rights Privacy Act (FERPA) ...................................... 5

10
Support Academic Futures and Educators for Today's Youth

11
   (SAFETY) Act ............................................................................... 1, 4

12
CONSTITUTIONAL PROVISIONS

13
Eleventh Amendment ............................................................... 2, 15, 16

14
Fourteenth Amendment ............................................................... *passim*

15
Cal. Const. Article 1

16
   § 1 ........................................................................................ 15, 23

17
COURT RULES

18
Federal Rules of Civil Procedure

19
   Rule 12(b)(1) .................................................................................. 2, 7

20
   Rule 12(b)(6) .................................................................................. 2, 7

21
OTHER AUTHORITIES

22
34 C.F.R.

23
   § 99.10(a) ........................................................................................ 5

24
Assembly Bill 1955 .................................................................... *passim*

25

26

27

28

**INTRODUCTION**

Lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ) students in California deserve to feel safe, supported, and affirmed for who they are at school. This includes a right to express themselves freely at school without fear of punishment or retaliation, or that teachers might "out" them without their permission. But since 2023, several school districts have enacted "forced outing" policies that expressly single out transgender and gender nonconforming students for discriminatory treatment. These policies require teachers and school staff to notify parents when a student requests to change their name or pronouns at school to reflect a different gender identity, even if notifying the parents puts the student at risk of physical or psychological harm.

Recognizing that the decision of when and to whom to "come out" is a deeply personal one, that family support is important for LGBTQ students' well-being, but that forcibly outing youth before they are ready can be harmful, the State Legislature adopted Assembly Bill 1955 to prohibit school "forced outing" policies. The bill, known as the Support Academic Futures and Educators for Today's Youth Act (SAFETY Act or Act), does two things: first, it mandates the State develop resources to help families and schools create supportive environments for LGBTQ students; second, it prohibits public schools from forcing staff members to disclose a student's sexual orientation, gender identity, or gender expression to others *without the student's consent* (unless otherwise required by State or federal law) or from penalizing staff for complying with State anti-discrimination law. The Act does not ban all disclosure of students' private information. Rather, it allows school districts to craft their own policies for when disclosure of this information is *permissible*; these policies just cannot *mandate* disclosure without student consent.

Plaintiffs—a group of parents and the City of Huntington Beach—filed this lawsuit to challenge the Act on its face and in its entirety. But the suit suffers from numerous jurisdictional deficiencies. The parent plaintiffs lack standing to sue,

1

since they have not alleged concrete or imminent injury traceable to the Act, while the City lacks standing because political subdivisions are categorically barred from bringing constitutional claims against the State in federal court. Further, the Governor has Eleventh Amendment immunity from all the claims.

Because it lacks jurisdiction, the Court's inquiry should stop there. But the claims also all lack merit. The parents' Fourteenth Amendment substantive due process claims fail because there is no parental right to forced disclosure of their child's gender identity, gender expression, or sexual orientation by school districts. In addition, the Act does not implicate the parental right regarding medical care of their children, because school personnel honoring a student's request regarding their name and/or pronouns does not constitute medical treatment. Also, the parents' "unconstitutional conditions" claim and the City's declaratory relief claim fail because they are derivative of the failed substantive due process claims.

For these reasons, the Court should grant Defendants' motion to dismiss without leave to amend under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## BACKGROUND

### I.   ASSEMBLY BILL 1955, THE SAFETY ACT

This year, the California Legislature responded to findings of a growing number of "[a]ttacks on the rights, safety, and dignity of transgender, gender-expansive, and other LGBTQ+ youth" in California and across the country, as well as a "rise in bullying, harassment, and discrimination" against these youth. Request for Judicial Notice (RJN), Ex. 1 at § 2(i). The Legislature found that this harassment has been preventing LGBTQ students "from accessing safe and supportive learning environments" critical to their well-being and success. *Id.* at § 2(m)-(n).[1]

---

[1]In adopting the legislation, the Legislature reviewed extensive data regarding poor mental health outcomes of LGBTQ youth associated with discrimination, bullying, and anti-queer

(continued…)

Of the harassment that LGBTQ youth face, the Legislature singled out school policies that "forcibly out" students by disclosing their LGBTQ identities to their families without their consent. *Id.* at § 2(e). By 2023, several school districts in California had enacted these "forced outing" policies, which sometimes required school employees to "out" students even if doing so risked physical, emotional, or psychological harm to the student.[2] But the Legislature found that choosing when and to whom to come out "are deeply personal decisions, impacting health and safety as well as critical relationships, that every LGBTQ+ person has the right to make for themselves." *Id.* at § 2(b). Research reviewed by the Legislature shows that LGBTQ youth generally benefit when they receive family support, but forcibly outing students to their parents without their consent and "before they are ready" can be extremely harmful.[3] *Id.* at § 2(d). Ultimately, the Legislature found forced-outing policies undermine students' ability to build trust with their parents, violate students' rights to privacy and self-determination, and prevent students from freely expressing themselves at school without fear of being outed. *Id.* at § 2(e)-(g) (noting students have a constitutional right to privacy and that courts have affirmed

---

policies. RJN Ex. 2 at 5-8 (reviewing extensive research findings). These outcomes were directly tied to whether youth had support and acceptance at home or school. For instance, research showed that rejection of a student's transgender identity or sexual orientation by family members was associated with negative health outcomes (such as suicide, depression, substance abuse, homelessness, and sexual risk-taking). *Id.* at 6. Similarly, a national survey showed the overwhelming majority of LGBTQ students report feeling unsafe and targeted at school when schools failed to provide a safe and welcoming environment, with devastating impacts on their mental health, attendance, disciplinary record, academic performance, and prospects for post-secondary education. *Id.* at 6-7.

[2] *See, e.g., Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605, Superior Court of California, County of Placer (April 10, 2024); *People v. Chino Valley Unified Sch. Dist.*, No. CIVSB2317301, Superior Court of California, County of Riverside (Aug. 23, 2023) (*Chino Valley I*); *Mae M. v. Komrosky*, No. CVSW2306224, Superior Court of California, County of Riverside (Aug. 2, 2023).

[3] In particular, the Legislature reviewed comments and data provided by the bill's supporters showing that "[s]tudents often refuse external support out of fear of being outed to their parents," including refusing mental health supports. RJN Ex. 2 at 8. (citing finding that "44% of LGBTQI+ children who never reported harassment at school are fearful that school staff will out them to their family"). Advocates further informed the Legislature that "[t]hese concerns are often justified, as 57% of LGBTQI+ youth report that they have faced parental rejection" ranging "from parents mocking their child's LGBTQI+ identity to more extreme actions that impact the well-being of LGBTQI+ children, including physical abuse and being kicked out of the home." *Id.*

1    the right of young people to keep personal information private).

2        By contrast, the Legislature found that "[a]ffirming school environments

3    significantly reduce the odds of transgender youth attempting suicide," improve

4    education outcomes for transgender and gender non-conforming youth, and lead to

5    "a number of positive outcomes" for all LGBTQ youth, including lower rates of

6    depression and "being less likely to feel unsafe at school because of their gender

7    expression or sexual orientation, or both." *Id.* at § 2(j)(1)-(3).  Against this

8    backdrop, the Legislature found that all students deserve to be "safe, supported, and

9    affirmed for who they are at school." *Id.* at § 2(a).

10       To address these concerns and promote supportive school environments, the

11   Legislature enacted Assembly Bill 1955, known as the "SAFETY Act" (Act).  The

12   law, which takes effect on January 1, 2025, does two things: first, it requires the

13   California Department of Education to develop resources to assist families and

14   schools in creating supportive environments for LGBTQ students.  RJN Ex. 1 at § 3

15   (adding Cal. Educ. Code § 217).  Second, it expressly prohibits public schools in

16   California from adopting or enforcing forced-outing policies.  *Id.* at §§ 4-5.[4]

17   Specifically, it prohibits school staff from being "required to disclose any

18   information related to a pupil's sexual orientation, gender identity, or gender

19   expression to any other person without the pupil's consent unless otherwise

20   required by state or federal law." *Id.* at § 5 (adding Cal. Educ. Code § 220.3(a)).

21   And it prohibits school districts from enacting such policies or retaliating against

22   staff who support students in the exercise of their rights under the California

23   Education Code, including its anti-discrimination provisions.  *Id.* at §§ 4, 6 (Cal.

24   Ed. Code §§ 220.1, 220.5).

25       The Act does not bar the disclosure of this private information in every

26   circumstance.  Rather, it specifically allows for *mandatory* disclosure of

27   _____

28       [4] The Act specifically applies to any "school district, county office of education, charter school, state special school for the blind or the deaf," and their governing boards. *Id.*

4

information when the student consents or when "required by state or federal law," such as if disclosure to parents is required by the Family Educational Rights Privacy Act (FERPA) or California law.[5] *See* RJN Ex. 1 at §§ 220.3(a), 220.5(a); *see e.g.,* 34 C.F.R. § 99.10(a) (parent right to access student records); Cal. Educ. Code §§ 51101(a)(10) (same), 51101(a)(1) (parent right to visit their student's classrooms). In addition, in focusing only on forced-outing policies, it allows school districts to adopt nuanced policies that allow—but do not mandate—disclosure in certain circumstances, consistent with other applicable laws such as State and federal privacy and anti-discrimination protections.

Notably, the Act does not prohibit schools from disclosing to parents when a student's health and well-being are at risk. Under State law, schools may notify parents or guardians—and, in some instances, may have a duty to notify them—when staff learn of significant risks to student safety. *See, e.g.*, Cal. Ed. Code § 49602 (confidential communications to school counselor may be disclosed to parents if counselor "has reasonable cause to believe disclosure is necessary to avert a clear and present danger"); *Phyllis v. Superior Ct.*, 183 Cal. App. 3d 1193, 1196 (Ct. App. 1986) (school had a duty to notify parents that student had been sexually assaulted at school). The Act does not impact that duty or prevent schools from notifying parents of concrete safety risks. Nor does it prohibit optional disclosure of sexual orientation or gender identity in relation to those safety risks. Thus, a school district could adopt a policy that, consistent with State privacy protections, allows staff to disclose the student's gender identity or sexual orientation without the student's consent in those specific instances when there is a compelling need based on a threat to student's physical or mental well-being. The Act simply prohibits a school district from *forcing* staff to do so without the

---

[5] Under FERPA, parents must be afforded "the right to inspect and review" their child's written education records. 20 U.S.C. § 1232g(a)(1)(A), (a)(4). FERPA requires parents be given access to their children's education records upon request, but there is no requirement for a school to affirmatively notify a parent when an education record related to their child reflects a different name or pronoun. *Id.*, § 1232g(a)(2).

1    student's consent.

2    **II.  PLAINTIFFS' COMPLAINT**

3          Nine sets of pseudonymous parents (Parent Plaintiffs) and the City of

4    Huntington Beach (City) brought this lawsuit against Governor Gavin Newsom,

5    Attorney General Rob Bonta, and State Superintendent for Public Instruction Tony

6    Thurmond (Defendants).  ECF No. 1 (Compl.) at 58.  The Parent Plaintiffs'

7    children—identified as "1C" through "9C"—attend school in at least four different

8    counties.  *Id.* ¶¶ 9, 30, 51, 80, 95, 109, 128, 150.  Only six are alleged to attend

9    public schools subject to the Act.  *Id.*  Of those, only four have expressed a gender

10   nonconforming or transgender identity, and only three of those students have

11   allegedly used different pronouns or names at school, which Plaintiffs refer to as a

12   "social transition."  *Id.* ¶¶ 17, 42, 111, 135-144.  Two of these three students have

13   agreed, after intervention by their parents, to revert back to using their given name

14   and pronouns at school.  *Id.* ¶¶ 24-25, 46.

15         While the parents of these three students were allegedly unaware of their

16   social transition for some unspecified amount of time, no Parent Plaintiff alleges

17   they are not currently aware of their children's gender identity, including at school.

18   *See, e.g., id.*  They nonetheless each allege that they will be harmed in the future by

19   the Act, and thus bring three claims to challenge it: two claims under the

20   Substantive Due Process Clause of the Fourteenth Amendment, asserting the Act

21   violates their right to refuse treatment for their children and their right to

22   information about their children; and a claim that the Act violates the

23   unconstitutional conditions doctrine by requiring them to give up these alleged

24   rights in order to access a public education.  *Id.* ¶¶ 309-357.

25         For its part, the City brings one, separate claim for declaratory relief that the

26   Act (or the State laws on which it is "based") violates the Fourteenth Amendment.

27   *Id.* ¶¶ 358-364.

28

**LEGAL STANDARD**

The party asserting federal subject matter jurisdiction bears the burden of establishing its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or based upon extrinsic evidence. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir. 2007). In considering if a complaint states a claim, a court must accept as true all of the material factual allegations in it, but need not accept as true allegations that contradict matters properly subject to judicial notice" or "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted).

**ARGUMENT**

**I.    THE COURT LACKS SUBJECT MATTER JURISDICTION**

**A.    The City Lacks Standing Because It is a Political Subdivision of the State**

The City lacks standing to bring its declaratory relief claim that the Act violates the Fourteenth Amendment. *See* Compl. ¶ 362; *see generally id.* ¶ 358-64. The Ninth Circuit has consistently held that a political subdivision of the State lacks standing to sue the State itself or another political subdivision of the State to challenge State law on federal constitutional grounds in federal court. *See, e.g.*, *City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*, 625 F.3d 231, 233 (9th Cir. 1980) (noting it is well established that political subdivisions of a state "may not challenge the validity of a state statute under the Fourteenth Amendment"); *City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019) ("[W]e have consistently held that political subdivisions

1    lack standing to challenge state law on constitutional grounds in federal court.");

2    *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360,

3    1364 (9th Cir. 1998) ("per se rule" that political subdivisions lack standing to

4    challenge statutes of the state or one of its political subdivisions includes challenges

5    under the Supremacy Clause); *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d

6    1104, 1108 (9th Cir. 1999) (political subdivision lacks standing to sue State "to the

7    extent that its action challenges the validity of state regulations on due process and

8    Supremacy Clause grounds").  This standing rule for political subdivisions suing

9    the State also applies to claims alleging that State law violates a federal statute.

10   *Thomas v. Mundell*, 572 F.3d 756, 759 (9th Cir. 2009) (applying rule to plaintiffs'

11   claims that state law violated Title VI of the Civil Rights Act of 1964 and 42 U.S.C.

12   § 1981).

13          The City's argument that it is exempt from this doctrine because of its status

14   as a charter city is patently frivolous.  *See* Compl. ¶ 298; *see generally id.* ¶¶ 257-

15   270, 282-298.  The Ninth Circuit has expressly rejected this argument and applied

16   the doctrine to charter cities.  *See e.g.*, *Burbank-Glendale-Pasadena Airport Auth.*,

17   136 F.3d at 1364 (holding that "charter cities in California generally are defined as

18   political subdivisions" and thus subject to *South Lake Tahoe*).  In fact, both this

19   Court and the Ninth Circuit have recently rejected the City's attempt to make this

20   specious standing argument in another meritless lawsuit against the state.  *See City*

21   *of Huntington Beach v. Newsom*, 2024 WL 4625289 at *1 (9th Cir. Oct. 30, 2024)

22   ("[O]ur precedent has applied *South Lake Tahoe*'s standing rule to California's

23   charter cities"); *City of Huntington Beach v. Newsom*, 2023 WL 8043846, at *7

24   (C.D. Cal. Nov. 13, 2023) ("Nor is the standing analysis any different for a charter

25   city as opposed to a general law city.").

26          The City's alternative standing arguments are baseless.  It alleges that as a

27   charter city, it may assert *parens patriae* standing on behalf of its citizens, however,

28   unlike states, "political subdivisions such as cities and counties, whose power is

derivative and not sovereign, cannot sue as *parens patriae*." *See, e.g.*, *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *see also Burbank-Glendale-Pasadena Airport Auth.*, 136 F.3d at 1364 ("[C]harter cities in California generally are defined as political subdivisions"). Likewise, the City's argument that it has associational standing to bring suit on behalf of individuals within its jurisdiction under *Central Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002) lacks merit because, unlike in that lawsuit, the City does not fulfill the same function as a private trade association designed to serve the interests of its residents for which associational standing rules would apply. *Id.* at 951 n.8. Moreover, that case involved a state agency suing the *federal* government, and therefore did not address the *South Lake Tahoe* rule. In any event, the Court should reject the City's attempted end run around the *South Lake Tahoe* standing doctrine though its *parens patriae* and associational standing arguments, given the Ninth Circuit's confirmation that the doctrine applies to charter cities.

Furthermore, even if *South Lake Tahoe* did not apply, the City still has not alleged sufficient injury to establish standing to sue. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). This is because AB 1955 applies to school-based employees, but the City has not alleged that it employs or controls any school-based staff. Accordingly, the City lacks standing and the fourth claim should be dismissed in its entirety.

## B.    Parent Plaintiffs Lack Standing to Sue

Parent Plaintiffs' claims also must be dismissed because they lack standing. To establish standing, a plaintiff must show: (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Here, Parent Plaintiffs have not alleged any injury stemming from the Act, much less one traceable to Defendants and redressable through this litigation.

1.    **Parent Plaintiffs Have Not Shown Any Concrete, Imminent Injury**

To meet the injury in fact requirement, plaintiffs must demonstrate an invasion of a legally protected interest that is both (1) "concrete and particularized" to them and (2) "actual or imminent," and not hypothetical or conjectural. *Lujan*, 504 U.S. at 560. A plaintiff has not shown concrete injury if their claims rest solely on an "abstract injury" stemming from "only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). In addition, "[a]llegations of possible future injury" are not enough; a "threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (citations omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

None of the Parent Plaintiffs have alleged sufficient injury in fact to establish standing. Three of the families conspicuously do not allege that their children (3C, 4C, and 5C) attend a public school in California subject to the Act. *See* Compl. ¶¶ 50-93; *see e.g.*, *Loffman v. California Dep't of Educ.*, 2024 WL 4586970, at *13 (9th Cir. Oct. 28, 2024) (affirming dismissal of parent plaintiffs whose children attended private school for lack of standing in a challenge to statute that applied only to the public school system).

Similarly, three of the plaintiff families do not allege that their children (3C, 6C, and 9C) are gender nonconforming or transgender such that they would be impacted by the Act. *See John and Jane Parents 1 v. Montgomery County Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023), *cert. denied sub nom. Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 144 S. Ct. 2560 (2024) (holding parent plaintiffs lacked standing to challenge school gender identity policy because they failed to allege their children had gender support plans); *see also Doe v. Pine-Richland Sch. Dist.*, 2024 WL 2058437, *4-9, (W.D. Pa. May 7, 2024); *Short v. New Jersey Dep't of Educ.*, 2024 WL 3424729, *5-9 (D. N.J. July 16, 2024). In fact, according to

10

their own allegations, these three sets of parents are merely worried over the hypothetical impacts of the Act.  For instance, parents 3A and 3B are allegedly concerned that their child may be socially transitioned solely because the child has autism, making no allegation that their child has shown any signs of wishing to express a different gender identity.  Compl. ¶¶ 52-59.  Parent 6A alleges that his child "has not displayed any issues with gender confusion" and "has no signs of gender dysphoria." *Id.* ¶¶ 94, 102.  His alleged "fears" over the Act stem simply from his ex-wife allegedly dressing their child in dresses in 2021, though he also alleges this action had no effect on the child's gender identity. *Id.*  Finally, Parent 9A's fear that a teacher in the future may "exacerbate" her child's "gender confusion" is both conjecture and nonsensical, conflating sexual orientation with gender identity, an issue the Complaint is completely silent about with respect to her child. *See id.* ¶¶ 154-156 (alleging her child "was questioning whether he might be gay").  Without any grounding in actual facts, these "fears" are simply speculation. *See All. for Hippocratic Med.,* 602 U.S. at 381; *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.*, 95 F.4th 501, 506 (7th Cir. 2024) (affirming dismissal of parent group's challenge to school district's student gender identity policy because its "expressions of worry and concern do not suffice to show that any parent has experienced actual injury or faces any imminent harm attributable to the [policy]").

Moreover, even the parents who do allege having gender non-conforming children in public school (Parents 1A, 2A, 7A, and 8A) have not actually shown a "certainly impending" future injury. *See Clapper*, 568 U.S. at 409.  This is because the Act is narrowly focused on school policies requiring notification, and these parents are already aware of their children's gender identity at school. *See* Compl. ¶¶ 10-25, 33-46, 111-123, 133-44.[6]  For instance, Parent 7A has had repeated

---

[6] Parent 8A does not allege her child has socially transitioned at school or intends to do so, and thus fails to allege any impact from the Act at all. *See* Compl. ¶¶ 149-159.

conversations with her child's school about her child's continued use of a male name and different pronouns at school. *Id.* ¶¶ 113-122. She alleges no risk of future harm beyond unsupported conjecture that the Act "will only make the situation worse"—nor can she, since there is no information the school would keep private that she does not already know. *See id.* ¶ 126. Plaintiffs 1A and 2A allege their children have agreed to return to using their given names and original pronouns at school, and there is no allegation that these parents have reason to believe their children will not honor this agreement and again request a new name and pronouns at school, prompting potential future privacy. *See e.g.*, Compl. ¶¶ 24, 46-47; *see J&J Parents*, 78 F. 4th at 629-30 (rejecting speculative argument that "some of their own children could be" or "might soon be" students with a gender support plan).

Further, even if Parents 1A and 2A had alleged reasons to believe their children will request a social transition at school in the future (which they have not), they still could not establish any concrete risk of "certainly impending" harm. Parent 1A allegedly has a "contractual agreement" with her child's school that she "would be informed if [her child] began going by a male name" at school. *Id.* ¶ 22. While she allegedly fears this contract "will be undermined," this fear is wholly speculative and unsupported, in part because there is no allegation that the agreement actually conflicts with the language of the Act—much less that explains how it does so. Similarly, there is no factual support for Parent 2A's speculation that a hypothetical future social transition "could" place their child's mental health and academic records at risk since they have only alleged that their child's "trans identity"—not a social transition— is correlated to anxiety and have not alleged any impact on academic records. *Id.* ¶¶ 37, 45 (alleging "2C was once marked absent", but not that the absence was unable to be corrected or impacted her academic performance), 47. Further, their allegation that they would be "unaware of, and thus unable to respond to, any other mental health issues associated with social

transitioning" is wholly false and contrary to state law, which specifically allows disclosure of such information. *See supra* at 5; *see e.g.*, Educ. Code ¶ 49602.[7]

### 2. Parent Plaintiffs Have Not Shown Causation or Redressability

Even if Parent Plaintiffs had alleged a sufficiently concrete and imminent injury, they would still fail to establish causation and redressability. To satisfy the causation requirement, a plaintiff must show that their alleged injury is "fairly traceable" to defendant's alleged misconduct and not the result of third-party conduct. *Lujan*, 504 U.S. at 560-61; *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013). The line of causation must be more than attenuated and any links in the causal chain must remain plausible, rather than hypothetical or tenuous. *Bellon*, 732 F.3d at 1142. Causation is particularly challenging for plaintiffs to establish when, as here, the challenged law does not regulate plaintiffs directly. *Lujan*, 504 U.S. at 562. A plaintiff may not "rely on speculation about the unfettered choices made by independent actors not before the courts." *Clapper*, 568 U.S. at 415, n. 5 (quotation marks omitted). Rather, they must show that the "third parties will likely react in predictable ways" that will likely injure plaintiffs. *All. for Hippocratic Med.*, 602 U.S. at 380 (citation omitted).

Plaintiffs fail to satisfy the causation requirement because any possible injury to them would stem from either an individual educator or a policy in their local school districts, and not the Act itself. The Act only prohibits school districts from having forced-outing policies; it does not dictate the circumstances when this

---

[7] Plaintiffs' argument that several Parent Plaintiffs may be harmed by the Act because they "have been threatened by their child when that child was being social transitioned at school" is also baseless. Compl. ¶ 305. First, the two families alluded to have not alleged they have children who attend public schools subject to the Act. *Id.* ¶¶ 60-72 (Parent 4A), 74-93 (Parents 5A and 5B). Second, while they allege their children have threatened them in the past, there is no plausible inference that respecting the youth's name and pronouns *caused* these threats or that a hypothetical future social transition would "certainly" lead to future threats of violence. In fact, for one family, their child's alleged threats came before the child began identifying as transgender, undermining any possibility of causation. *Id.* ¶ 65-67.

13

information can or cannot be shared, a decision that is ultimately set by local school districts and implemented by staff. Parent Plaintiffs have not established that any school district policies are attributable to the Act or that, without the Act, their districts would have policies that would not allegedly harm Plaintiffs. In fact, school policies protecting the privacy of Parent Plaintiffs' children preexisted the Act. *See e.g.*, Compl. ¶¶ 15, 42, 55, 70. Further, to the extent their hypothetical injuries were predicated on district policies that require student consent in most instances, the chain of causation would be doubly speculative and attenuated because they would also rely on the independent actions of their children not consenting to disclosure.

Parent Plaintiffs also fail to show redressability. While related to causation, redressability further examines the "connection between the alleged injury and requested judicial relief." *Bellon*, 732 F.3d at 1146. Here, enjoining the Act would not redress Parent Plaintiffs' hypothetical future injuries because the Act only prohibits forced-outing policies that do not exist at their schools. In other words, an injunction would have no effect on the actual local district policies that do already exist and purportedly may injure the parents in the future. Moreover, it is clear Plaintiffs' real dispute is not over schools keeping student's gender identity private—information the Parent Plaintiffs all already have—but with their children's underlying gender identity and their schools' willingness to provide a safe space by accommodating social transitions—a practice to which they object. *See e.g.*, Compl. ¶¶ 24, 37, 88, 90, 122, 140, 143, 158, 306. But this is not relief they can obtain by attacking the Act, which does not dictate how schools respond to requests by students to use a different name or pronouns—or to requests by their parents not to do so. For these reasons, Parent Plaintiffs' claims should be dismissed.

**C.    The Governor Enjoys Eleventh Amendment Immunity and Should Be Dismissed**

Governor Newsom should be dismissed from this case under the Eleventh Amendment because he does not have any responsibility for enforcement of the Act.  The Eleventh Amendment generally bars federal lawsuits brought against a state.  "It does not, however, bar actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)).  For this exception to apply, the official must have "some connection" with enforcement of the challenged act.  *Ex parte Young*, 209 U.S. at 157.  The connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."  *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998) (citation omitted).  The relevant inquiry then is "whether a named state official has direct authority and practical ability to enforce the challenged statute." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846-847 (9th Cir. 2002) (barring injunctive and declaratory relief claims against Governor and cabinet official, as they did not "have the requisite enforcement connection" to challenged ballot proposition).

Plaintiffs have failed to allege the "direct" connection between Governor Newsom and the challenged Act required to overcome Eleventh Amendment immunity.  They do not allege that he has any direct role with respect to enforcing the Act.  Instead, they simply allege that "[t]he California Constitution vests 'the supreme executive power of this State' in the Governor," and that he "'shall see that the law is faithfully executed.'"  Compl. ¶ 160 (citing Cal. Const. art. V, § 1).  But this generalized duty to enforce California law is insufficient to overcome Eleventh Amendment immunity.  *See, e.g., Ass'n des Eleveurs de Canards et d'Oies du*

15

1    *Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (holding governor was entitled

2    to Eleventh Amendment immunity in suit "because his only connection to [the

3    challenged statute] is his general duty to enforce California law"); *Davis*, 307 F.3d

4    at 847; *S.B. by & through Kristina B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218,

5    1236 (E.D. Cal. 2018) (holding the governor enjoyed immunity because he "has no

6    alleged factual connection to the enforcement of the California Education Code,

7    other than a general duty to enforce California law as the governor").  Because

8    Plaintiffs cannot overcome Eleventh Amendment sovereign immunity, the

9    Governor should be dismissed.

10   **II.  THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' CLAIMS BECAUSE THEY FAIL TO STATE COGNIZABLE CLAIMS AS A MATTER OF LAW**

11

12         **A.  Parent Plaintiffs' Substantive Due Process Claims Fail**

13       Parent Plaintiffs allege the Act violates their parental rights under the Due

14   Process Clause, because it prohibits school districts from adopting or enforcing

15   forced-disclosure policies.  As a threshold matter, assuming such a right existed,

16   Plaintiffs fail to meet the relevant standard for their facial challenge to the Act

17   because there are instances where disclosure is permitted.

18       Furthermore, the Act does not violate the Due Process Clause because parents

19   do not have a fundamental right to force school staff to report their child's gender

20   identity, gender expression, or sexual orientation.  Also, the parental right regarding

21   a student's medical care is not implicated because the Act does not involve medical

22   treatment.  And, even assuming any substantive due process right was implicated

23   by the Act (and none is), it withstands constitutional scrutiny.

24            **1.  Parent Plaintiffs' Facial Challenge Fails Because They Cannot Show the Act Would Be Invalid in Every Circumstance**

25

26       Parent Plaintiffs challenge the Act on its face, seeking to strike it down in its

27   entirety based on alleged parental substantive due process rights.  *See* Compl. at

28   58:3-9 (seeking "injunctive relief preventing Defendants from enforcing AB

1  1955"); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)

2  (facial challenge seeks to "invalidate[] the law itself").  Plaintiffs' decision to bring

3  a facial challenge "comes at a cost."  *Moody v. NetChoice, LLC*, 144 S. Ct. 2383,

4  2397 (2024).  A facial challenge is "the most difficult challenge to mount

5  successfully, since the challenger must establish that no set of circumstances exists

6  under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745

7  (1987).

8      Parent Plaintiffs cannot meet that standard because the Act—some provisions

9  of which have nothing to do with the alleged injuries and claims here (see RJN Ex.

10  1 at § 3 (directing CDE to develop resources to support families and schools)—

11  permits many scenarios through which information about their student's gender

12  identity and/or gender expression will be disclosed to parents, including at least the

13  following:

14      • When a school district adopts a policy requiring notification to parents,

15        with the student's consent, and school staff makes such a disclosure with

16        student consent.

17      • When a school district adopts a policy that permits disclosure without

18        student consent if state law pertaining to student safety requires parental

19        notification, and information is conveyed to parents through that

20        provision.

21      • When districts disclose information to parents to comply with

22        requirements imposed by state or federal law.

23      • When parents exercise their existing rights to visit schools and

24        classrooms, so they can be involved in school and their child's lives in

25        ways that would give them the ability to learn more about their child.

26      • When students and parents initiate conversations about gender identity,

27        gender expression, and sexual orientation with each other in the time and

28        manner of their own choosing; the Act promotes such family discussions

17

1    through supports.  *See* Cal. Educ. Code, §217.

2        Thus, even assuming a due process right to compel schools to disclose to

3    parents that their child is presenting with a different gender expression, or using a

4    different name or pronouns than assigned at birth, or is gay (which there is not), the

5    Act does not implicate such a right—and thus no there would be no violation—in

6    these circumstances.  Because Parent Plaintiffs cannot meet their burden of

7    showing "no set of circumstances exists under which the Act would be valid," their

8    claims should be dismissed in their entirety.  *See Salerno*, 481 U.S. at 745.

9                **2.    Substantive Due Process Does Not Require Schools to**
                         **Notify Parents of a Student's Gender Identity, Gender**
10                       **Expression, or Sexual Orientation**

11       Parent Plaintiffs' claim that they have a substantive due process right to forced

12   disclosure by schools of information regarding their students' gender identity,

13   gender expression, and sexual orientation (Compl. ¶¶ 352-355), fails because it is

14   foreclosed by precedent.  The Ninth Circuit, based on longstanding Supreme Court

15   precedent, has confirmed that while parents have a substantive due process right to

16   choose their child's educational forum, they do not have a substantive due process

17   right to direct their chosen school's policies, administration, or curriculum.  As

18   such, courts have repeatedly dismissed due process challenges to school policies

19   across a range of contexts that parents argued implicated important aspects of their

20   child's upbringing.  Parent Plaintiffs' substantive due process claim should be

21   dismissed for the same reason.

22       There is no substantive due process right to compel schools to adopt a policy

23   that requires school staff to discriminate against transgender and gender

24   nonconforming students or place them in harm's way.  The Due Process Clause of

25   the Fourteenth Amendment generally "protects an individual's fundamental rights

26   to liberty and bodily autonomy."  *C.R. v. Eugene School Dist. 4J*, 853 F.3d 1142,

27   1154 (9th Cir. 2016).  The Supreme Court has repeatedly made clear that parental

28   due process rights have "limited scope" in the educational context.  *Norwood v.*

                                          18

*Harrison,* 413 U.S. 455, 461 (1973); *Runyon v. McCrary*, 427 U.S. 160, 177 (1976).  In *Runyon*, the Court rejected the claim that parental rights permitted schools to discriminate against students, stating that parental rights to direct the upbringing of their children—in the school context—are limited to the facts of *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (right to send child to private school) and *Meyer v. Nebraska*, 262 U.S. 390, 397, 403 (1923) (right to provide instruction in languages other than English at private school).  *Runyon*, 427 U.S. at 177.  It has stressed that those precedents do not afford parents a constitutional right to a "private school education unfettered by reasonable government regulation."  *Id*. at 163, 177-78.  Thus, the rights recognized in *Pierce* and *Meyer* do not support creating a parental right to force school staff to notify parents of a student's sexual orientation, gender identity or expression, absent student consent, or to constitutionally prohibit the State from enacting law that forecloses such local policies.

Further, there is no infringement of a parental right where, as here, the Act does not require or prohibit any action by parents, in contrast to the laws at issue in *Meyer* and *Pierce*.  *See, e.g., Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health, 503 F.3d 256, 263-64* (3rd Cir. 2007) (no parental right at stake where public health clinics gave contraception to minors without parental consent, because clinics did not compel the minors in any way, including not forbidding them from talking with their parents).

Following from that precedent, the Ninth Circuit has repeatedly held that a parent has no substantive due process right to control the administration, policies, curriculum, or operations of their student's school.  *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1231 (9th Cir. 2020); *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 711 (9th Cir. 2019); *Fields v. Palmdale Sch. Dist*., 427 F.3d 1197, 1204-1207 (9th Cir. 2005), *amended on denial of reh'g en banc*, 447 F.3d 1187 (9th Cir. 2006).  A parent may choose their student's educational forum without state

interference, but once that decision is made, the parent's fundamental right to control that education is "substantially diminished." *Fields*, 427 F.3d at 1206. A parent has no substantive due process right to dictate how a school operates its learning environment, even where a school's chosen policy conflicts with the parent's beliefs about how best to raise their student. *See Parents for Priv.*, 949 F.3d at 1231 (parents are entitled to inform their child about sex and gender identity, but have no substantive due process right to override school policy allowing students to use facilities associated with their gender identity.) Allowing this kind of claim would amount to imposing an obligation on schools to "accommodate the personal, moral or religious concerns of every parent," which "would not only contravene the educational mission of the public schools, but also would be impossible to satisfy." *See Fields*, 427 F.3d at 1206.

District courts have applied this framework and precedent in a number of recent challenges to school districts' policies or practices regarding social transition of students, and held that parents do not have a substantive due process right to be notified of their student's transgender or gender nonconforming identity by the school district. *See, e.g., Regino v. Staley*, 2023 WL 4464845, at *3-4 (E.D. Cal. July 11, 2023), *appeal docketed,* No. 23-1601 (9th Cir. July 21, 2023); *Foote v. Town of Ludlow*, 2022 WL 18356421, at *5, 9 (D. Mass. Dec. 14, 2022), *appeal docketed*, No. 23-1069 (1st Cir. January 17, 2023); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*, 622 F. Supp. 3d 118, 130 (D. Md. 2022), *vacated and remanded based on lack of standing*, 78 F.4th 622 (4th Cir. 2023), *cert. denied sub nom. Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 144 S. Ct. 2560 (2024); *Blair v. Appomattox Cnty. Sch.l Bd.*, 2024 WL 3165312 at *6 (W.D. Va. June 25, 2024), *appeal docketed*, No. 24-1682 (4th Cir. July 24, 2024); *Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*, 2024 WL 706797 at *11 (D.N.J. Feb. 21, 2024).

### 3. The Act Does Not Implicate Parental Rights Related to the Refusal of Medical Care for Their Children

Parent Plaintiffs also invoke the parental right to refuse medical treatment for their minor children to support their argument for forced disclosure policies when students socially transition at school. Such parental rights are irrelevant here because the Act does not address or impact medical care or treatment.

Medical treatment is what licensed healthcare professionals provide their patients in the course of diagnosis and treatment, consistent with the regulated practice of medicine. *See, e.g.*, *Shanks v. Blue Cross & Blue Shield of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992). Accordingly, courts have recognized a parental substantive due process right related to medical care for their children with respect to in-patient hospitalization for mental illness, *Parham v. J.R.*, 442 U.S. 584, 604 (1979), medical examination of a child in protective custody, *Mann v. Cnty. of San Diego,* 907 F.3d 115, 1162 (9th Cir. 2018), spinal taps, *Mueller v. Auker,* 700 F.3d 1180, 1186-89 (9th Cir. 2012), and blood draws to test for disease, *Kanuszewski v. Michigan Dep't of Health and Hum. Serv.,* 927 F.3d 396, 411-12, 415-16 (6th Cir. 2019). By contrast, referring to a transgender person by their chosen name and pronouns is not medical treatment—it is not regulated as a form of medical care, nor does doing so require any diagnosis or licensure. Anyone can respect a transgender person's identity, and doing so is a matter of courtesy and respect, not medical care. Parent Plaintiffs' allegation otherwise, *see* Compl. ¶¶ 312-313, is implausible.[8] *See, e.g.*, *Foote*, 2022 WL 18356421 at *5 ("Plaintiffs have failed to

---

[8] Plaintiffs refer to "social transitioning," Compl. ¶¶ 312-313, which they distinguish from "chemical and surgical transitioning," *id.* ¶ 220. They use "social transitioning" to primarily refer to a student using a different first name and pronouns. *See, e.g.*, *id.* ¶¶ 14-17, 43-45, 55-66. Plaintiffs cite *Parents for Priv.*, 949 F.3d at 1210, to support their allegation that social transitioning is "recognized as a medical intervention" (Compl. ¶ 214), but the case does not support that allegation. There, the Ninth Circuit considered a school policy that allowed transgender students to use bathroom and locker room facilities consistent with their gender identity. It held that the policy did not implicate any parental substantive due process right, and characterized the policy as one intended to promote a better learning environment for students, not one having anything to do with medical care. *Parents for Priv.*, 949 F.3d at 1217-18.

1    adequately allege that Defendants provided medical or mental health treatment . . .

2    simply by honoring their requests to use preferred names and pronouns at school");

3    *Regino*, 2023 WL 4464845 at *3 (rejecting as conclusory the allegation that

4    permitting social transitioning at school constitutes medical treatment).

5          Furthermore, having gender nonconforming expression or a transgender

6    identity is not, in itself, a medical condition.  *See, e.g.*, *Grimm v. Gloucester Cnty.*

7    *Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (while

8    gender dysphoria is a recognized mental health disorder suffered by some gender

9    nonconforming individuals, being transgender is "not a psychiatric condition, and

10   implies no impairment in judgment, stability, reliability, or general social or

11   vocational capabilities").  Social transitioning is not limited to individuals who

12   suffer from gender dysphoria.  Moreover, even for individuals with gender

13   dysphoria, the mere fact that social transition has recognized benefits for their well-

14   being does not render it medical treatment giving rise to a parental substantive due

15   process right.   For example, "aerobic exercise" has recognized benefits and is thus,

16   at times, described as a "treatment."  *Johnson v. Astrue*, 597 F.3d 409, 411 (1st Cir.

17   2009).  But it is not credible to claim that schools perform medical treatment on

18   students by permitting them to run on a playground.  Because the Act does not

19   implicate medical interventions, Parent Plaintiffs' reliance on parental rights related

20   to their children's medical care is misplaced.

21          **4.    The Act Survives Review, Whether Rational Basis or Strict**
22          **Scrutiny Applies**

23          Because there is no fundamental parental right to forced disclosure of

24   Plaintiffs' children's gender identity, gender expression, and sexual orientation,

25   there need only be a "reasonable relation to a legitimate state interest" to justify the

26   Act.  *Fields*, 427 F.3d at 1208 (applying rational basis review to parental

27   substantive due process claim).  The State has a legitimate, and even compelling,

28   interest in protecting transgender and gender nonconforming students from bullying

and harassment, and in fostering a safe and supportive school environment where students are not outed before they are ready.  *See, e.g., New York v. Ferber*, 58 U.S. 747, 756 (1982) (state interest in "safeguarding the physical and psychological well-being of a minor" is compelling); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3rd Cir. 1980) (policy served compelling state interest in not discriminating against transgender students); *Parents for Priv.*, 949 F.3d at 1238 ("[T]he Student Safety Plan is rationally related to the legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status"); *Fields*, 427 F.3d at 1209; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (recognizing "long history of discrimination against transgender people") *cert. denied*, 143 S. Ct. 2414 (2023). The Legislature specifically enacted the Act to support and protect transgender, gender nonconforming, and gay students from such harms.  *See supra*, at 2-6; RJN Ex. 1 at § 2 (setting forth Legislative findings for the Act).

The Act also supports the compelling governmental interest in protecting LGBTQ students' privacy.  *See, e.g.*, Cal. Const. Art. 1, §1; *Ngoun v. Wolf*, 517 F. Supp.2d 1177, 1191 (C.D. Cal. 2007) (student had "[c]onstitutionally protected privacy right with respect to disclosure of her sexual orientation" by school administrators to her parents); RJN Ex. 1 at § 2(g); *In re M.T.*, 2024 WL 4614003 at *7-9 (Cal. Ct. Appeal) (transgender person has a right to informational privacy in limiting the timing and amount of the disclosure of confidential information).

Even if strict scrutiny applies here (and it does not), the Act would meet that standard too.  *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (government infringement on "fundamental" right must be narrowly tailored to serve a compelling state interest).  It is narrowly tailored in furtherance of the State's compelling interest in protecting students because, as previously discussed, it only precludes districts from adopting and enforcing forced-disclosure policies, while permitting mandatory disclosure when a student consents or in circumstances where

23

it would otherwise be required by state or federal law.  Cal. Educ. Code, §§ 220.3, 220.5.  The Act also allows districts to adopt policies that lay out other permissible circumstances for parental disclosure.  *See supra* at 5-6,17-18.  Moreover, it supports families of LGBTQ students by offering resources for them and their districts (Cal. Educ. Code, § 217), which may facilitate open communications between LGBTQ students and their parents, with district support.  Thus, the due process claims should be dismissed.

### B.    Parent Plaintiffs' Unconstitutional Conditions Claim Fails Because It Is Derivative of Their Failed Due Process Claims

Parent Plaintiffs further allege that the Act violates the "unconstitutional conditions" doctrine.  Specifically, they argue that the Act conditions "the benefit of taxpayer funded education" on parents ceding their alleged "parental rights to refuse medical treatment and make executive decisions for their child" to the state, forcing them "to choose between removing their children from California's public and charter schools or sacrificing the benefit of an education that they pay for with their own tax dollars."  Compl. ¶¶ 330-34; *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("the government may not deny a benefit to a person because he exercises a constitutional right").  However, Plaintiffs first must identify a fundamental right that the Act purportedly forces them to give up, which they cannot do.  *See e.g., Parents for Priv.*, 949 F.3d at 1225 n.12 (because plaintiffs failed to show a violation of a substantive due process right, their unconstitutional condition argument based on that asserted right "also fails").  "If the asserted right is not protected by the Constitution," then any conditions allegedly placed on the asserted right "cannot be constitutionally impermissible."  *Id.* (citing *Koontz*, 570 U.S. at 604.)  Parent Plaintiffs' claim fails because it is wholly derivative of their deficient substantive due process claims.

24

### C. The City's Declaratory Relief Claim Fails Because It Is Derivative of Parent Plaintiffs' Due Process Claims

The City alleges that under the Supremacy Clause, there is "no true conflict" between its Ordinance forbidding educators in the City from "withhold[ing] any information related to a child's sexual orientation, gender identity, or gender expression from parents" and the Act, because the Act allegedly violates the Fourteenth Amendment.  Compl. ¶¶ 360-61.  On that basis, the City requests a declaration that the Act, "or alternatively, the California statutes and constitutional provisions on which [it] is based," violate the Fourteenth Amendment, and "provides no obstacle" to the Ordinance.  *Id*. ¶ 362.  The City alternatively seeks a declaration that "disclosure of social transitioning, and issues regarding sexual orientation, gender identity, and gender expression to parents is required by federal law."  *Id*.  But this claim fails too because it is derivative of the underlying substantive due process allegations.  *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1097 (N.D. Cal. 2022) (dismissing declaratory relief claim after all underlying claims were dismissed); *Martinez v. Newsom*, 46 F.4th 965, 972-973 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1782 (2023) (a claim for declaratory relief, standing alone, is insufficient to confer jurisdiction).

## CONCLUSION

For the reasons above, Plaintiffs' claims should be dismissed in their entirety without leave to amend.

Dated:  November 12, 2024                    Respectfully submitted,

ROB BONTA
Attorney General of California

*Jennifer Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for Defendants*

25

1 | **CERTIFICATE OF COMPLIANCE**

2 |   The undersigned, counsel of record for Defendants, certifies that this brief

3 | contains 25 pages, which complies with the page limit set by the Judge Marshall's

4 | Standing Order, Section 7(c).

5 | Dated:  November 12, 2024       Respectfully submitted,

6 |               ROB BONTA
              Attorney General of California

7 |

8 |

9 |               JENNIFER A. BUNSHOFT
              Deputy Attorney General

10 |               *Attorneys for Defendants*

11 |

12 | SA2024304292
67227487.docx

26