Michael E. Gates, City Attorney (SBN 258446)
OFFICE OF THE CITY ATTORNEY
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
michael.gates@surfcity-hb.org
*Counsel for Plaintiff City of Huntington Beach, a
California Charter City, and Municipal Corporation*

Donald M. Falk (SBN 150256)
SCHAERR | JAFFE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr*
Stephanie L. Freudenberg*
Justin A. Miller*
Aaron C. Ward*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
sfreudenberg@schaerr-jaffe.com
jmiller@schaerr-jaffe.com
award@schaerr-jaffe.com

Nicholas Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. S.E., #231
Washington, DC 20003
(202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs City of Huntington Beach, a California
Charter City, and Municipal Corporation; and Parents 1A-10A*

1

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, PARENTS 1A-9A,

           Plaintiffs,

v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California; and TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 8:24-cv-02017-CBM(JDEx)

**AMENDED COMPLAINT**

**ACTION SEEKING STATEWIDE RELIEF**

**AMENDED COMPLAINT**

Plaintiff City of Huntington Beach ("Huntington Beach") and Parents 1A-10A, through undersigned counsel, file this Amended Complaint for declaratory and injunctive relief against Defendants Robert Bonta and Tony Thurmond, in their official capacities (collectively, "Defendants").

**INTRODUCTION**

Gender dysphoria is a mental health disorder according to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").[1] Yet Assembly Bill 1955 ("AB 1955") prevents schools from requiring that parents be informed when their child requests the government's

---

[1] Natlie J. Nokoff, *Table 2: DSM-5 Criteria for Gender Dysphoria, Medical Interventions for Transgender Youth in,* Endotext (Kenneth R. Feingold et al. eds., 2022), https://tinyurl.com/3ryx234v.

2

help in diagnosing, managing, or treating this mental health disorder, such as by requesting social transitioning treatment like being called by a different name and pronouns.

And AB 1955 sets no age limit—schools cannot be required to notify parents even if preschoolers request or are offered treatment for gender dysphoria.

Furthermore, AB 1955 prevents schools from disciplining in any way employees who are initiating or facilitating social transitioning, which courts have recognized is a type of medical intervention or treatment for gender dysphoria, *see, e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024) (listing "social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents" as "medical treatment for gender dysphoria"), and that medical professionals have recognized inflicts serious short-term and long-term harm.

In short, AB 1955 enables secret social transitioning at school, harming parents, children, and communities by cutting parents out of their right to notice and consent to their minor children's treatment. And this usurpation has inevitable side effects, including failure to diagnose or treat other mental health issues that children with gender dysphoria often have. To help their child, parents need to know what is going on. Imagine the outrage if parents were kept in the dark about a child's epileptic seizures at school and the treatment school employees provided for that condition.

Determining whether a child has a medical condition like gender dysphoria and how to treat it are personal and private questions, not educational issues to be dictated by the State. The State is thus intruding in a very personal, private matter—communication on one of the most intimate of topics between a parent and child—in violation of the U.S. Constitution.

AB 1955 violates the 14th Amendment of the U.S. Constitution, which guarantees the right of parents to make decisions about their minor children,

particularly regarding the right to refuse medical treatment—in this case, social transitioning. AB 1955 substitutes teachers and schools into that parental role, allowing them to actively encourage and participate in socially transitioning kids without telling the parents.

The purported justifications for AB 1955, California statutory and constitutional protections for minor children of privacy and against discrimination, must give way to the federal Constitution's protections for parental rights— particularly because AB 1955 arrogates parental rights to the State without requiring any finding that parents have been abusive or neglectful.

To protect parents and children in Huntington Beach, as well as the City's economy, the City passed an ordinance that prohibits educators within the city limits from keeping parents in the dark regarding gender issues. That ordinance is in direct conflict with AB 1955. At least two Parent Plaintiffs and their children are protected by that ordinance.

To protect parental rights guaranteed by the U.S. Constitution, to protect children who need parents to know their medical situation, and to protect communities who suffer when parents and children suffer, the City of Huntington Beach and a group of Parent Plaintiffs have brought this suit. This lawsuit seeks declaratory and injunctive relief regarding the unconstitutionality of AB 1955, and any other state statutes or constitutional provisions upon which it purports to be based.

## JURISDICTION AND VENUE

1.    This case presents federal questions arising under the Constitution of the United States and seeks relief for the deprivation of federal rights under color of state law. This Court accordingly has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

2.     This Court has authority to award Plaintiffs declaratory relief pursuant to 28 U.S.C. § 2201, and injunctive relief under 28 U.S.C. §§ 1343, 2202, and Rule 65 of the Federal Rules of Civil Procedure.

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

***The City Plaintiff***

4.     Plaintiff City of Huntington Beach is and at all relevant times was a Municipal Corporation and Charter City.[2]

5.     The City of Huntington Beach was constituted by its people and incorporated on February 17, 1909. Since adoption of its Charter on May 17, 1937, the City of Huntington Beach is a Charter City created by the consent of the people within its jurisdiction and authorized by Article XI, Section 5 of the California Constitution to exclusively govern municipal affairs.

6.     The City of Huntington Beach has nearly 200,000 residents, including parents and children. There are also 35 elementary schools and five high schools located in the City.

---

[2] City of Huntington Beach, State of California Charter (as amended), available at https://tinyurl.com/bddhj49c.

***The Parent Plaintiffs***

***Family 1***

7.     Parent 1A is a citizen and resident of California, and the mother of a 17-year-old biological girl who struggles with gender identity issues, and who will be referred to as 1C.

8.     1A is an African American and Jewish woman who considers herself a "lifelong liberal democrat."

9.     For the 2024-2025 school year, 1C attends the Twelfth Grade at a public school in Los Angeles County.

10.     In 2021, 1A was cleaning 1C's room, and discovered a notebook with drawings depicting self-harm and the bloody aftermath of "gender transition" surgeries, and a discussion of suicidal ideation and an intention to "come out" as a member of the opposite sex.

11.     1C followed through on her stated plan to "come out" to her parents.

12.     Later in 2021, 1C began the Ninth Grade at a public high school. 1C agreed with her parents to use her given name while at school.

13.     At the start of the school year, 1C was asked by school employees for her preferred pronouns.

14.     Teachers and administrators began "socially transitioning" 1C, referring to her by a male name and male pronouns.

15.     The principal of the school pulled 1C aside for a meeting to tell 1C that the principal and teachers were mandated to not tell 1A about 1C's social transitioning.

16.     And one school staff person even made 1C a new school identification card with the male name.

17.     1A discovered the social transition only at the end of the school year, after noting the male name used on a biology assignment.

6

18. As 1C entered the Tenth Grade in the 2022-2023 school year, teachers and administrators continued referring to 1C by a male name and male pronouns.

19. 1A requested multiple meetings with the school principal, but she was repeatedly denied. And when 1A was finally able to secure a meeting with the principal, she was informed, without notice, that the principal was inviting additional officials to the meeting.

20. Due to the lack of progress from attempts to meet with school officials, 1A began attending school board meetings.

21. In addition, 1A was forced to file multiple public record requests and retain an attorney to protect her parental rights and the mental health of her daughter.

22. Towards the end of this school year, 1A was able to secure an agreement with the school district specifying that 1A would be informed if 1C began going by a male name or male pronouns.

23. In the 2023-2024 school year, 1C again began going by a male name and male pronouns, prompting the principal to arrange a meeting with 1A.

24. Following 1A's request for the school to stop using male names and pronouns for 1C, repeated communications from 1A's attorney, and a written statement by 1C agreeing to use her legal name and female pronouns, the school agreed not to call 1C by a male name or use male pronouns.

25. 1A reports that, as far as she is aware, 1C no longer identifies as the opposite sex and is "becoming herself again."

26. 1A desires to be notified by the school if 1C expresses gender dysphoria or gender-confused behavior in the future, especially if 1C's teachers are attempting to socially transition 1C.

27. 1A fears that once AB 1955 goes into effect, the school will once again not inform her if 1C expresses any symptoms of gender dysphoria or if teachers again start to socially transition 1C.

28.   AB 1955 thus undermines her hard-won contractual rights, her parental rights, and her ability to protect her daughter's mental health. With 1A cut out of her child's treatment, she will have no way of knowing if 1C again decides to request social transitioning from her public school.

29.   Indeed, 1C's school has already erred on the side of nondisclosure when given any colorable legal justification to do so. For instance, it cited AB 1266 to deny 1A's requests for meetings and records and continued to do so until corrected by 1A's attorney.

### *Family 2*

30.   Parent 2A is a citizen and resident of California, and the mother of 2C, a middle-school-aged biological girl who struggles with gender confusion.

31.   2A is a self-described liberal democrat, and she supports the LGBTQ+ community.

32.   For the 2024-2025 school year, Child 2C attends the Seventh Grade at a public school in San Diego County.

33.   2C completed the Fifth Grade in the 2022-2023 school year, which ran from August 2022 to June 2023.

34.   During this school year, 2C was introduced to the concept of a "gender spectrum," and shortly thereafter modified her style of dress and haircut.

35.   Unbeknownst to her parents at the time, 2C began identifying as "trans," despite never having discomfort with her gender before.

36.   Also unbeknownst to her parents, 2C had joined a friend group with four other girls, who had similarly become "trans-identified" despite no history of gender confusion.

37.   Her parents suspected that their daughter was having issues with gender confusion. 2C became increasingly socially withdrawn and developed intense anxiety.

8

38. In January 2023, 2C started therapy when 2A and her husband, 2C's father, noticed the anxiety and the change in behavior. 2A and her husband are unaware if the "trans identity" was discussed during therapy. When asked, the therapist told 2A and her husband that gender confusion had been mentioned but that she was not comfortable treating gender dysphoria and referred them to a gender specialist. The therapy group that this therapist is associated with has a LGBTQ+ confidentiality policy. 2A and her husband did interview several gender specialists, but those therapists all follow California protocols that mandate gender affirming care, which 2A and her husband believe is the wrong approach for 2C who is questioning her gender.

39. During the summer of 2023, 2A and her husband discovered a secret YouTube account that 2C had created to continue research into her "trans identification." They then applied strict restrictions to block content not appropriate for children. This block eliminated the trans content appearing in her account.

40. In August 2023, the therapist for anxiety ended the therapy right before the new Sixth Grade school year. The therapist believed that 2C was fully well adjusted and had the tools to deal with her anxiety.

41. 2C started Sixth Grade—considered middle school in her district—in the 2023-2024 school year.

42. Teachers began using a male name and male pronouns for 2C at the start of school year: August 2023. 2A and her husband were not informed of the change.

43. In December of 2023, 2C "came out" to her parents as "trans-identified." 2C admittedly was not sure what being "trans" meant for her, but that she was still figuring it out. 2A and her husband believe that the continued celebration and social transition of 2C by the school had further pushed 2C to identify as "trans."

44.    Further concealing the development from her parents, all email correspondence used 2C's correct name and female pronouns, but the male name and male pronouns were used for many homework assignments, and by one of her teachers signing her yearbook.

45.    This social transitioning impaired 2C's academic record. For instance, 2C was once marked absent when a substitute teacher was unaware of the discrepancy between her legal name on the attendance sheet and the male name she was using.

46.    2C has since agreed with her parents to use her legal name and female pronouns with all school staff.

47.    2A desires to be notified by the school if 2C expresses gender dysphoria or gender-confused behavior in the future, especially if 2C's teachers are attempting to socially transition 2C.

48.    2C is on the verge of tumultuous teenage years and may again exhibit symptoms of gender confusion. If the school again socially transitions 2C, and 2A is not informed, her parental rights, 2C's mental health, and 2C's academic records could be placed at risk.

49.    In addition, if 2A is kept unaware of any other mental health issues associated with 2C's gender dysphoria, she will be unable to respond to those issues and get 2C proper medical treatment. Such issues could eventually lead to permanent psychological and physical damage.

50.    AB 1955 exacerbates these risks and undermines 2A's agreement with 2C by significantly reducing the likelihood of any disclosure to 2A by school employees.

### *Family 3*

51.    Parent 3A is a California citizen and resident of Los Angeles County, and is the mother of 3C, a young boy at elevated risk for gender confusion.

52.    For the 2024-2025 school year, Child 3C attends Second Grade at a public elementary school in Los Angeles County.

53.    3C is a 7-year-old boy with autism spectrum disorder, which places him at higher risk of gender dysphoria.

54.    3C's best friend at school is a girl, and he prefers to play with girls rather than boys. He is very interested in colors, patterns, symbols, and rainbows.

55.    Untrained teachers and other government officials making diagnoses and treatment decisions about 3C without input from 3A, who knows her child better than a school official ever could, may mistake 3C's friendships with girls and his interests as indications of gender confusion.

56.    3A is aware of another boy attending Second Grade at 3C's school who comes to school dressed as a girl.

57.    Because of 3C's autism spectrum disorder and his elementary school curriculum's discussion of gender issues at an early age, 3A and her husband, 3C's father, are concerned 3C is at a significantly elevated risk of being diagnosed by school officials with gender dysphoria or similar disorders. Because these officials do not understand his full health profile, they are not equipped to make treatment decisions, including social transitioning.

58.    To address these concerns, 3A and her husband met with the school principal at the start of the 2023-2024 school year to discuss relevant policies.

59.    The principal confirmed that the school will not notify 3A or her husband if 3C begins expressing doubts about his gender, changes his name or pronouns, or desires to socially transition.

60.    The principal also confirmed that the school will go beyond mere nondisclosure and will actively support a "social transition" if 3C requests one, with no notice to 3C's parents.

11

61.    3A desires to be notified by the school if 3C expresses gender dysphoria or gender-confused behavior in the future, especially if 3C's teachers are attempting to socially transition 3C.

62.    Nondisclosure places 3C at significant risk for being misdiagnosed with gender dysphoria due to his autism spectrum disorder, which could exacerbate his existing mental health issues and contribute to additional ones. Accordingly, 3A faces a significant risk to her parental rights and right to notice and consent to treatment of her minor child.

63.    In addition, because of AB 1955, 3A has felt forced to begin discussing gender issues with 3C at a much earlier age than she would have otherwise, to ensure she is not caught by surprise by a sudden transition.

64.    The anticipation of AB 1955 going into effect has thus caused 3A to alter her parenting in ways she is not comfortable with but feels are necessary, as AB 1955 exacerbates the risks to her parental rights and her son's health.

### *Family 4*

65.    Parent 4A is a citizen and resident of California and is the mother of a 16-year-old biological girl who struggles with gender identity issues, and who will be referred to as 4C.

66.    4C struggles with mental health issues including depression, autism, ADHD, and psychosis.

67.    In the Fourth Grade, 4C began to be bullied as her learning difficulties became more obvious to her peers.

68.    In the Fifth Grade, 4C was sexually assaulted by classmates, a fact that was either unknown to her school or intentionally withheld from her parents.

69.    In the Sixth Grade, 4C's mental health problems worsened, and she was placed on an Individualized Education Plan.

70. Nonetheless, potentially violent symptoms—including a statement to 4A that 4C could have killed her in her sleep—prompted 4A to engage a therapist and a psychiatrist for 4C.

71. During the course of this treatment, 4C disclosed the sexual assault incident in the Fifth Grade to a therapist and to her parents.

72. As her mental health issues worsened, 4C began identifying as "trans."

73. To attempt to find a healthy environment for 4C, 4A and her husband, 4C's father, transferred her to several different public schools.

74. School faculty generally referred to 4C using a masculine name and "they/them" pronouns.

75. This social transitioning treatment occurred even though 4A referred to 4C with her legal name and feminine pronouns at Individualized Education Plan meetings, and also informed the school that 4C was experiencing severe mental health issues.

76. For the 2024-2025 school year, 4C attends a non-public nonsectarian school ("NPS") that provides services to public school students with disabilities. 4C's tuition at the NPS is paid by the public Local Education Agency that placed her in the NPS.

77. Closely communicating with 4C's teachers is crucial to allow 4A to understand changes in her daughter's mental health and identity.

78. 4A desires to be notified by the school if 4C expresses gender dysphoria or gender-confused behavior in the future, especially if 4C's teachers are attempting to socially transition 4C.

79. Monitoring such developments is also crucial to protecting 4A's own safety, and the safety of her family, given 4C's history of violent threats when her mental health worsens.

13

80.    AB 1955 significantly decreases the likelihood of disclosure from school employees and officials, thus making it more difficult for 4A to monitor 4C's mental health, parent her, protect her, and protect her family.

81.    4A is also the mother of a 12-year-old boy, who will be referred to as 4D.

82.    4D has been diagnosed with autism and ADHD.

83.    For the 2024-2025 school year, 4D attends a public charter school three days per week. He is homeschooled by 4A an additional two days per week.

84.    4A quit her job to more closely monitor 4C and 4D, and to homeschool 4D two days per week.

85.    4A desires to be notified by the school if 4D ever expresses gender dysphoria or gender-confused behavior in the future, especially if 4D's teachers are attempting to socially transition 4D.

86.    AB 1955 would significantly decrease the likelihood that 4D's charter school would disclose any symptoms of gender dysphoria that may be expressed by 4D, interfering with 4A's ability to monitor 4D's mental health and parent him.

### *Family 5*

87.    Parent 5A is a citizen and resident of California. She is the mother of a biological girl who struggles with identity issues and who will be referred to as 5C.

88.    Parent 5A has sole custody of 5C.

89.    For the 2024-2025 school year, 5C attends Twelfth Grade at a public high school in San Diego County.

90.    5C has long struggled with mental health, and she has been on an Individualized Education Plan since the Second Grade.

91.    She has been diagnosed with depression, ADHD, autism spectrum disorder, and sensory processing disorders.

92.    She also has a tested IQ of 130.

14

93. For the 2020-2021 school year, 5C was enrolled in a public middle school in San Diego County.

94. In May 2021, then-14-year-old 5C began identifying as "gender fluid."

95. The school's staff and faculty began referring to 5C by a male name and using non-feminine pronouns.

96. Following this social transitioning treatment, 5C displayed increasingly hostile behavioral problems, frequently screaming at and threatening 5A and her husband, 5C's stepfather.

97. She would stand over them and observe them in their sleep as part of this pattern of threatening behavior.

98. In or around early October 2022, 5C sent an email with violent imagery, expressing her desire to kill her entire family.

99. This resulted in 5C entering an assisted living facility for about eighteen months.

100. Following 5C's release from the assisted living facility in spring of 2024, she moved back in with her family and enrolled in a different public high school in San Diego County.

101. Despite explicit requests from 5A to use 5C's given name and female pronouns and avoid social transitioning treatment, the high school staff and faculty refer to 5C by a male name and use "they/them" pronouns.

102. 5A desires to be notified by the school if 5C expresses gender dysphoria or gender-confused behavior in the future, especially if 5C's teachers are continuing to attempt to socially transition 5C.

103. AB 1955 will frustrate 5A's communications with 5C's school, infringing on 5A's parental rights, interrupting Family 5's home life, undermining 5A's ability to protect 5C's mental health, and potentially exposing 5A and her husband to physical threats from 5C.

15

104. Not informing 5A regarding changes in 5C's expressed gender dysphoria and the status of her social transitioning may make it impossible to understand 5C's school environment and thus to effectively treat her mental health issues and protect themselves.

105. 5A is also the mother of a 13-year-old girl, who will be referred to as 5D.

106. For the 2024-2025 school year, 5D attends a public charter school in San Diego County.

107. 5D has been negatively impacted by her older sister 5C's struggles.

108. 5A desires to be notified by the school if 5D expresses gender dysphoria or gender-confused behavior in the future, especially if 5D's teachers are attempting to socially transition 5D.

109. If AB 1955 were to go into effect, 5A would likely not be informed if 5D begins expressing signs of gender dysphoria or gender confusion, or if the school begins to socially transition 5D.

110. This would interfere with 5A's ability to parent 5D and make decisions regarding her mental health.

### Family 6

111. Parent 6A is a citizen and resident of California, and is the father of 6C, a boy under the age of 10 who has not displayed any issues with gender confusion despite efforts to encourage him to "identify" as a girl.

112. Given the demonstrated social component of gender dysphoria treatment, especially rapid-onset gender dysphoria, cutting 6A out of treatment decisions risks misdiagnoses of any future issues.

113. For the 2024-2025 school year, 6C attends a public elementary school in Los Angeles County.

114. Prior to the initiation of divorce proceedings, 6C's mother began encouraging and facilitating 6C to dress in girl's clothing, and she began reading to

16

him from books about alternative pronouns and telling him that he could choose to be a boy or a girl.

115. Divorce proceedings culminated in joint legal and physical custody.

116. During the school year one year, 6C's mother would frequently send him to school in dresses on the days she had custody, claiming it was 6C's choice, but 6C never asked to wear dresses when he was with his father.

117. 6C's grade school teacher would inform 6A when this occurred.

118. During the divorce proceedings, 6A enrolled 6C in treatment with a child therapist.

119. 6A relies on information from 6C's teachers to allow the child therapist to make a complete and accurate diagnosis.

120. After many months of treatment, the therapist confirmed that, despite the pattern of repeated dress wearing when 6C is with his mother, 6C has no signs of gender dysphoria, gender incongruence, or transgenderism. The social transitioning treatment that took place at school was thus not warranted.

121. 6A desires to be notified by the school if 6C expresses gender dysphoria or gender-confused behavior in the future, especially if 6C's teachers are attempting to socially transition 6C.

122. Once AB 1955 goes into effect, 6A can no longer depend on being informed regarding gender issues related to his son by his son's teachers or others at his son's school.

123. This will prevent 6A from being able to parent his son in a caring, proactive way, or provide the information his son's therapist will need to accurately diagnose and continue to treat 6C.

124. Additionally, if 6C is again socially transitioned at school but 6A is now kept in the dark, as California's policies encourage, it could also threaten his joint custody rights.

125.  Thus, AB 1955 poses a threat to 6A's present and future parental rights, including his ability to ensure quality mental health treatment for 6C.

***Family 7***

126.  Parent 7A is the mother of a 16-year-old biological girl, 7C.

127.  Parent 7A describes herself as "not anti-trans" and not "opposed to same-sex marriage/partnerships."

128.  For the 2024-2025 school year, 7C attends public school in Orange County.

129.  In late 2021, 7A surprised her daughter with a particular dress that was trending online and that 7C "wanted so badly." 7C was "over-the-moon happy" about it and wore it several times.

130.  Approximately six months later, at 7C's eighth grade graduation, 7A first learned that 7C's school called her by a male name. 7A was waiting for the announcer to call her daughter's name so that she could jump to her feet, clap, shout and cheer for her. Instead, 7A heard the announcer call out a male name with 7C's last name.

131.  During 7C's freshman year of high school, the correspondence from her high school that 7A received began referring to 7C as the same male name as was announced at her eighth grade graduation.

132.  Just prior to 7C's sophomore year, 7A submitted an application for reduced-price lunches for 7C. 7A then received a phone call that they couldn't find 7C in their system, even though that school district was the only one she had been enrolled in since kindergarten.

133.  Upon calling the school district's headquarters to request they include 7C's real name somewhere in their system so that she could be found, 7A was transferred to 7C's high school counselor.

134.  The counselor refused to put 7C's real name in the system for fear that 7C would be "outed" if a substitute teacher was teaching, despite 7A pointing out

that it was a safety issue not to have 7C's real name in the system anywhere, even in an "Otherwise known as" box.

135.   7A later learned that this counselor would regularly pull 7C out of class to have "counseling sessions" with her, without 7A's permission or even knowledge.

136.   Additionally, the counselor was pulling 7C out of classes that she was failing in, keeping her from going to the next class, and in some cases, making her to completely miss lunchtime, causing her to go hungry until she got home from school.

137.   Around this time, 7C began getting severe headaches and began missing considerable amounts of school because of the headaches. Her grades "suffered terribly."

138.   During that school year, 7A had forgotten to excuse one of 7C's absences and received a call from a substitute school staff person regarding 7C's male name having an unexcused absence.

139.   When 7A informed the school employee that she did not have a child with that name, and gave the employee 7C's real name, birthdate, and address, the employee asked her for her student ID number, causing 7A to miss 15-20 minutes of work trying to find the number.

140.   At the end of the school year, 7C's counselor sent 7A an email suggesting 7C's male name enroll in summer school due to missing credits.

141.   7A responded that she did not have a child with that name, that she would appreciate if the school counselor referred to 7C by her real name when communicating with 7A, requested again that 7C's real name be entered into the school's system, and accused the counselor of trying to erase 7C.

142.   The counselor responded with an email referring to "Your student," and then reported 7A to Child Protective Services for "emotional abuse."

143.   CPS came to 7A's home and conducted interviews and an investigation but found nothing amiss and took no action.

19

144. The CPS visit "was extremely stressful" for 7A.

145. 7A desires to be notified by the school if 7C expresses gender dysphoria or gender-confused behavior in the future, especially if 7C's teachers are attempting to socially transition 7C.

146. AB 1955 entrenches the idea that 7A is not to be informed about her child's treatment and will only make the situation worse and keep her even more in the dark about her daughter.

### *Family 8*

147. Parent 8A is a California citizen and resident and is the mother of 8C, a 16-year-old biological girl who has struggled with gender identity issues since they were introduced to her in elementary school as a 9–10-year-old.

148. For the 2024-2025 school year, 8C attends a public high school in San Francisco County.

149. When 8C was only 9–10 years old and attending the Fourth Grade in San Francisco County, her elementary school brought in a private company to teach 8C sex education.

150. 8C came home very excited to educate her mother, 8A on all of the things that she had learned: that there are many pronouns, that her friend chose they/them pronouns, that someone can have a female body and a male brain or vice-versa, that there are many genders and sexual orientations, and that there are many same sex parents, including 8C's female Physical Education teacher who has children with her partner.

151. 8A told 8C that she was too young for those discussions and that her elementary school should not be teaching her those things. The discussion ended, but 8C was left with the idea that 8A doesn't like that kind of education.

152. A few years later, 8C was attending middle school in San Francisco County when the COVID-19 lockdowns began. 8C was deeply affected by her friend's move to another state (the same friend who had chosen they/them pronouns

20

in Fourth Grade). 8C's friend became very depressed at the same time 8C began going through puberty and feeling uncomfortable with her changing body.

153.   8C and her out-of-state friend began playing online games and joined some Discord servers set up as transgender safe spaces. In those groups, 8C was groomed and guided in transgenderism while playing online games. 8C and her friend formed plans to leave their families and to start different lives under transgender identities.

154.   One day, 8A's husband, 8C's father, discovered some inappropriate pictures on 8C's iPad. When he questioned 8C about them, 8C became very rebellious, which was strange as she had never disrespected her parents in that manner before.

155.   About one hour later, 8A received a phone call from the police department that 8C had run away from home, and that the police would be coming to speak with 8A and her husband. 8A let the police officers into her home, and they told her that 8C was having an emergency and was suicidal. They told 8A and her husband that because they were unaccepting parents of 8C's transgender identity, she had overdosed on her father's diabetic medicine and then run away.

156.   This sudden revelation was a shock, as 8C had never been suicidal before. 8A and her husband let the police officers search their house for any other medications. 8A and her husband were scared and blindsided, and they followed the police officers' instructions.

157.   8C was admitted twice to a mental hospital for 10 days each time of involuntary holds. The meetings with Child Protective Services were a terrible experience, where it was clear that 8A and 8C's father could not say anything or they would not be allowed to see their daughter again. CPS showed them that it had the power to take 8C away from her parents, and it proposed sending 8C to a group home.

21

158.  8A and her husband requested that their insurer and medical provider, Kaiser Permanente, provide 8C with a mental health therapist who could be respectful of their family's religious beliefs. Kaiser declined and assigned 8C a transgenderism activist. This therapist referred 8C to transgender clinics and scared 8A and her husband by telling them that if they kept insisting on religious belief requests, then CPS would take 8C to a foster home. The therapist told them that if 8A and her husband would not let 8C be transgender, then the foster care system would allow her to transition.

159.  The therapist focused on teaching 8C about privacy and confidentiality rights to the point that 8C began saying her parents were abusive. The therapist did incalculable damage to 8C's mental health.

160.  8A and her husband found another therapist outside their insurance network who aligned with their family's religious beliefs. They found this necessary to avoid the constant threat of CPS harassment. 8A and her husband paid out of pocket for every session.

161.  Kaiser sent CPS to Family 8's home. CPS reopened their case based on the insurance company's allegations that 8A and her husband were not supporting 8C, because they had skipped a Kaiser session (so that they could change therapists). 8A's second daughter, who was seven years old at the time, had to testify in defense of her parents to the police department and CPS. It was painful for 8A to see her daughters pitted against each other in this manner.

162.  Kaiser offered 8C hormone treatments and endocrinologist visits. The endocrinologist office began reaching out to 8A, and she decided to part ways with Kaiser. 8A felt that it was crazy for Kaiser to be pushing transgender hormone treatments to a 12-year-old child.

163.  8A changed their insurance to UCSF. 8C later told 8A that her stays at UCSF psych wards were similar, where children were advised to initiate Individualized Education Program plans with school counselors. 8A has found most

22

school counselors to be transgenderism activists, creating a very difficult situation for anyone, like herself, that does not subscribe to transgender ideology.

164.   When 8C began high school, 8A was told that the school needed to create a safe space for 8C. A school counselor told 8C to go to a youth shelter whenever she feels unsafe from her parents. 8C has done so.

165.   8A feels that her daughter, 8C, is getting better, although her progress is slow. If her family had been dependent on public benefits, she is not sure she would have been able to resist the combined efforts of health insurers, medical providers, schools, CPS and police officers.

166.   AB 1955 exacerbates the government efforts to shape 8C's sexuality and gender identity that Family 8 has been fighting since 8C was a child. It withholds information of the utmost intimacy about 8A's child from her, and teaches 8C that her parents are not "safe" but that keeping secrets from them is and will be facilitated by the government. It enables social transitioning treatment and perhaps further medical treatment without 8A's knowledge or consent. And it prevents any non-transgender ideological policies from being adopted.

167.   8A desires to be notified by the school if 8C expresses gender dysphoria or gender-confused behavior in the future, especially if 8C's teachers are attempting to socially transition 1C.

168.   Secret social transitioning efforts on the part of 8C's schools will exacerbate the problems that Family 8 has already faced.

169.   Thus, AB 1955 poses a threat to 8A's present and future parental rights and 8C's health and well-being.

170.   8A is also the mother to a 12-year-old girl, who will be referred to as 8D.

171.   Because of the struggles experienced by 8C, 8A is now sending 8D to a private Catholic school.

172.   It is a financial burden to pay the tuition for 8D's private school, but 8A is afraid to send her younger daughter to public school because she fears that public school will not inform her if 8D expresses symptoms of gender dysphoria and may socially transition 8D without her knowledge, as they did with 8C.

173.   AB 1955 further deters 8A from allowing 8D to attend public school, because the school will use AB 1955 to justify withholding information about 8D's mental health.

### *Family 9*

174.   Parent 9A is a resident of California, and the mother of 9C, a middle-school-aged boy who was led to question his gender identity as an 11-year-old child at the encouragement of his teacher.

175.   For the 2024-2025 school year, 9C attends the Eighth Grade at a public middle school in Los Angeles County.

176.   In 2022, the week after Thanksgiving, 9C told his mother that his Sixth-Grade teacher was gay and had LGBTQ+ flags in his classroom.

177.   That same week, 9C's teacher explained to 9C and his classmates that he brought the LGBTQ+ flags to the classroom because there were gay children their same age (11- and 12-year-olds), and he wanted to support them.

178.   9A began noticing changes in 9C. He began feeling depressed and started to cry regularly. 9A approached her child on multiple occasions to ask him why he was feeling sad, to show him how much she loves him, and to provide emotional support.

179.   9C finally told his mother that he was feeling confused and lost and was questioning whether he might be gay. He said he didn't know why he was having those thoughts and had never had them before.

180.   9C's depression worsened, and he would tell 9A that he didn't want to grow up and didn't want to be in the Sixth Grade. It reached the point that 9C told his father, 9A's husband, that whatever he was feeling, he wanted it to end.

24

181. 9A and her husband didn't see an improvement in 9C until the school year ended and after they took 9C to a Christian psychologist. There, 9C learned how to cope with the gender dysphoria he was experiencing and the psychologist provided him with proper therapy treatment to help him be in tune with his biological self.

182. For months, 9A watched her child suffer because an adult used his position of trust to tell pre-pubescent children that they might be gay.

183. Children who are misdiagnosed with gender dysphoria or decide to detransition or desist often later find that they were not transgender, but instead gay.

184. 9A desires to be notified by the school if 9C expresses gender dysphoria or gender-confused behavior in the future, especially if 9C's teachers are attempting to socially transition 9C.

185. 9C is no longer in that class, but 9A is still afraid that another teacher will exacerbate the gender confusion that 9C's Sixth Grade teacher introduced to him, especially now that 9C is a middle school teenager. If that happens, 9A is afraid that AB 1955 will prevent 9C's school from informing her what is happening with her son so that she will be able to respond to changes in his mental health and help him obtain appropriate treatment.

186. Thus, AB 1955 poses a threat to 9A's present and future parental rights, including her ability to counsel with 9C and to ensure quality mental health treatment for him.

### *Family 10*

187. Parent 10A is a lifetime resident of Huntington Beach and the father of two daughters, who will be referred to as 10C and 10D, who reside with him in Huntington Beach.

188. 10C is 12 years old. She has been diagnosed with autism spectrum disorder, which places her at higher risk of gender dysphoria.

189. 10D is 9 years old.

25

190.   For the 2024-2025 school year, 10C attends the Seventh Grade in a public middle school in Huntington Beach.

191.   For the 2024-2025 school year, 10D attends a public elementary school in Huntington Beach.

192.   10A is concerned that, once AB 1955 goes into effect, teachers in Huntington Beach will feel emboldened to promote gender dysphoria, gender confusion, and transgenderism to his daughters, without informing him or their mother.

193.   10A is aware of a public school in Huntington Beach that required students to watch a video, sometimes more than once, that advertised pride month and featured and promoted transgenderism.[3]

194.   10A was informed that, when some students protested having to watch the video, a math teacher in the school threatened punishment.

195.   10A was concerned and contacted the school over this issue.

196.   10A desires to be notified by the school if 10C or 10D expresses gender dysphoria or gender-confused behavior in the future, especially if their teachers are attempting to socially transition them.

197.   10A is relieved that the City has protected his parental rights to know about mental, emotional, and physical health issues regarding his children when at school, but he worries that AB 1955 will take away the rights that the City has codified.

198.   10A will lose the parental rights recognized and protected by the City ordinance if AB 1955 goes into effect and is deemed to supersede the City's ordinance.

---

[3] *See* https://tinyurl.com/569w7unn.

### *The Defendants*

199.  Defendant Robert Bonta is the Attorney General of California. The California Constitution vests the Attorney General with the duty to "see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 13. Defendant Bonta is sued in his official capacity.

200.  Defendant Tony Thurmond is the California State Superintendent of Public Instruction. Defendant Thurmond is the California Department of Education's main executive officer and as such is responsible for creating, adopting, and implementing Department policies and guidance documents. Defendant Thurmond is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *AB 1955*

201.  AB 1955's roots start in 2013 when the California Department of Education ("CDE") began issuing "guidance" that schools must keep a student's gender identity hidden from parents.

202.  This guidance, which does not have the force of law,[4] was turned into Administrative Regulation 5145.3 by the California School Board Association and distributed to public school boards for adoption.

203.  Schools were directed to create a covert, parallel records-filing system to hide students' name changes, in order to skirt parents' requests for pupil records or education records to which they are entitled under California Education Code § 49069.7 and the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

---

[4] This was admitted by a CDE attorney in federal court. *See* Tr. of Mot. Hr'g of Apr. 29, 2024 at 8:23–9:4, *Mirabelli v. Olson*, No. 3:23-cv-00768-BEN-WVG (S.D. Cal.), ECF No. 111.

204. After several school districts passed policies that required parental notification whenever a child sought to socially transition at school, California enacted AB 1955, called the Support Academic Futures and Educators for Today's Youth Act (SAFETY Act).

205. Governor Newsom signed AB 1955 into law on July 15, 2024, and AB 1955 goes into effect on January 1, 2025.

206. AB 1955 amends the California Education Code. *See* Exhibit 1.

207. Relevant to this suit, AB 1955 adds three sections to Chapter 2 of Part 1 of Division 1 of Title 1 of the Education Code. First, it adds Section 220.1, which prohibits any adverse employment actions against employees or contractors of school districts, county offices of education, charter schools, or state special schools for "support[ing] a pupil in the exercise of rights set forth in" four articles of the Education Code, "perform[ing] the employee's work activities in a manner consistent with the recommendations or employer obligations set forth in this chapter," or "provid[ing] instruction to pupils consistent with the current content standards, curriculum frameworks, and instructional materials adopted by the state board, and any other requirements of this code[.]" AB 1955, § 4.

208. Second, AB 1955 adds Section 220.3. That section states that "[a]n employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." AB 1955, § 5.

209. Finally, AB 1955 adds Section 220.5, which prohibits school districts, county offices of education, charter schools, and state special schools from enacting or enforcing "any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's sexual

28

orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." AB 1955, § 6.

210. And Section 220.5 also declares that "[a]ny policy, regulation, guidance, directive, or other action of a school district, county office of education, charter school, or state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, that is inconsistent with subdivision (a) is invalid and shall not have any force or effect." *Id.*

211. Plaintiffs are harmed because AB 1955 prevents public schools from requiring that teachers, staff, administrators, or other employees inform a child's parents when that child requests the government's facilitation in diagnosing, managing, or treating gender dysphoria, such as asking to be called by pronouns or a name of the opposite sex, or otherwise seeking social transition.

212. And AB 1955 means that if a teacher or other school employee socially transitions a child, whether that employee initiates the transition or facilitates the child's request for a transition, a school cannot require the communication of the transition to a parent unless the child consents. Nor can the school do anything regarding the employee who is involved in the social transition.

213. And AB 1955 sets no age limit—schools cannot notify parents even if preschoolers socially transition.

214. Defendant Thurmond, on the date Governor Newsom signed AB 1955 into law, issued a press release where he "celebrated" the bill's signing, noted that he "supported AB 1955," and declared that he was "proud to work alongside our legislators" to "ensure that this bill made it to the Governor's desk for signing." Press Release #24-37, Cal. Dep't of Educ., State Superintendent Thurmond Celebrates Signing of AB 1955: The SAFETY Act, Ensuring Safe and Supportive Learning Environments for LGBTQ+ Students (July 15, 2024), https://tinyurl.com/3vmeeffj ("Thurmond Press Release"). His press release further referred to policies enacted

by school districts to require parental notification when a child seeks to socially transition as "forced outing policies." *Id.*

215. Defendant Bonta, in response to the school district policies requiring parental notification that prompted the passage of AB 1955, brought suit against those districts because, he said, these policies were "forced outing polic[ies]." *See* Press Release, Rob Bonta, Att'y Gen., Cal. Dep't of Just., Attorney General Bonta Announces Lawsuit Challenging Chino Valley Unified School District's Forced Outing Policy (Aug. 28, 2023), https://tinyurl.com/24mep2bj ("Bonta Press Release").

216. AB 1955 observes twice, once with § 220.3 and once with § 220.5, that these sections "do[] not constitute a change in, but [are] declaratory of, existing law." AB 1955, §§ 5, 6.

217. Defendant Thurmond, in contrast, hailed the law as "a major step forward for the rights of students and families," and declared "it a reason to celebrate[.]" Thurmond Press Release, *supra.*

218. AB 1955 does not mention what that apparent "existing law" is. Defendant Bonta's lawsuits against school districts that had adopted a parental notification policy suggest three possibilities.

219. First, Bonta argued that the parental notification policies violated sections 200 and 220 of California's Education Code, as well as section 11135 of the Government Code, because those provisions "ensure equal rights and opportunities for every student and prohibit discrimination on the basis of gender identity and gender expression." Bonta Press Release.

220. Second, Bonta claimed that a parental notification policy violates the Equal Protection Clause of the California Constitution because the "policy unlawfully discriminates and singles out students who request to identify with or use names or pronouns different from those on their birth certificates, or who access

30

programs or facilities that, in the view of the Board, are not 'aligned' with the student's gender." *Id.*

221.   Third, Bonta alleged a parental notification policy would violate a state constitutional right to privacy because "California's constitution expressly protects the right to 'privacy,' including both 'informational privacy,' and 'autonomy privacy,' and the policy's mandate to out transgender and gender-nonconforming students against their wishes or without their consent violates that right." *Id.*

### *Social Transitioning*

### *Gender Dysphoria and Gender Incongruence are Medical Conditions*

222.   Gender dysphoria and gender incongruence are medical, psychiatric diagnoses. Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (gender dysphoria) ("DSM-5"), *available at* https://psychiatryonline.org/dsm; World Health Org., *Conditions Related to Sexual Health: Gender Incongruence in, ICD-11: International Classification of Diseases for Mortality and Morbidity Statistics* 1168 (11th Rev. 2022), https://tinyurl.com/yc266cfj. Gender incongruence is a mismatch between sex and perceived or desired gender identity. The American Psychiatric Association describes gender dysphoria as "psychological distress" from that mismatch. Am. Psychiatric Ass'n, *What is Gender Dysphoria?* (Aug. 2022), https://tinyurl.com/ejdtae49.

223.   The world, including the United States, is experiencing an unprecedented epidemic of gender confusion. See, e.g., Joanne Sinai, Letter to Editor, *Rapid onset gender dysphoria as a distinct clinical phenomenon*, 245 J. Pediatrics 250 (2022), https://tinyurl.com/y2zajsr2.

224.   New diagnoses of gender dysphoria among children ages 6–17 almost tripled in a recent 4-year period, leaping from 15,172 in 2017 to 42,167 in 2021. Robin Respaut & Chad Terhune, *Putting numbers on the rise in children seeking gender care*, Reuters (Oct. 6, 2022), https://tinyurl.com/2u3ftpj7.

225. Between 2016 and 2020, California saw a three-fold increase, from 1,000 to 3,000 annual diagnoses among Medicaid patients. *Id*. Medical treatments also increased. The number of children aged 6–17 in the United States who were placed on puberty blockers between 2017 and 2021 more than doubled from 633 to 1,390 new patients, as did the number placed on synthetic hormones, from 1,905 to 4,231 new patients. *Id.*

226. In the United States, the rate of adults identifying as transgender doubled in the ten years between 2002 and 2011. Dianna Kenny, *Children and young people seeking and obtaining treatment for gender dysphoria in Australia: Trends by state over time (2014-2018)* (Sept. 4, 2019), https://tinyurl.com/bdcnnmk2. Over the next five years, the rate doubled again to 0.6%, i.e., 1.4 million people. *Id.*

227. Then, between 2016 and 2021, the percentage and number of adults identifying as transgender remained steady. Jody L. Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, at 1, 13, Williams Inst., UCLA Sch. of Law (June 2022),https://tinyurl.com/4v6av9kx.

228. The DSM-5 reports an expected incidence of gender dysphoria of 0.05%–0.014% among males and 0.002%–0.003% for females. Samuel Veissière, *Why is Transgender Identity on the Rise Among Teens?*, Psych. Today (Nov. 28, 2018), https://tinyurl.com/4ctenn3b; *see* DSM-5 (Gender Dysphoria) at 454.

229. But current findings are "clearly puzzling: Transgender identity is now reported among young natal females at rates that clearly exceed all known statistics to date." Veissière, *supra*.

230. An estimated 1.4% of children aged 13–17 and 1.3% of those aged 18–24 currently identify as transgender. Herman et al., *How Many Adults*, *supra* at 5.

231. Those rates increased from the Williams Institute's 2017 report, which used data from 2014 to 2016, and estimated the number of trans-identified youth in both of those age ranges as 0.7%. Jody L. Herman et al., *Age of Individuals Who*

*Identify as Transgender in the United States* 2, Williams Inst., UCLA Sch. of Law (Jan. 2017), https://tinyurl.com/ycptjcb4.

232.    Youth are identifying as transgender at higher rates than previous generations. Youth aged 13–24 represent 42.7% of transgender-identified persons 13+, although that same age group represents only 18.6% of the U.S. 13+ population. Herman et al., *How Many Adults, supra* at 6.

233.    These trends are particularly pronounced in California. In one school in Davis, 4% of 10th–12th Grade students, one in twenty-five, claim trans identity. Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand (Jan. 17, 2023), https://tinyurl.com/3w2taz77.

234.    This amount is 2.8 times the national average. *Id.*

235.    Between 2019 and 2023, the percentage of transgender and nonbinary college students in the University of California system tripled from 0.6% to 1.9%. Erin Allday & Emma Stiefel, *More UC Students Identify as Nonbinary or Trans, New Enrollment Data Shows*, S.F. Chronicle (Feb. 6, 2024), https://tinyurl.com/mryb9yez.

236.    UC Berkeley saw its share of transgender and nonbinary students rise from 0.2% to 1.8%. *Id.*

237.    This acceleration among youth began in 2010, increasing from 3.5 per 100,000 in Georgia, 5.5 in Southern California, and 17 in Northern California to 38, 44, and 75, respectively, per 100,000 population, only four years later. Qi Zhang et al., *Changes in Size and Demographic Composition of Transgender and Gender Non-Binary Population Receiving Care at Integrated Health Systems*, 27 Endocrine Prac. 390 (2021), https://tinyurl.com/b6pmyu85.

### *Rapid Onset Gender Dysphoria*

238.    This massive increase in both diagnoses of gender dysphoria and incongruence and trans-identifying children and youth is part of a new pattern that

33

has been called rapid-onset gender dysphoria. *See* Lisa Littman, *Parent Reports of adolescents and young adults perceived to show signs of rapid onset of gender dysphoria*, 13 PLoS ONE e0202330, at 36. (2018), https://tinyurl.com/4cc5pstf.

239. Rapid-onset gender dysphoria is characterized by the sudden appearance of gender dysphoria for the first-time during puberty or later, in children and youth who had no prepubertal distress with their sexed bodies.

240. Dr. Littman's study of parent reports reveals concerning trends that highlight the social component of gender dysphoria and incongruence and trans-identification.

241. The adolescent and young adults in the study were 82.8% female, with a mean age of 16.4 years. *Id.* at 2.

242. The majority, 62.5%, "had reportedly been diagnosed with at least one mental health disorder or neurodevelopmental disability prior to the onset of their gender dysphoria." *Id.*

243. Among the friendship groups studied, the first friend to identify as transgender did so on average at 14.4 years old. *Id.* at 17. In these groups, 3.5 of the friends on average became transgender-identified. *Id.* And in 36.8% of these groups, the majority of the friends became transgender-identified. *Id.* at 17–18.

244. Many of the sources that the parents thought of as influencing their children's gender dysphoria were social: "YouTube transition videos (63.6% [of parents reporting]); Tumblr (61.7%); a group of friends they know in person (44.5%); a community/group of people that they met online (42.9%); a person they know in-person (not online) 41.7%." *Id.* at 21.

245. One example highlighted in the report was the case of four young girls whose "very popular coach" came out as transgender. *Id.* at 16. "[W]ithin one year, all four students announced they were also transgender." *Id.*

246. Social media regarding medical transitioning is often targeted at youths. One especially egregious example involved Dr. Giancarlo McEvenue, a plastic

surgeon in Canada, who bragged on social media about how much breast tissue he had removed from healthy teenage girls. The McLean Clinic's Instagram post read, "For all you good boys, Dr. McEvenue is not bringing gifts, he's taking them away." Michele Mandel, *Decision upheld against surgeon's social media posts on transgender top surgery*, Toronto Sun (Nov. 11, 2021), https://tinyurl.com/yc7e9fpf.

247. Dr. Littman's findings were confirmed in another study in 2023. Michael Bailey & Suzanna Diaz, *Rapid-Onset Gender Dysphoria: Parent Reports on 1,655 Possible Cases*, J. Open Inquiry In Behav. Scis. (2023), available at https://tinyurl.com/43rvzmjx.

248. This study included 1,655 parents of trans-identifying youth aged 11–21, with 90%+ of the parents identifying as progressive pro-LBGT rights. *Id.* at 6. This study also showed that 60.9% of female children adopted trans identity concurrently with at least one friend, while only 38.7% of males reported the same. *Id.* at 10. Male youth spent more time on social media or internet at 5.6 hours. And females in the study were over-represented by a 3:1 ratio. *Id.* at 11.

249. Even the World Professional Association for Transgender Health ("WPATH"), a group self-described as both a "scientific organization and an advocacy group for the transgendered," *Edmo v. Corizon*, 949 F.3d 489, 497 (2020) (citations omitted), concedes that adolescents can be susceptible to social influence towards gender identity adoption. Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S45 (2022), https://tinyurl.com/msdk6p87.

250. The President of WPATH, Dr. Marci Bowers, acknowledges that children adopting transgender identities may be influenced by peers: "There are people in my community who will deny that there's any sort of 'social contagion' — I shouldn't say social contagion, but at least peer influence on some of these decisions," Bowers said in reference to the growing number of children who identify as transgender. "I think that's just not recognizing human behavior." Michelle

35

Goldberg, Opinion, *Trans Kids Deserve Private Lives, Too*, N.Y. Times (Jan. 23, 2023), https://tinyurl.com/2hyp3scr.

251. Dr. Laura Edwards-Leeper, the psychologist who participated with the creation of the United States' first gender clinic for children and Dr. Erica Anderson, a former board member of WPATH who identifies as transgender, cautioned that the peer influence of a trans-identified child must be explored when determining treatments of trans-identifying youth. Laura Edwards-Leeper & Erica Anderson, *The mental health establishment is failing trans kids*, Wash. Post (Nov. 28, 2021), https://tinyurl.com/4t2ar8zk.

### *Social Transitioning is a Medical Treatment*

252. Gender dysphoria and gender incongruence are sometimes treated with active intervention, such as social transitioning by changing a person's pronouns, name, clothes, bathroom, or sports team, and, in some cases, breast-binding or genital-tucking. The Ninth Circuit has recognized social transitioning as medical care and treatment. *See, e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024) (listing "social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents" as "medical treatment for gender dysphoria").

253. WPATH, an advocacy group for transgenderism, has also recognized social transitioning as medical treatment. *See WPATH, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 9-10 (7th ed. 2011) (listing "[t]reatment options" for gender dysphoria, including "[c]hanges in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity).").

254. Social transitioning is "a complex decision and should be considered an 'active intervention,'" not a neutral act. NHS Eng., *Supporting Children and Young People with Gender-related Questions or Distress and Their Sexual Orientation*, MindEd (July 11, 2023), https://tinyurl.com/mw53kpt5 (select

"Supporting children and young people with gender questions or distress and their sexual orientation for health and education professionals"; click "Play" for "Part 2: Supporting children and young people with gender-related questions or distress in education settings"; click "Continue"; scroll to "Social Transition"); *see also* DSM-5, Gender Dysphoria at 451 (*Transsexual* denotes an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment and genital surgery (sex reassignment surgery).") (italics in original).

255.   It is considered an "active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." The Cass Review for NHS Eng., *Independent Review of Gender Identity Services for Children and Young People: Final Report* 158, The Cass Review (2024), https://tinyurl.com/ysew5cbu ("Cass Final Report").

256.   Dr. Anderson called social transitioning "one of the most difficult psychological changes a person can experience." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1208 (S.D. Cal. 2023). Dr. Anderson further testified in court that "embarking upon a social transition based solely upon the self-attestation of the youth without consultation with parents and appropriate professionals is unwise." *Id.*

257.   The independent review of the U.K.'s National Health Service gender identity services found that "[c]linical involvement in the decision-making process should include advising on the risks and benefits of social transition as a planned intervention, referencing best available evidence. This is not a role that can be taken by staff without appropriate clinical training." Cass Final Report, *supra* at 164.

258.   And crucially, for both children and adolescents, "[o]utcomes for children and adolescents are best if they are in a supportive relationship with their family. For this reason parents should be actively involved in decision making unless there are strong grounds to believe that this may put the child or young person at risk." *Id.*

37

259. Persistent social transitioning leads to chemical and then surgical transitioning. *See* Soc'y for Evidence-Based Gender Med., *Early Social Gender Transition in Children is Associated with High Rates of Transgender Identity in Early Adolescence* (May 6, 2022), https://tinyurl.com/4wwvaxkp (citing Kristina R. Olson et al., *Gender Identity 5 Years After Social Transitioning*, 150 Pediatrics e2021056082 (2022)); Pien Rawee et al., *Development of Gender Non-Contentedness During Adolescence and Early Adultho*od, 53 Archives Sexual Behav. 1813, 1813, 1821 (2024), https://tinyurl.com/554rs7yh (15-year study in the Netherlands demonstrates that close to 75% of youth ages 11–26 outgrow their discomfort with their sex by age 26. Notably, the return to comfort is directly related to the span of elapsed time.).

260. Courts have found that "no one disputes" these procedures "carry risks" and that they lack conclusive "evidence supporting their use." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir. 2023), *cert. granted,* 144 S. Ct. 2679 (2024); *accord Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1225 (11th Cir. 2023) ("[T]he record evidence is undisputed that the medications at issue present *some* risks," including "'loss of fertility and sexual function.'"), *reh'g en banc denied,* No. 22-11707, 2024 WL 3964753 (11th Cir. Aug. 28, 2024).

261. Social transitioning remains a controversial and, at best, unproven medical and mental health intervention. The only systematic review of evidence on this question to date reports an "absence of robust evidence of the benefits or harms of social transition for children and adolescents." Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Arch. Disease Childhood 1, 1 (2024).

262. Chemical and surgical transitioning are irreversible. Known side-effects include shortened life expectancy,[5] sterilization and infertility,[6] sexual dysfunction,[7] increased prevalence of suicide,[8] brain development issues, including lowering of IQ,[9] heart attacks and stroke,[10] and osteoporosis.[11]

263. These procedures are increasing. An increased number of young females have undergone gender-related double mastectomies, with a marked climb beginning in 2010 and a 13-fold increase between 2013 and 2020. Annie Tang et al., *Gender-Affirming Mastectomy Trends and Surgical Outcomes in Adolescents*, 88 Annals of Plastic Surgery, S325, (2022), https://tinyurl.com/4srctkce.

264. Chemical and surgical transitioning are lucrative. In 2020, the U.S. sex reassignment market was estimated to hit $1.5 billion by 2026. Press Release,

[5] Robert Hart, *Transgender People Twice As Likely To Die As Cisgender People, Study Finds*, FORBES (May 16, 2022), https://tinyurl.com/3jwuzu67.

[6] Philip J. Cheng et al., *Fertility concerns of the transgender patient*, 8 Translational Andrology & Urology 209, 209 (2019), https://tinyurl.com/4byhevwu.

[7] Mauro E. Kerckhof et al., *Prevalence of Sexual Dysfunctions in Transgender Persons: Results from the ENIGI Follow-Up Study*, 16 J. Sex Med. 2018, 2018, 2024 (2019), https://tinyurl.com/yv6sv4ed (Erratum 17 J. Sex Med. 830 (2020), https://tinyurl.com/5649zfr9).

[8] Gabrielle M. Etzel, *New study finds 12-fold higher risk of suicide attempt for adult transgender patients*, Wash. Examiner (May 17, 2024), https://tinyurl.com/4yrczt7p.

[9] Sallie Baxendale, *The impact of suppressing puberty on neuropsychological function: A review*, 113 Acta Paediatrica 1156, 1156, 1163–64 (2024), https://tinyurl.com/m69mbny3.

[10] Darios Getahun et al., *Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals Internal Med. 205, 206 (2018), https://tinyurl.com/5n6w659b.

[11] Michael Biggs, *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria*, 34 J. Pediatric Endocrinology & Metabolism 937, 937 (2021), https://tinyurl.com/ywwux98y.

AMENDED COMPLAINT
Case No.: 8:24-cv-02017-CBM (JDEx)

GlobeNewswire, Sex Reassignment Surgery Market to Hit USD 1.5 Bn by 2026: Global Market Insights, Inc. (Mar. 31, 2020), https://tinyurl.com/34ywd63r.

265.   In 2022, the market was estimated to have already reached $2.1 billion, with an anticipated growth rate of 11.25% from 2023 to 2030. Grand View Rsch., *U.S. Sex Reassignment Surgery Market Size, Share & Trends Analysis Report By Gender Transition (Female-to-male, Male-to-female), By Procedure (Mastectomy, Vaginoplasty, Scrotoplasty, Hysterectomy, Phalloplasty), And Segment Forecasts, 2023–2030*, https://tinyurl.com/2dup22u2 (last visited Sept. 17, 2024).

266.   Part of the increasing lucrativeness of the field is that "sex reassignment surgery ["SRS"] is gaining popularity among the young transgender population in the U.S." *Id.* "The 2021 annual report of Mount Sinai Center for Transgender Medicine and Surgery indicated that approximately 41.7% and 25.8% of the transfeminine population aged 25 to 34 and aged 15 to 24, respectively, underwent SRS." *Id.*

### *Social Transitioning is Harmful in the Long-term*

267.   Tragically but predictably, the growth in children and adolescents identifying as transgender has corresponded with an increase in children and adolescents coming to regret their actions and decisions to socially or medically transition.

268.   Medical science cannot accurately predict which youth will eventually desist or detransition. No known test exists to distinguish transgenderism from gender incongruence. *See, e.g.*, Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Childhood*, 28 Int'l Rev. Psychiatry 13, 18 (2016) ("[T]he clinical utility of currently identified factors is low."); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3876 (2017) ("Hembree, *Endocrine Treatment*") ("With current knowledge, we cannot predict the psychosexual outcome for any specific child.").

40

269.    Doctors know that some children will come to regret transitioning. Dr. Daniel Metzger, a gender-affirming pediatric endocrinologist at British Columbia Children's Hospital, remarked in a meeting, "Some of the Dutch researchers … gave some data about young adults who had transitioned and reproductive regret. Like, regret. And, it's there. And I don't think any of that surprises us … most of the kids are nowhere in any kind of a brain space to really, really, really talk about it in a serious way. That's always bothered me, but, you know, we still want the kids to be happy … happier in the moment, right?" Project Veritas, *WPATH Gender Affirming Doctor Shows Concern for Mental Health of Minors After Transition Surgeries*, YouTube, at 0:02–0:28 (Oct. 6, 2022), https://tinyurl.com/bddpymbk.

270.    The term "detransitioner" means a person who pursued medical treatment in some fashion to further a transgender identity—e.g., puberty blockers, hormones, or surgeries—but then ceased such treatments and embraced his or her biological sex.

271.    The term "desister" means a person who identified as something other than his or her sex but did not pursue medical interventions in furtherance of that belief, and then embraced his or her biological sex.

272.    The Dutch clinicians who pioneered pediatric gender transition noted an "80–95%" desistence rate for gender dysphoria in children. Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1893 (2008); *see also* Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*, Tablet (Feb. 21, 2023), https://tinyurl.com/287dnbh3 (noting that chief psychiatrist at Tampere University's pediatric gender clinic confirmed that "four out of five" children with gender dysphoria desist by adulthood).

273.    Accordingly, they recommended against social transition before puberty to prevent non-persisting youths "from having to make a complex change back to the role of their natal gender," Annelou L. C. de Vries & Peggy T. Cohen-

41

Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. Homosexuality 301, 308 (2012), predicting "that the drawbacks of having to wait until early adolescence … may be less serious than having to make a social transition twice," Thomas D. Steensma & Peggy T. Cohen-Kettenis, *Gender Transitioning Before Puberty?*, 40 Archives Sex Behav. 649, 649–50 (2011).

274.   As for medical transitions, one court recently noted that "some of the same European countries that pioneered these treatments now express caution about them and have pulled back on their use." *L.W.*, 83 F.4th at 477.

275.   Most gender-dysphoric children eventually desist, and studies show that a majority of gender-dysphoric males (63–100%) and a substantial minority of gender-dysphoric females (32–50%), decide that they are gay or lesbian, not transgender. James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 313 (2020) (collecting 11 studies from 1972 to 2019).

276.   The American Psychiatric Association observed the same phenomena in a 2012 literature review, noting that "only a minority" of children diagnosed with gender identity disorder "will identify as transsexual or transgender in adulthood (a phenomenon termed *persistence*), while the majority will become comfortable with their natal gender over time (a phenomenon termed *desistence*)." William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 169 Am. J. Psych. data suppl. 4 (2012), https://tinyurl.com/4wy4w7xh.

277.   Gender dysphoria or incongruence is often temporary, but social transitioning can lock it in. The Endocrine Society cautions that children who have socially transitioned "may have great difficulty in returning to the original gender role upon entering puberty," and that social transition "has been found to contribute to the likelihood of persistence." Hembree, *Endocrine Treatment*, *supra* at 3879; *see also* Thomas D. Steensma et al., *Factors Associated with Desistence and Persistence*

*of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. Am. Acad. Child & Adolescent Psychiatry 582, 588 (2013).

278.    Gender dysphoria or incongruence that first manifests in adolescence is also often unstable. This group primarily comprises young people, mostly girls, who did not exhibit gender-identity issues as children, experienced sudden onset after beginning puberty, and present with comorbid mental-health problems. E. Abruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*, 49 J. Sex & Marital Therapy 673, 684–85 (2023).

279.    The very existence of this category of gender-dysphoric or incongruent youth demonstrates that transgender identity is neither innate nor immutable. *See* Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives of Sexual Behav. 1983, 1988–89 (2019); Littman, *Parent Reports, supra* at 30–33.

280.    Given the desistence of most gender-dysphoric or incongruent youth, many such children will come to regret their decision and detransition. *See, e.g.*, Christina M. Roberts et al., *Continuation of Gender-Affirming Hormones Among Transgender Adolescents and Adults*, 107 J. Clinical Endocrinology & Metabolism e3937, e3937, e3938 (2022) (noting that 30% of those starting treatments discontinued within four years); Ruth Hall et al., *Access to Care and Frequency of Detransition Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7 BJPsych Open 1, 7 (2021) (noting that 32% of those starting treatments at adult clinic disengaged from treatment or detransitioned within 16 months).

281.    The authors of one such study noted that "the detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields." Isabel Boyd et al., *Care of Transgender Patients: A General Practice Quality*

*Improvement Approach*, 10 Healthcare 1, 11, 13 (2022) ("Of the 41 patients that had received hormone treatment … Nine patients had stopped hormone therapy … Four transmen had comments in the records that related to a change in gender identity or detransitioning…"; and noting that 32% of adults regretted, detransitioned, or discontinued treatment).

282.   Claims that regret and detransitioning are extremely rare are based mainly on studies involving adults who transitioned as adults. *See* Valeria P. Bustos et al., *Regret After Gender-Affirmation Surgery: A Systematic Review and Meta-Analysis of Prevalence*, 9 Plastic & Reconstructive Surgery—Global Open e3477 (2021).

283.   A recent study found that the true rate of regret and detransition is unknown. *See generally* Jay Cohn, *The Detransition Rate Is Unknown*, 52 Archives Sexual Behav. 1937 (2023). But the desistance rate for gender dysphoria in children is high. Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*, Tablet (Feb. 21, 2023), https://tinyurl.com/287dnbh3 (noting that eighty percent of children with gender dysphoria desist by adulthood).

284.   The novelty of adolescent-onset gender-dysphoria or incongruence means that it is being treated experimentally, with little insight into the long-term effects and risks of treatment.

### *Social Transitioning is Also Harmful in the Short Term*

285.   Although the ultimate outcomes of these experimental treatments involving social and medical transition of children and adolescents are still largely unknown, researchers can observe immediate harms in how these conditions are diagnosed.

286.   Gender dysphoria and gender incongruence, like all medical or mental health matters, must be treated on a case-by-case basis. No two cases are the same. Yet AB 1955 favors a one-size-fits-all social transitioning approach that leads to bad health outcomes.

44

287.   Dr. Hilary Cass's interim report to the U.K.'s National Health Service mentioned the problem of "diagnostic overshadowing," when the person diagnosing a child identifies gender as a source of distress and ignores all other problems, including ones that might be causing the gender distress. The Cass Review for NHS Eng., *Independent Review of Gender Identity Services for Children and Young People: Interim Report* 17 (2022), https://tinyurl.com/274ckh7x.

288.   Some frequently undiagnosed and untreated comorbidities, such as depression, that present with gender dysphoria, also increase the risk of suicide.

289.   It is imperative that the parents of children at risk of suicide be involved in their treatment. Data shows that 95.5% of suicides of children ages 10–14 occur at home. Nat'l Inst. of Mental Health, *Understanding the Characteristics of Suicide in Young Children* (Dec. 14, 2021), https://tinyurl.com/3jveh3j6.

290.   Another frequent comorbidity is autism, which researchers have found is a predominant factor in adolescents who identify as transgender. *See, e.g.*, Cass Final Report, *supra* at 6 (16.6 percent of the youth with gender dysphoria also were diagnosed with autism spectrum disorder); Jennifer Murphy et al., *Autism and transgender identity: Implications for depression and anxiety*, 69 Rsch. Autism Spectrum Disorders 101466, 101466 (2020), https://tinyurl.com/yhxx84uz ("An online study of 727 individuals revealed a substantial overlap between transgender identity and autism"); Riittakerttu Kaltiala-Heino et al., *Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development*, 9 Child Adolesc. Psychiatry Ment. Health 9, at p. 1 (2015), https://tinyurl.com/nhfawypf (26% of the 47 youth seeking gender interventions in Finland's study were autistic.)

291.   Risk of gender dysphoria also tends to run within families. One study found that risk of gender dysphoria increased between 3.88 and 4.48 times for the siblings of those with gender identity disorder. Esther Gómez-Gill et al., *Familiality*

*of Gender Identity Disorder in Non-Twin Siblings*, 39 Archives of Sexual Behavior 546, 546 (2010).

292. Researchers have proposed a genetic basis for gender dysphoria. Madeleine Foreman et al., *Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*, 104 J. Clinical Endocrinology & Metabolism 390, 392–93 (2019).

293. Gender dysphoria is known to have "strong heritability." Frederick L Coolidge & Ari Stillman, *The strong heritability of gender dysphoria,* in *The Plasticity of Sex, The Molecular Biology and Clinical Features of Genomic Sex, Gender Identity and Sexual Behavior*, 63 (2020).

294. Treating a child's gender dysphoria or incongruence requires parental involvement. The NHS has warned that "[s]upporting a social transition without the involvement of parents or carers can create complex difficulties within families and is not recommended. Secrets between parents or carers and their children are problematic and are likely to create further issues in the future." NHS Eng., *Supporting Children and Young People with Gender-related Questions or Distress and Their Sexual Orientation*, MindEd (July 11, 2023), https://tinyurl.com/mw53kpt5.

295. Parents alone possess "the best source of information" about a child's "medical history, temperament, habits, activities, or other factors that may provide a better and more accurate understanding to the [child's] communication regarding gender identity[.]" Sarah Parshall Perry & Thomas Jipping, *Legal Mem. 355, Public School Gender Policies that Exclude Parents are Unconstitutional* 6, Heritage Found. (June 12, 2024), https://tinyurl.com/2xef3pa6.

296. According to Dr. Erica Anderson, parents "'are often the only people who have frequently and regularly interacted with a child or adolescent throughout'" his or her life who has a full "'view of the child's development over time.'" *Mirabelli*, 691 F. Supp. 3d at 1208 (quoting Anderson expert declaration).

297. The need for informed parents to render treatment is especially important given that no known test can distinguish transgenderism from gender non-congruence. Parents often know better than anyone "'how long the child or adolescent has been experiencing gender incongruence,'" "'whether there might be any external cause of those feelings,'" and "'how likely those feelings are to persist.'" *Id.* "[T]o place teachers in the position of accepting without question" a minor's gender preference and then "'direct[ing] such teachers to withhold the information from parents concerning their minor children is hugely problematic.'" *Id.*

298. In contrast to parents, schools lack the information to make these distinctions. Nor do schools have the training and experience to provide individualized treatment, to diagnose children with gender dysphoria, or to opine and advise them on treatment, even if they had the information to do so.

### *Charter Cities*

299. Under the California Constitution of 1849, cities were "but subordinate subdivisions of the State Government," and the Legislature had power to "enlarge or restrict" city powers. *Johnson v. Bradley*, 841 P.2d 990, 993–95 (Cal. 1992) (quoting *San Francisco v. Canavan*, 42 Cal. 541, 557 (1872)).

300. But after the Constitution of 1879 was adopted, the Supreme Court of California declared it was "manifestly the intent" of the drafters "to emancipate municipal governments from the authority and control formerly exercised over them by the Legislature." *Id.* at 993 (quoting *People v. Hoge*, 55 Cal. 612, 618 (1880)).

301. As a practical matter, however, for several years Charter Cities remained subject to general State laws. *See Davies v. City of Los Angeles*, 24 P. 771, 773 (Cal. 1890).

302. To confirm the intent that Charter Cities are creatures of the Constitution and not of the State, in 1896, article XI of the State Constitution was amended "to prevent existing provisions of charters from being frittered away by

47

general laws," and "to enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent, in their own way." *Fragley v. Phelan*, 58 P. 923, 925 (Cal. 1899). *Fragley* further observed the Charter City authority "was intended to give municipalities the sole right to regulate, control, and govern their internal conduct independent of general laws." *Id*. at 925.

303.    A question arose whether Charter City authority extended only to matters explicitly enumerated in the charter. Answering in the negative and affirming Charter Cities' broad authority, Article XI was amended again in 1914 to give Charter Cities the power "*to make and enforce all laws and regulations in respect to municipal affairs*, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." *Johnson,* 841 P.2d at 994.

304.    The Charter City powers remained essentially unaltered for the next half-century. "In 1968, as part of the general overhaul of the state Constitution, the California Constitution Revision Commission recommended to the Legislature that the above sections be retained in substance but rewritten and renumbered as new Article XI, section 5 . . . ." which was approved by the voters in 1970. *Johnson*, 841 P.2d at 995.

305.    Recent case law has fleshed out Charter Cities' independence. In *Redondo Beach v. Padilla*, a Charter City sued the Secretary of State challenging enforcement of the Voter Participation Rights Act. 260 Cal.Rptr.3d 263, 265-66 (2020). The voting statute required "political subdivisions" to align their local elections with on-cycle elections. *Id.* The Charter City challenged the voting statute, arguing that it only applied to "political subdivisions" (*i.e.*, general-law cities) and that a Charter City was not a "political subdivision." *Id.*

306.    The California Court of Appeal agreed. The *Redondo Beach* Court began by observing that "California law recognizes two types of cities." *Id.* at 268. While general-law cities are political subdivisions of the State, "Charter cities are

48

specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." *Id.* That Court then noted that "the term 'political subdivision of the state' has been construed to distinguish counties from 'municipal corporations' with separate and distinct powers and purposes." *Id.* at 271 n.7.

307. The *Redondo Beach* Court concluded a Charter City is not a "political subdivision," and thus had broad authority over its own elections. *Id.* at 275.

308. Likewise, in *Haytasingh v. City of San Diego*, the Court observed that the "'contention that the legal status of a municipal corporation is akin to that of a county cannot be sustained either upon reason or authority.'" 286 Cal.Rptr.3d 364, 387 (Ct. App. 2021) (quoting *Otis v. City of Los Angeles*, 126 P.2d 954, 958 (Cal. Ct. App. 1942)). The reason is that "[i]t is the free consent of the persons composing them that brings into existence municipal corporations … while it is the sovereign will [of the state] which brings into being counties as local subdivisions of the state." *Id.* (quoting *Otis*, 126 P.2d at 958).

309. Contrasting the establishment of Charter Cities by the free consent of their residents, political subdivisions—such as general-law cities—are established "without the solicitation, consent or concurrent action of the people residing within them." *Haytasingh*, 286 Cal.Rptr.3d at 387 (quoting *Otis,* 126 P.2d at 958). The upshot is that "[charter] [c]ities, therefore, are distinct individual entities, and are not connected political subdivisions of the state. As a matter of fact, municipalities, and particularly charter cities, are in a sense independent political organizations and do not pretend to exercise any functions of the state." *Id.* (quoting *Otis*, 126 P.2d at 958).

310. Just as the Court of Appeal did in *Redondo Beach*, the *Haytasingh* Court concluded that when the Legislature uses the term "political subdivision," it does not mean a Charter City. *Id.* at 390.

311. In sum, Charter Cities "are distinct individual entities, and are not connected political subdivisions of the state." *Id.* at 387 (quoting *Otis*, 126 P.2d at 958). "It is the free consent of the persons composing them that brings into existence municipal corporations. . . ." *Id.* (quoting *Otis*, 126 P.2d at 958).

312. For this reason, then, Charter Cities, far from being creatures of the State, enjoy constitutionally recognized autonomy (Cal. Const. art. XI) and municipal authority over certain areas of governance that is "'supreme and beyond the reach of legislative enactment.'" *Redondo Beach*, 46 Cal.App.5th. at 910 (quoting *State Building & Constr. Trades Council of Cal. v. City of Vista*, 279 P.3d 1022, 1027 (Cal. 2012)).

### *Huntington Beach Parents-Right-to-Know Ordinance*

313. On September 17, 2024, the Huntington Beach City Council passed for a second time Ordinance No. 4326, two weeks after passing it initially. *See* Exhibit 2.

314. The Ordinance amended the Huntington Beach Municipal Code by adding Chapter 1.23 that made Huntington Beach a "Parents' Right to Know" city.

315. The Ordinance's findings include that "[a]s a Charter City, that derives its power from the consent of the people, the City of Huntington Beach has a direct interest in protecting the rights of parents of minor children residing within its jurisdiction, and it has a direct interest in challenging the State's actions that are demonstrably driving large economic producers out of California." HB Municipal Code 1.23.010(M).

316. Additionally, the City found that "[t]he protection of parents and children in the City from interference by the State over 'a student's sexual orientation, gender identity, or gender expression' is a municipal affair, not a statewide concern." *Id*. 1.23.010(L).

317. Furthermore, "[t]here can be no greater example of a municipal affair than the regulation of Huntington Beach citizens['] private and highly personal

subject of 'a student's sexual orientation, gender identity, or gender expression' that should be, and remain, between a parent and a child. The people of Huntington Beach have a right to govern Huntington Beach municipal affairs and challenge the State's attempt to assert authority of municipal affairs." *Id*.

318. And the Ordinance pointed to federal constitutional parental rights found in the Fourteenth Amendment as recognized by the U.S. Supreme Court and the Ninth Circuit. *See id*. 1.23.010(F)–(H).

319. Thus, the Ordinance recognized that "[p]arents have a right to know about their child's 'sexual orientation, gender identity, or gender expression' without the interference, prohibition, and/or inhibition presented by AB 1955." *Id*. 1.23.020(B).

320. As a result, besides declaring Huntington Beach a "Parents' Right to Know" city, *id*. 1.23.020(C), the Ordinance holds that "[n]o educators in the City of Huntington Beach[] . . . shall withhold any information related to a child's sexual orientation, gender identity, or gender expression to Parents of said children with or without the child's consent." *Id*. 1.23.020(D).

321. Anyone who violates the Ordinance can be cited.

322. The City of Huntington Beach, like all cities, is a distinct entity affected by the well-being of its residents.

323. Recognizing this reality, the Ordinance further noted that the City "has a direct interest in protecting its Parents, children, and the City's economy by the impact of this State legislation, and therefore the City of Huntington Beach has legal standing, as claimed, emphasized, and asserted herein, to challenge AB 1955." *Id*. 1.23.030(A).

324. The City of Huntington Beach, unlike many cities, is a charter city.

325. As a charter city, the City is an association of its residents, with a unique authority to protect each resident. In other words, the City is "by the people, for the people."

51

326. Recognizing this unique dynamic, the Ordinance goes beyond protecting the City's own proprietary interests in the well-being of its residents. The Ordinance also authorizes the City to directly defend the rights of any individual member of the Huntington Beach community, allowing suit "on behalf of a City resident who is a Parent of a minor student in a public school in Huntington Beach alleging violations of their rights as a result of AB 1955." *Id.* 1.23.030(C).

327. Hence, the City Council took a vote, as authorized in the Ordinance, *see id.* 1.23.030(B), to initiate legal action against the State to challenge AB 1955 on September 17, 2024, with a majority of the Council approving such action.

### *Standing—Huntington Beach*

328. Cities may assert standing based on their own interests as entities, in defending their proprietary interests congruent with those of their residents, or under third party standing doctrines. Variations of all those grounds apply here.

329. The City has standing on at least six grounds.

330. *First*, the City has standing as a charter city in its constitutionally recognized autonomy as an "independent political organization[] [that] do[es] not pretend to exercise any functions of the state."*Haytasingh*, 286 Cal.Rptr.3d at 387. AB 1955 infringes that autonomy.

331. That infringement comes because the City has validly passed an ordinance in conflict with that statute and, to the extent the statute is seen as superseding the Ordinance, the City's "sole right to regulate, control, and govern their internal conduct independent of general laws" is undermined. *Fragley*, 58 P. at 925.

332. The City thus has a concrete injury, caused by AB 1955, that can be redressed by a favorable ruling of this Court, satisfying the three elements of Article III standing.

333.    *Second*, AB 1955 will economically harm the City, as it will drive businesses and taxpayers currently located in the City out of the state, reducing the City's revenues.

334.    This is already happening elsewhere in California as Elon Musk announced he was relocating SpaceX—which generates $8.5 billion dollars and employs over 13,000 Californians—from California to Texas as a direct result of AB 1955.[12]

335.    The City has an interest in protecting its economic viability and will be economically harmed by AB 1955, also providing standing. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979) (city had standing to sue where realty groups' practices which could encourage residents to leave and result in a reduced tax base).

336.    *Third*, a municipality may sue to redress "injury to its ability to function as a municipality in regulating persons and property within its jurisdictional control." *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d at 848; *cf. Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 927 (9th Cir. 1990) (recognizing a protectable "municipal interest in taxing and regulatory powers" for intervention as of right).

337.    To show that such an injury actually exists, the municipality must identify some "actual conflict" between the challenged action and its ability to regulate. *Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014), *vacated in part on other grounds and remanded sub nom. Sturgeon v. Frost*, 577 U.S. 424 (2016). The actual conflict between the Ordinance and AB 1955 is evident here.

---

[12] *See* Will Biagini, *'Final Straw': Elon Musk Moving SpaceX to Texas After California Passes Anti-parent Law,* Texas Scorecard (July 17, 2024), https://tinyurl.com/bdk4a24s.

338.   *Fourth*, a municipality—even one that is not a charter city—may sue "to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (citations omitted). And those proprietary interests are "not confined to protection of its real and personal property. The 'proprietary interests' that a municipality may sue to protect are as varied as a municipality's responsibilities, powers, and assets." *Id.* (citations omitted).

339.   The City has determined that AB 1955 threatens its proprietary interests by harming City residents, and expressed that determination through the Ordinance.

340.   The City Council, by passing the Ordinance in its duty to represent City residents, has determined that the interests of parents and their children are congruent with the interests of the City.

341.   *Fifth*, and alternatively, given its special status as a charter city and the Ordinance's authorization to protect City residents, the City has *parens patriae* standing on behalf of its citizens.

342.   Given their special status—created by citizens rather than the state and thus not political subdivisions of the state—charter cities, like states, "are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).

343.   Like states, "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the [City] standing to sue *parens patriae* is whether the injury is one that the [City], if it could, would likely attempt to address through its sovereign lawmaking powers." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). And the City has done just that in passing the Ordinance.

344.   Were the City a general city—a mere creation of and political subdivision of the state—it would lack *parens patriae* standing. *See Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir.1985) ("political

54

subdivisions . . . cannot sue as parens patriae because their power is derivative and not sovereign."). But as a charter city it may assert such standing to raise claims on behalf of its citizens that are harmed by AB 1955.

345. *Sixth*, and also alternatively, the City has standing because it is an association of its residents.

346. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

347. Government entities have standing to bring suit on behalf of individuals within their jurisdiction when the elements of this test are satisfied. *Central Delta Water Agency v. U.S.*, 306 F.3d 938, 951 (9th Cir. 2002).

348. This is particularly true where they "have qualities often found in private associations." *Id.* at 951 n.8.

349. Even regular cities frequently have such qualities. *See City of Stamps, Arkansas v. Alcoa, Inc.*, No. CIV. 05-1049, 2006 WL 2254406, at *6 (W.D. Ark. Aug. 7, 2006) ("an individual citizen of Stamps would have standing to sue, and Stamps seeks to protect interests germane to its purpose, which is, at least in part, to provide for the welfare of its citizens under its police powers.").

350. And charter cities much more closely resemble private associations than normal cities. As explained above, charter cities such as Huntington Beach are independent of direct government by the State. They thus are more directly governed, and the City's leadership can be expected to reflect the values of most residents, many of whom intentionally choose the City for that reason.

351. While under *City of South Lake Tahoe v. California Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233 (9th Cir. 1980), and its progeny, a political subdivision

55

of a state may not sue the state or a subdivision of it over state law in federal court, that prohibition does not apply to the City's assertion of its residents' rights, either as *parens patriae* or as an association of residents.

352.   As the Southern District of California observed in *Pioneers Memorial Healthcare District v. Imperial Valley Healthcare District*, "[i]t is beyond question that political subdivisions can, generally speaking, suffer a concrete and particularized injury worthy of Article III attention. It is equally clear that an individual's constitutional rights can be violated by a state's actions against a subdivision. And the very premise of third-party standing is that a plaintiff—having suffered his own injury in fact—can sometimes 'rest' his claims on legal rights *he does not possess.* So, assuming [the City] can demonstrate a cognizable injury, there is no obvious reason why . . . *South Lake Tahoe*'s [] rights-based reasoning prevents [the City] from leaning on the interests of others."  No. 24-CV-861 JLS (LR), 2024 WL 3858135, at *7-8 (S.D. Cal. Aug. 19, 2024) (emphasis in original).

353.   The *Pioneers Memorial* court ultimately walked back from this conclusion. *Id.* at *8 (avoiding the conclusion as "contrary to the thrust of this body of binding authority."). But this Court should follow the *Pioneers Memorial* court's premises through to their inevitable conclusion: the *South Lake Tahoe* rule does not bar municipalities from asserting third-party standing.

354.   In addition, the *South Lake Tahoe* rule should not apply here even to the City's direct claims, as a charter city is not a political subdivision of the state, as California courts have confirmed after *City of South Lake Tahoe* was decided. In addition, the *City of South Lake Tahoe* decision "offered no independent reasoning for its per se standing rule." *City of San Juan Capistrano v. California Pub. Utilities Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019). Indeed, it does not even appear to use the word "standing" in the same way as modern cases. *Id.* at 1283 (Nelson, J., concurring) (urging reconsideration of *South Lake Tahoe* in light of change of the meaning of the word "standing").

***Standing—Parents***

355.  The Parent Plaintiffs face imminent harm by AB 1955 in multiple ways.

356.  *First*, the Parent Plaintiffs will be injured when information of the utmost intimacy about their children is withheld from them. AB 1955 signals to parents, children, and government school employees that the care of children rests with the State, not their parents.

357.  The loss of information is not a one-time event related only to a child informing a school official that the child might be transgender. The loss of information includes each time that a child requests care or treatment, including social transitioning, from the government and parents are denied the opportunity to know or consent.

358.  Nor is identifying as transgender an immutable characteristic. That position ignores the growing number of desisters and detransitioners who come to no longer identify as transgender.

359.  *Second*, the Parent Plaintiffs will be harmed in their ability to parent their children. AB 1955 fosters communities of secrecy where children are taught that their parents might not be "safe" and that secrets from them are safe and will be facilitated by the government.

360.  To counter the malignant influence of AB 1955, the Parent Plaintiffs are compelled to teach their children about gender and sexuality issues in a level of detail that they do not consider appropriate for their children, but that is necessary in an environment where government employees are encouraged to discuss such topics with children, to keep these discussions secret from the parents, and to actively facilitate social transitioning of these children without their parents' knowledge.

361.  The point of AB 1955 is to keep parents in the dark. *See Deanda v. Becerra*, 96 F.4th 750, 759 (5th Cir. 2024) (finding standing to challenge law designed to keep parents "in the dark").

57

362.    Parent Plaintiffs cannot be sure if the statewide policy is being used against them because at its core the purpose of the policy is to keep them from finding out. If the Parent Plaintiffs find out about the policy, then the policy has failed.

363.    The Parent Plaintiffs have standing to challenge AB 1955 because, if they must wait until after their children receive unconsented-to treatment, then the Parent Plaintiffs lack any way to protect their children and preserve their parental decision-making role.

364.    *Third*, the Parent Plaintiffs will be harmed if their children receive medical treatment without their knowledge and consent, including through social transitioning. The Parent Plaintiffs object to the State's decision to facilitate experimental gender dysphoria treatments and to usurp parents' roles in consenting to their minor children's treatment.

365.    The subjection of the Parent Plaintiffs' children to AB 1955 is not disputed. Each of the Parent Plaintiffs has at least one child attending a school subject to the challenged provisions of AB 1955, which will infringe on their parental rights. The fostered policy of secrecy depends on a single trigger: a child requesting or a school official offering gender dysphoria treatment, including social transitioning.

366.    *Fourth*, the Parent Plaintiffs will be harmed by having a statewide policy in place that prohibits schools from requiring government school employees to inform parents if they plan to offer medical treatment to their children. *See Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007); *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1163 (9th Cir. 2024).

367.    Some of the parents lived in communities and school districts with family-friendly policies requiring schools to inform parents if the school had been asked to facilitate social transitioning. AB 1955 ends these policies.

58

368. *Fifth*, some Parent Plaintiffs suffer imminent harm specific to their circumstances.

369. For instance, when AB 1955 takes effect, the odds significantly increase that Parent 1A's contractual agreement with her child's school will be undermined.

370. Likewise, AB 1955 will severely hamper Parent 6A's ability to get information from his child's teacher that 6A needs to properly parent his child and to provide his child's therapist for proper treatment.

371. Furthermore, several Parent Plaintiffs have been threatened by their child when that child was being socially transitioned at school, and their safety may be seriously jeopardized if they don't know what's going on with their child as to gender issues at school. The odds that information will be withheld significantly increase when AB 1955 takes effect.

372. Parent 10A will lose the benefit of the City's ordinance when AB 1955 goes into effect.

373. *Sixth*, at least some Parent Plaintiffs suffer immediate harm because AB 1955 will take effect in less than one month.

374. For example, Parents 3A and 3B, against their better judgment about when to start teaching their son about gender issues, have started to do so despite their child's young age (under 10) and disability (autism) given his higher risk of being socially transitioned at school in the wake of AB 1955.

375. In other words, AB 1955 is forcing their parental hand, making them teach ideas that they think are premature for their son's developmental stage, but they are doing so because the potential harm caused by AB 1955 is greater than the harm of this premature teaching.

376. *Finally*, all of the Parent Plaintiffs will be harmed in their constitutionally protected right to parent their child, including to reject the treatment of social transitioning, when AB 1955 goes into effect.

377. Parents face potentially catastrophic harm: further damage to their parent-child relationship, further mental and even self-inflicted harm to their child, the withholding of information crucial to fulfilling their role as parent, the loss of custody, and perhaps even bodily harm or death.

378. The relief Plaintiffs seek would reduce the probability of injury. They thus have standing.

### FIRST CLAIM FOR RELIEF:

### 14th Amendment Due Process Clause—Parents' Right to Refuse Treatment of their Minor Children

### U.S. Const. Amend. XIV, § 1, Cl. 3

379. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

380. The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, includes certain substantive rights.

381. Among these is parents' fundamental right to direct their children's upbringing. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality) (collecting cases).

382. This fundamental right includes the right of parents to make medical, including mental health, decisions for their children.

383. Plaintiffs challenge severable provisions of AB 1955, specifically the references to gender identity and gender expression within Sections 5 and 6, as violative of this constitutional right, because gender dysphoria and gender incongruence are mental health conditions, and social transitioning is a medical intervention.

384. Specifically, AB 1955 § 5(a) (added to the Education Code as Section 220.3) unconstitutionally provides that "[a]n employee or a contractor of a school district, county office of education, charter school, or state special school for the

60

blind or the deaf shall not be required to disclose any information related to a pupil's . . . gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law."

385.   In addition, AB 1955, § 6(a) (added to the Education Code as Section 220.5) unconstitutionally prohibits schools from informing parents when medical treatment is occurring at school, by prohibiting public school districts and the like from "enact[ing] or enforc[ing] any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity, or gender expression to any other person without the pupil's consent."

386.   This imposition of a communications barrier between teachers and parents regarding their child's gender identity or gender expression impairs parents' ability to raise their children. Without information about their child's symptoms of gender dysphoria and/or gender incongruence or about their child's desire and attempt to socially transition, parents suffer the loss of their exclusive decision-making authority over whether the medical treatment of socially transitioning their child is in their child's best interest and how to best help their child through that difficult situation.

387.   What is more, "[p]arental involvement is essential to the healthy maturation of schoolchildren." *Mirabelli,* 691 F.Supp.3d at 1222. But through AB 1955, California "has adopted a policy . . . that places a communication barrier between parents and teachers." *Id*.

388.   And the Supreme Court has also recognized that an "inability to obtain information" to which one is entitled is an injury. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998); *Spokeo v. Robins*, 578 U.S. 330, 342 (2016); *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989).

61

389. The Supreme Court has long framed parental rights in terms of parents' decision-making authority over their own minor children. *Troxel*, 530 U.S. at 72–73 (plurality op.); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

390. The government must apply a "presumption that a fit parent will act in the best interest of his or her child," and may override parents only after providing procedural due process and a sufficiently high substantive standard, such as "clear and convincing evidence" of harm or abuse. *Troxel,* 530 U.S. at 69 (plurality). The government may not "transfer the power to make [a] decision from the parents to some agency or officer of the state," "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

391. But AB 1955 §§ 5(a) and 6(a), with respect to gender identity and gender expression, transfer the power to make the decision about whether a minor child should transition to a different gender identity from the parents to school employees and the child.

392. Governmental burdens on the right to raise children are subject to strict scrutiny and must be struck down unless "narrowly tailored to serve a compelling government interest." *Nunez v. City of San Diego*, 114 F.3d 935, 951–52 (9th Cir. 1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993).

393. The challenged provisions of AB 1955 are not narrowly tailored. The law does not require a finding of abuse or neglect on the part of parents but interferes with the constitutionally protected parent-child relationship across the board.

394. The challenged provisions of AB 1955 do not serve any compelling interest because the law is detrimental to children's safety. The challenged provisions of AB 1955 interfere with parents' ability to provide professional assistance that children may urgently need, as gender dysphoria often presents with depression, suicidal ideation, or anxiety.

62

395. Thus, the challenged provisions of AB 1955 violate the Fourteenth Amendment.

396. To the extent that the challenged provisions of AB 1955 are deemed as merely declaratory of existing state statutory or constitutional law, then those laws (Education Code §§ 200, 220; Government Code § 11135; California Constitution Equal Protection Clause; California Constitution's right to privacy) violate the Fourteenth Amendment to the extent they place a child's state statutory or constitutional right above that of a parent's federal constitutional right.

397. The challenged provisions of AB 1955 threaten the rights of all Parent Plaintiffs, but pose an even stronger threat to some families.

398. For instance, Parent 1A has won a hard-fought battle with her daughter's school district to come to an agreement where the school will use her daughter's legal name and female pronouns, and disclose to 1A if her daughter begins going by a male name. AB 1955's challenged provisions would make enforcing this contract and the parental rights it secures more difficult.

399. Parent 4A faces extreme challenges with 4C's mental health that may ultimately result in threats to the family's physical safety, and the challenged provisions of AB 1955 exacerbate these risks by making monitoring 4C's mental health more difficult.

400. Parents 5A and 5B similarly face risks to their physical safety from 5C's mental health.

401. In addition, both 4A and 5A and 5B have younger children, who are at elevated risk of gender dysphoria given their siblings' struggle with this condition.

402. Finally, parent 6A has unique concerns given the necessity of reporting to assist with his son's ongoing monitoring by a therapist and to maintain custody.

403. Plaintiffs have no adequate remedy at law. Absent relief, Defendants' actions continue to harm and threaten to harm Plaintiffs by impairing enjoyment of this right.

**SECOND CLAIM FOR RELIEF:**

**Unconstitutional Conditions**

**U.S. Const. Amend. XIV, § 1, Cl. 3; 42 U.S.C. § 1983**

404. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

405. The unconstitutional conditions doctrine is triggered "whenever the government succeeds in pressuring the plaintiff into forfeiting a constitutional right in exchange for a benefit or the government withholds a benefit based on the plaintiff's refusal to surrender a constitutional right." *Stavrianoudakis v. U. S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1137 (9th Cir. 2024) (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606–07 (2013)).

406. The doctrine applies to both enumerated constitutional rights, *see Koontz*, 570 U.S. at 604, and unenumerated constitutional rights, *see Mem'l Hosp. v. Maricopa County,* 415 U.S. 250, 258–59 (1974) (right to travel).

407. Under this doctrine, even if the plaintiff seeks only a "discretionary benefit," the government may not "condition the benefits it bestows" on the "relinquishment of constitutional rights." *Stavrianoudakis*, 108 F.4th at 1136 (quoting *Frost v. R.R. Comm'n*, 271 U.S. 583, 593–94 (1926)).

408. No parent in the United States should be forced to choose between their fundamental rights and access for their children to the public education the parents fund.

409. California cannot order parents to give up their parental rights to refuse medical treatment and make executive decisions for their child, absent some finding that the parents are unfit.

410. California has conditioned the benefit of taxpayer funded education on parents ceding their parental role to the state.

64

411.   Parents cannot protect their children and their rights and preserve their decision-making authority except by refusing the benefits of public education and removing their children from public schools.

412.   Parents are thus forced to choose between removing their children from California's public and charter schools or sacrificing the benefit of an education that they pay for with their own tax dollars.

413.   Plaintiffs have not accepted the state's unconstitutional conditions, and any such conditions constitute an independent constitutional violation.

414.   And to the extent that the challenged provisions of AB 1955 are deemed as merely declaratory of existing state statutory or constitutional law, then those laws (Cal. Educ. Code §§ 200, 220; Cal. Gov't Code § 11135; California Constitution's Equal Protection Clause, Cal. Const. art. I, § 7(a); California Constitution's right to privacy, Cal. Const. art. I, § 1) violate the unconstitutional conditions doctrine to the extent they place a child's state statutory or constitutional right above that of a parent's federal constitutional right.

415.   Plaintiffs have no adequate remedy at law. Absent relief, Defendants' actions continue to harm and threaten to harm Plaintiffs by impairing enjoyment of this right.

**THIRD CLAIM FOR RELIEF:**

**Federal Due Process Clause—Parental Right to Information**

**U.S. Const. Amend. XIV, § 1, Cl. 3; 42 U.S.C. § 1983**

416.   Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

417.   Parents cannot exercise their fundamental constitutional right to make decisions regarding their children's care when the government deliberately withholds critical medical, mental, educational, and religious information from them.

65

418. The challenged provisions of AB 1955 undermine these fundamental parental interests.

419. Parents' right to information is at its apex when it concerns the physical and mental wellbeing of their children.

420. Parental consultation is "particularly desirable" regarding "profound moral and religious concerns." *Belloti v. Baird,* 443 U.S. 622, 640 (1979) (plurality).

421. Parental consultation is also particularly desirable for medical treatment and when the safety of the child is at stake.

422. In particular, parents are injured when schools withhold information parents need to make informed decisions about their child's safety.

423. Under federal law, parents are entitled to complete access to all of their children's education records. *See* 20 U.S.C. § 1232g(a)(1)(A). The implementing regulations are even clearer. Schools "may disclose personally identifiable information" from a student's education records "without the consent" of a student or parent, if "[t]he disclosure is to parents." 34 C.F.R. § 99.31(a)(8). Thus, parents are entitled by law to their children's education records, and neither the child nor the state can thwart a parent in exercising this right.

424. California's own laws recognize that parents must consent to the "medical care" of their children unless the child is "15 years of age or older," "liv[es] separate and apart" from his parents or guardians, and manages his own finances. Cal. Fam. Code § 6922(a). The law further states that medical professionals may "advise the minor's parent or guardian of the treatment given or needed" whether or not the minor patient consents. *Id.* § 6922(c).[13]

---

[13] Until recently, California law separated out mental health treatment, requiring parents to consent to "mental health treatment or [outpatient] counseling" unless the child is "12 years of age or older, … is mature enough to participate intelligently," and would either "present a danger of serious physical or mental harm to self or to others" without treatment or "is the alleged victim of incest or child abuse." Cal.

AMENDED COMPLAINT
Case No.: 8:24-cv-02017-CBM (JDEx)

425.   Gender dysphoria or incongruence are psychological issues that can be serious in themselves and require treatment.

426.   Gender dysphoria or incongruence often present with other psychiatric comorbidities such as depression, anxiety, suicidal ideation and attempts, and self-harm. These comorbidities also require treatment.

427.   Parents cannot participate in caring for their children, including making treatment decisions, when the state withholds their children's medical and educational information.

428.   Parents cannot consent to or refuse treatment for their children when the state withholds their children's medical and educational information.

429.   Gender dysphoria or incongruence involve profound medical moral concerns that go to the heart of who people are collectively, who the child is as a person, and how the child relates to the people and world around the child.

430.   Parents cannot participate in the companionship, care, custody, and management of their children regarding these medical and moral concerns when the state withholds information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns.

431.   When parents are provided with the medical and educational information that they need, some parents may decide that a social transition is not in their child's best interest. Other parents may come to the opposite conclusion. Some parents may decide that professional therapy is necessary. Other parents may make other decisions. All of these parents, however, are injured when AB 1955 facilitates

Fam. Code § 6924(b); *see also id.* § 6924(g) (noting that statute became inoperative on July 1, 2024 and is repealed as of January 1, 2025). Even then, professionals "offering" these services "shall make their best efforts to notify the parent or guardian of the provision of services." *Id.* § 6924(c). And the service itself "shall include involvement of the minor's parent or guardian," unless the professional determines it would be inappropriate and sets out in writing the individualized reasons the child's parent or guardian was not contacted. *Id.* § 6924(d).

AMENDED COMPLAINT
Case No.: 8:24-cv-02017-CBM (JDEx)

withholding information from them and excludes them from these crucial conversations.

432. Yet the challenged provisions of AB 1955 unconstitutionally presume that parents will not act in the best interest of their children.

433. Accordingly, the challenged provisions of AB 1955 deprive parents of their parental notice and consent rights. This injury is separate and distinct from injuries sustained when schools in fact engage in social transitioning. Given that California's policy is focused on restricting information to parents, it is unlikely that parents will discover when schools provide clandestine treatments. Some of plaintiff parents' children may have been treated without the parents' knowledge or consent. This treatment would be an additional injury, beyond the deprivation of parental notice and consent rights.

434. And to the extent that the challenged provisions of AB 1955 are deemed as merely declaratory of existing state statutory or constitutional law, then those laws (Education Code §§ 200, 220; Government Code § 11135; California Constitution Equal Protection Clause; California Constitution's right to privacy) violate the Fourteenth Amendment to the extent they place a child's state statutory or constitutional right above that of a parent's federal constitutional right.

435. Plaintiffs have no adequate remedy at law. Absent relief, Defendants' actions continue to harm and threaten to harm Plaintiffs by impairing enjoyment of this right.

**FOURTH CLAIM FOR RELIEF:**

**14th Amendment & Declaratory Judgment Act—AB 1955 and**

**City's Ordinance**

**U.S. Const. Amend. XIV, Cl. 3; 28 U.S.C. § 2201(a).**

436. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

68

437.   The Declaratory Judgment Act states that when there is "a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

438.   The City has every reason to believe that that the State will file a lawsuit against the City if it tries to enforce its own ordinance given that the Ordinance is in direct conflict with AB 1955.

439.   Here, Plaintiff Huntington Beach believes that under the Supremacy Clause of the U.S. Constitution, there is no true conflict between the City's Ordinance and AB 1955 because AB 1955 is unconstitutional under the Fourteenth Amendment.

440.   Thus, Plaintiff Huntington Beach seeks a declaration from this Court that AB 1955 is, or, alternatively, the California statutes and constitutional provisions upon which AB 1955 is based are, in violation of the U.S. Constitution's Fourteenth Amendment, and thus AB 1955 (or these other statutes and constitutional provisions) provides no obstacle to Plaintiff's Ordinance.

441.   Or, Plaintiffs seek a declaration from this Court that disclosure of social transitioning, and issues regarding sexual orientation, gender identity, and gender expression to parents is required by federal law.

442.   Plaintiffs have no adequate remedy at law. Absent relief, Defendants' actions continue to harm and threaten to harm Plaintiffs by impairing enjoyment of this right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.   Preliminary and permanent injunctive relief preventing Defendants from enforcing the challenged, severable provisions of AB 1955 §§ 5(a) and 6(a), as they related to gender identity and gender expression, or, alternatively, from enforcing the California statutes and constitutional provisions upon which those

69

provisions of AB 1955 are based to the extent those statutes and provisions violate the Fourteenth Amendment to the U.S. Constitution;

2. Preliminary and injunctive relief of the same nature as requested in the preceding paragraph, but preventing Defendants from enforcing the challenged provisions of AB 1955 against Parent Plaintiffs 1A, 4A, 5A and 5B, and 6A in their unique factual circumstances;

3. An order and judgment declaring that the challenged, severable provisions of AB 1955, or, alternatively, the California statutes and constitutional provisions upon which AB 1955 is based, violate the Fourteenth Amendment of the U.S. Constitution;

4. An order and judgment declaring that the challenged, severable provisions of AB 1955, or, alternatively, the California statutes and constitutional provisions upon which AB 1955 is based, violate the Fourteenth Amendment of the U.S. Constitution as applied to Parent Plaintiffs 1A, 4A, 5A and 5B, and 6A in their unique factual circumstances;

5. An order and judgment declaring that because AB 1955, or, alternatively, the California statutes and constitutional provisions upon which AB 1955 is based, violate the Fourteenth Amendment of the U.S. Constitution, they provide no obstacle to the City's Ordinance;

6. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

7. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Gene C. Schaerr*

Michael E. Gates, City Attorney
(SBN 258446)
OFFICE OF THE CITY ATTORNEY
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
michael.gates@surfcity-hb.org

*Counsel for Plaintiff City of Huntington Beach, a California Charter City, and Municipal Corporation*

Donald M. Falk (SBN 150256)
SCHAERR | JAFFE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr*
Stephanie L. Freudenberg*
Justin A. Miller*
Aaron C. Ward*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
sfreudenberg@schaerr-jaffe.com
jmiller@schaerr-jaffe.com
award@schaerr-jaffe.com

71

Nicholas Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. S.E., #231
Washington, DC 20003
(202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs City of Huntington Beach, a California Charter City, and Municipal Corporation; and Parents 1A-10A*

Dated:  December 3, 2024

AMENDED COMPLAINT
Case No.: 8:24-cv-02017-CBM (JDEx)