1   ROB BONTA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   JENNIFER A. BUNSHOFT (SBN 197306)
    KEVIN L. QUADE (SBN 285197)
4   Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3377
6    Fax:  (415) 703-5480
     E-mail:  Jennifer.Bunshoft@doj.ca.gov
7   *Attorneys for Defendants*

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13  | **CITY OF HUNTINGTON BEACH, a** | 8:24-cv-02017 CBM (JDEx) |
    | **California Charter City, and** | |
14  | **Municipal Corporation, PARENTS** | **MEMORANDUM OF POINTS** |
    | **1A-9A,** | **AND AUTHORITIES IN SUPPORT** |
15  | | **OF DEFENDANTS' MOTION TO** |
    | Plaintiffs, | **DISMISS AMENDED** |
16  | | **COMPLAINT** |
    | **v.** | |
17  | | Date:          March 4, 2025 |
    | **GAVIN NEWSOM, in his official** | Time:          10:00 a.m. |
18  | **capacity as Governor of the State of** | Courtroom:  8D |
    | **California; ROBERT BONTA, in his** | Judge:         The Honorable Consuelo |
19  | **official capacity as Attorney General** | B. Marshall |
    | **of the State of California; and TONY** | Trial Date:    N/A |
20  | **THURMOND, in his official capacity** | Action Filed: September 17, 2024 |
    | **as California State Superintendent of** | |
21  | **Public Instruction,** | |
22  | Defendants. | |

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3    Introduction.................................................................................................1

4    Background................................................................................................2

5    I.    Assembly Bill 1955, The SAFETY Act .........................................2

     II.    Procedural Background...................................................................6

6    Legal Standard ..........................................................................................6

7    Argument ...................................................................................................7

     I.    The Court Lacks Subject Matter Jurisdiction .......................................7

8        A.    The City Lacks Standing Because It Is a Political
9              Subdivision of the State ...................................................7

10        B.    Parent Plaintiffs Lack Standing to Sue ........................................9

11             1.    Parent Plaintiffs Have Not Shown Any Concrete,
                     Imminent Injury ...................................................9

12             2.    Parent Plaintiffs Have Not Shown Causation or
                     Redressability .....................................................14

13    II.    The Court Should Dismiss All of Plaintiffs' Claims Because
            They Fail to State Cognizable Claims As a Matter of Law...............16

14        A.    Parent Plaintiffs' Substantive Due Process Claims Fail...........16

15             1.    Parent Plaintiffs' Facial Challenge Fails Because
                     They Cannot Show the Act Would Be Invalid in
16                   Every Circumstance .......................................17

17             2.    Substantive Due Process Does Not Require Schools
                     to Notify Parents of a Student's Gender Identity or
                     Expression ..................................................18

18             3.    The Act Does Not Implicate Parental Rights
19                   Related to The Refusal of Medical Care for Their
                     Children ..................................................21

20             4.    The Act Survives Review, Whether Rational Basis
                     or Strict Scrutiny Applies ...................................23

21        B.    Parent Plaintiffs' Unconstitutional Conditions Claim Fails
22             Because It Is Derivative of Their Failed Due Process
               Claims ..................................................................24

23        C.    The City's Declaratory Relief Claim Fails Because It Is
               Derivative of Parent Plaintiffs' Due Process Claims ...............25

24    Conclusion ..............................................................................................25

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

5

*Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*
    503 F.3d 256 (3rd Cir. 2007)...................................................................19

6

7

*Blair v. Appomattox Cnty. Sch. Bd.*
    2024 WL 3165312 (W.D. Va. June 25, 2024) ....................................20

8

9

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*
    136 F.3d 1360 (9th Cir. 1998).............................................................7, 8

10

*C.R. v. Eugene School Dist. 4J*
    853 F.3d 1142 (9th Cir. 2016)............................................................18

11

12

*Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*
    No. S-CV-0052605, Superior Court of California, County of Placer
    (April 10, 2024) ...................................................................................3

13

14

*Central Delta Water Agency v. U.S.*
    306 F.3d 938 (9th Cir. 2002)................................................................8

15

16

*City of Huntington Beach v. Newsom*
    2023 WL 8043846 (C.D. Cal. Nov. 13, 2023) ...................................8

17

18

*City of Huntington Beach v. Newsom*
    2024 WL 4625289 (9th Cir. Oct. 30, 2024) .......................................8

19

20

*City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*
    937 F.3d 1278 (9th Cir. 2019) .............................................................7

21

22

*City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*
    625 F.3d 231 (9th Cir. 1980)...........................................................7, 8, 9

23

24

*Clapper v. Amnesty Int'l USA*
    568 U.S. 398 (2013) .......................................................................11, 14

25

26

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
    897 F.3d 518 (3rd Cir. 1980)...............................................................23

27

28

ii

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

*Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*
  2024 WL 5006711 (D.N.J. Nov. 27, 2024)........................................................20

5
6

*Doe v. Horne*
  115 F.4th 1083 (9th Cir. 2024)...........................................................................22

7
8

*Doe v. Pine-Richland Sch. Dist.*
  2024 WL 2058437 (W.D. Pa. May 7, 2024) ......................................................10

9

*Fields v. Palmdale Sch. Dist.*
  427 F.3d 1197 (9th Cir. 2005)..............................................................19, 20, 23

10
11

*Food & Drug Admin. v. All. for Hippocratic Med.*
  602 U.S. 367 (2024) ...............................................................................9, 11, 14

12
13

*Foote v. Town of Ludlow*
  2022 WL 18356421 (D. Mass. Dec. 14, 2022) ...........................................20, 22

14
15

*Foti v. City of Menlo Park*
  146 F.3d 629 (9th Cir. 1998) ..............................................................................17

16
17

*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) ..............................................................................22

18
19

*Hammerling v. Google LLC*
  615 F. Supp. 3d 1069 (N.D. Cal. 2022)..............................................................25

20
21

*In re M.T.*
  2024 WL 4614003 (Cal. Ct. Appeal) ..................................................................24

22

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*
  481 F.2d 122 (9th Cir. 1973) .................................................................................8

23
24

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*
  622 F. Supp. 3d 118 (D. Md. 2022) ....................................................................20

25
26

*John and Jane Parents 1 v. Montgomery County Bd. of Educ.*
  78 F.4th 622 (4th Cir. 2023)..........................................................................10, 13

27
28

*Johnson v. Astrue*
  597 F.3d 409 (1st Cir. 2009) ..............................................................................22

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

*Kanuszewski v. Michigan Dep't of Health and Hum. Serv.*
    927 F.3d 396 (6th Cir. 2019) ................................................ 21

5
6

*Kokkonen v. Guardian Life Ins. Co. of Am.*
    511 U.S. 375 (1994) .......................................................... 6

7
8

*Koontz v. St. Johns River Water Mgmt. Dist.*
    570 U.S. 595 (2013) ..................................................... 24, 25

9

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ...................................................... 9, 14

10
11
12

*Mae M. v. Komrosky*
    No. CVSW2306224, Superior Court of California, County of
    Riverside (Aug. 2, 2023) ..................................................... 3

13
14

*Mann v. Cnty. of San Diego*
    907 F.3d 115 (9th Cir. 2018) ................................................ 21

15
16

*Martinez v. Newsom*
    46 F.4th 965 (9th Cir. 2022) ................................................ 25

17
18

*McNeil v. Sherwood Sch. Dist. 88J*
    918 F.3d 700 (9th Cir. 2019) ................................................ 19

19

*Meyer v. Nebraska*
    262 U.S. 390 (1923) ......................................................... 19

20
21

*Moody v. NetChoice, LLC*
    144 S. Ct. 2383 (2024) ...................................................... 17

22
23

*Mueller v. Auker*
    700 F.3d 1180 (9th Cir. 2012) ............................................... 21

24
25

*New York v. Ferber*
    58 U.S. 747 (1982) .......................................................... 23

26
27

*Ngoun v. Wolf*
    517 F. Supp.2d 1177 (C.D. Cal. 2007) ........................................ 23

28

iv

1

2

**TABLE OF AUTHORITIES**
**(continued)**

3
**Page**

4
*Norwood v. Harrison*
    413 U.S. 455 (1973) ......................................................................... 19

5
*Palomar Pomerado Health Sys. v. Belshe*
6
    180 F.3d 1104 (9th Cir. 1999) ........................................................... 7

7
*Parents for Priv. v. Barr*
    949 F.3d 1210 (9th Cir. 2020) ................................................... *passim*
8

9
*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.*
    95 F.4th 501 (7th Cir. 2024) ............................................................ 11
10

11
*Parham v. J.R.*
    442 U.S. 584 (1979) ......................................................................... 21

12
*People v. Chino Valley Unified Sch. Dist.*
13
    No. CIVSB2317301, Superior Court of California, County of
    Riverside (Aug. 23, 2023) ................................................................. 3
14

15
*Phyllis v. Superior Ct.*
    183 Cal. App. 3d 1193 (1986) ............................................................ 5
16

17
*Pierce v. Society of Sisters*
    268 U.S. 510 (1925) ......................................................................... 19
18

19
*Pioneers Mem'l Healthcare Dist. v. Imperial Valley Healthcare Dist.*
    2024 WL 3858135 (S.D. Cal. Aug. 19, 2024) ..................................... 9

20
*Regino v. Staley*
21
    2023 WL 4464845 (E.D. Cal. July 11, 2023) .............................. 20, 22

22
*Reno v. Flores*
    507 U.S. 292 (1993) ......................................................................... 24
23

24
*Runyon v. McCrary*
    427 U.S. 160 (1976) ......................................................................... 19
25

26
*Shanks v. Blue Cross & Blue Shield of Wis.*
    979 F.2d 1232 (7th Cir. 1992) .......................................................... 21
27

28

v

**TABLE OF AUTHORITIES**
(continued)

Page

*Short v. New Jersey Dep't of Educ.*
    2024 WL 3424729 (D. N.J. July 16, 2024) ........................................................ 10

*Sprewell v. Golden State Warriors*
    266 F.3d 979 (9th Cir. 2001) .............................................................................. 7

*United States v. Salerno*
    481 U.S. 739 (1987) ..................................................................................... 17, 18

*Warren v. Fox Family Worldwide, Inc.*
    328 F.3d 1136 (9th Cir. 2003) .............................................................................. 6

*Washington Env't Council v. Bellon*
    732 F.3d 1131 (9th Cir. 2013) ...................................................................... 14, 15

*Whitmore v. Ark.*
    495 U.S. 149 (1990) ........................................................................................... 10

*Williams v. Kincaid*
    45 F.4th 759 (4th Cir. 2022) .............................................................................. 23

*Zamani v. Carnes*
    491 F.3d 990 (9th Cir. 2007) ................................................................................ 6

STATUTES

34 C.F.R.
    § 99.10(a) ............................................................................................................. 5

20 U.S.C.
    § 1232g(a) ........................................................................................................... 21
    § 1232g(a)(1)(A) .................................................................................................. 5
    § 1232g(a)(4) ....................................................................................................... 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## (continued)

Page

California Education Code
  § 217 ....................................................................................................4, 18, 24
  § 220.1 ................................................................................................................4
  § 220.3 ......................................................................................................4, 21, 24
  § 220.3(a) ......................................................................................................4, 5
  § 220.5 ......................................................................................................4, 21, 24
  § 220.5(a) ............................................................................................................5
  § 49602 ................................................................................................................5
  § 49602 ..............................................................................................................14
  § 51101(a)(1) ......................................................................................................5
  §§ 51101(a)(10) ..................................................................................................5

Family Educational Rights Privacy Act ....................................................................5

Assembly Bill 1955 ..................................................................................passim

**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment ........................................................................*passim*

California Constitution Article 1
  § 1 ....................................................................................................................23

**COURT RULES**

Federal Rules of Civil Procedure
  12(b)(1) ........................................................................................................2, 6
  12(b)(6) ........................................................................................................2, 6

**INTRODUCTION**

Lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ) students in California deserve to feel safe, supported, and affirmed for who they are at school. This includes a right to express themselves freely at school without fear of punishment or retaliation, or that teachers might "out" them without their permission. But since 2023, several school districts have enacted "forced outing" policies that expressly single out transgender and gender nonconforming students for discriminatory treatment. These policies require teachers and school staff to notify parents when a student requests to change their name or pronouns at school to reflect a different gender identity, even if notifying the parents puts the student at risk of physical or psychological harm.

Recognizing that the decision of when and to whom to "come out" is a deeply personal one, that family support is important for LGBTQ students' well-being, but that forcibly outing youth before they are ready can be harmful, the State Legislature adopted Assembly Bill 1955 to prohibit school "forced outing" policies. The bill, known as the Support Academic Futures and Educators for Today's Youth Act (SAFETY Act or Act), does two things: first, it mandates the State develop resources to help families and schools create supportive environments for LGBTQ students; second, it prohibits public schools from forcing staff members to disclose a student's sexual orientation, gender identity, or gender expression to others *without the student's consent* (unless otherwise required by State or federal law) or from penalizing staff for complying with State anti-discrimination law. The Act does not ban all disclosure of students' private information. Rather, it allows school districts to craft their own policies for when disclosure of this information is *permissible*; these policies just cannot *mandate* disclosure without student consent.

Plaintiffs—a group of parents and the City of Huntington Beach—filed this lawsuit to challenge the Act, and seek to enjoin its provisions relating to gender identity and gender expression. But the suit suffers from numerous jurisdictional

1

deficiencies. The parent plaintiffs lack standing to sue, because they have not alleged concrete or imminent injury traceable to the Act, while the City lacks standing because political subdivisions are categorically barred from bringing constitutional claims against the State in federal court.

Because it lacks jurisdiction, the Court's inquiry should stop there. But the claims also all lack merit. The parents' Fourteenth Amendment substantive due process claims fail because there is no parental right to forced disclosure of their child's gender identity or gender expression by school districts. In addition, the Act does not implicate the parental right regarding medical care of their children, because school personnel honoring a student's request regarding their name and/or pronouns does not constitute medical treatment. Also, the parents' "unconstitutional conditions" claim and the City's declaratory relief claim fail because they are derivative of the failed substantive due process claims.

The Court should, therefore, grant Defendants' motion to dismiss without leave to amend under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## BACKGROUND

### I.  ASSEMBLY BILL 1955, THE SAFETY ACT

Last year, the California Legislature responded to findings of a growing number of "[a]ttacks on the rights, safety, and dignity of transgender, gender-expansive, and other LGBTQ+ youth" in California and across the country, as well as a "rise in bullying, harassment, and discrimination" against these youth. Request for Judicial Notice (RJN), Ex. 1 at § 2(i). The Legislature found that this harassment has been preventing LGBTQ students "from accessing safe and supportive learning environments" critical to their well-being and success. *Id.* at § 2(m)-(n).[1]

---

[1]In adopting the legislation, the Legislature reviewed extensive data regarding poor mental health outcomes of LGBTQ youth associated with discrimination, bullying, and anti-queer policies. RJN Ex. 2 at 5-8 (reviewing extensive research findings). These outcomes were directly tied to whether youth had support and acceptance at home or school. For instance, research

(continued…)

1    Of the harassment that LGBTQ youth face, the Legislature singled out school

2 policies that "forcibly out" students by disclosing their LGBTQ identities to their

3 families without their consent. *Id.* at § 2(e). By 2023, several school districts in

4 California had enacted such "forced outing" policies, which sometimes required

5 school employees to "out" students even if doing so risked physical, emotional, or

6 psychological harm to the student.[2] But the Legislature found that choosing when

7 and to whom to come out "are deeply personal decisions, impacting health and

8 safety as well as critical relationships, that every LGBTQ+ person has the right to

9 make for themselves." *Id.* at § 2(b). Research reviewed by the Legislature shows

10 that LGBTQ youth generally benefit when they receive family support, but forcibly

11 outing students to their parents without their consent and "before they are ready"

12 can be extremely harmful.[3] *Id.* at § 2(d). Ultimately, the Legislature found that

13 forced-outing policies undermine students' ability to build trust with their parents,

14 violate students' rights to privacy and self-determination, and prevent students from

15 freely expressing themselves at school without fear of being outed. *Id.* at § 2(e)-(g)

16 (noting students have a constitutional right to privacy and that courts have affirmed

17 the right of young people to keep personal information private).

18  showed that rejection of a student's transgender identity or sexual orientation by family members
19 was associated with negative health outcomes (such as suicide, depression, substance abuse,
    homelessness, and sexual risk-taking). *Id.* at 6. Similarly, a national survey showed the
20 overwhelming majority of LGBTQ students report feeling unsafe and targeted at school when
    schools failed to provide a safe and welcoming environment, with devastating impacts on their
21 mental health, attendance, disciplinary record, academic performance, and prospects for post-
    secondary education. *Id.* at 6-7.
22      [2] *See, e.g.*, *Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605, Superior
    Court of California, County of Placer (April 10, 2024); *People v. Chino Valley Unified Sch. Dist.*,
23 No. CIVSB2317301, Superior Court of California, County of Riverside (Aug. 23, 2023) (*Chino
    Valley I*); *Mae M. v. Komrosky*, No. CVSW2306224, Superior Court of California, County of
24 Riverside (Aug. 2, 2023).
        [3] In particular, the Legislature reviewed comments and data provided by the bill's
25 supporters showing that "[s]tudents often refuse external support out of fear of being outed to
    their parents," including refusing mental health supports. RJN Ex. 2 at 8 (citing finding that "44%
26 of LGBTQI+ children who never reported harassment at school are fearful that school staff will
    out them to their family"). Advocates further informed the Legislature that "[t]hese concerns are
27 often justified, as 57% of LGBTQI+ youth report that they have faced parental rejection" ranging
    "from parents mocking their child's LGBTQI+ identity to more extreme actions that impact the
28 well-being of LGBTQI+ children, including physical abuse and being kicked out of the home." *Id.*

3

By contrast, the Legislature found that "[a]ffirming school environments significantly reduce the odds of transgender youth attempting suicide," improve education outcomes for transgender and gender non-conforming youth, and lead to "a number of positive outcomes" for all LGBTQ youth, including lower rates of depression and "being less likely to feel unsafe at school because of their gender expression or sexual orientation, or both." *Id.* at § 2(j)(1)-(3). Against this backdrop, the Legislature found that all students deserve to be "safe, supported, and affirmed for who they are at school." *Id.* at § 2(a).

To address these concerns and promote supportive school environments, the Legislature enacted Assembly Bill 1955, known as the "SAFETY Act" (Act or AB 1955). The law, which took effect on January 1, 2025, does two things: first, it requires the California Department of Education to develop resources to assist families and schools in creating supportive environments for LGBTQ students. Cal. Educ. Code, § 217; RJN Ex. 1 at § 3. Second, it expressly prohibits public schools in California from adopting or enforcing forced-outing policies. Cal. Educ. Code § 220.1, 220.3, 220.5; RJN Ex. 1 at §§ 4-6.[4] Specifically, it prohibits school staff from being "required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." Cal. Educ. Code § 220.3(a); RJN Ex. 1. at § 5). And it prohibits school districts from enacting such policies or retaliating against staff who support students in the exercise of their rights under the California Education Code, including its anti-discrimination provisions. Cal. Educ. Code §§ 220.1, 220.5; RJN Ex. 1 at §§ 4, 6.

The Act does not bar the disclosure of this private information in every circumstance. Rather, it specifically allows for *mandatory* disclosure of information when the student consents or when "required by state or federal law," such as if

---

[4] The Act specifically applies to any "school district, county office of education, charter school, state special school for the blind or the deaf," and their governing boards. *Id.*

4

disclosure to parents is required by the Family Educational Rights Privacy Act (FERPA) or California law.[5] *See* Cal. Educ. Code §§ 220.3(a), 220.5(a); RJN Ex. 1 at §§ 4, 6; *see e.g.,* 34 C.F.R. § 99.10(a) (parent right to access student records); Cal. Educ. Code §§ 51101(a)(10) (same), 51101(a)(1) (parent right to visit their student's classrooms). In addition, in focusing only on forced-outing policies, it allows school districts to adopt nuanced policies that allow—but do not mandate—disclosure in certain circumstances, consistent with other applicable laws such as State and federal privacy and anti-discrimination protections.

Notably, the Act does not prohibit schools from disclosing to parents when a student's health and well-being are at risk. Under State law, schools may notify parents or guardians—and, in some instances, may have a duty to notify them—when staff learn of significant risks to student safety. *See, e.g.*, Cal. Educ. Code § 49602 (confidential communications to school counselor may be disclosed to parents if counselor "has reasonable cause to believe disclosure is necessary to avert a clear and present danger"); *Phyllis v. Superior Ct.*, 183 Cal. App. 3d 1193, 1196 (1986) (school had a duty to notify parents that student had been sexually assaulted at school). The Act does not impact that duty or prevent schools from notifying parents of concrete safety risks. Nor does it prohibit optional disclosure of sexual orientation or gender identity in relation to those safety risks. Thus, a school district could adopt a policy that, consistent with State privacy protections, allows staff to disclose the student's gender identity or sexual orientation without the student's consent in those specific instances when there is a compelling need based on a threat to student's physical or mental well-being. The Act simply prohibits a school district from *forcing* staff to do so without the student's consent.

---

[5] Under FERPA, parents must be afforded "the right to inspect and review" their child's written education records. 20 U.S.C. § 1232g(a)(1)(A), (a)(4). FERPA requires parents be given access to their children's education records upon request, but there is no requirement for a school to affirmatively notify a parent when an education record related to their child reflects a different name or pronoun. *Id*., § 1232g(a)(2).

## II.    PROCEDURAL BACKGROUND

Nine sets of pseudonymous parents (Parent Plaintiffs) and the City of Huntington Beach (City) originally brought this lawsuit against Governor Gavin Newsom, Attorney General Rob Bonta, and State Superintendent for Public Instruction Tony Thurmond (Defendants). ECF No. 1 (Compl.) at 58. After Defendants filed a motion to dismiss this complaint, *see* ECF Nos. 47, 47-1 at 7-25, Plaintiffs filed the operative amended complaint.  ECF No. 52 (FAC).[6] The original nine sets of pseudonymous parents, and a newly added tenth Parent Plaintiff, bring three challenges to the Act:  two claims under the Substantive Due Process Clause of the Fourteenth Amendment, asserting the Act violates their right to refuse treatment for their children and their right to information about their children; and a claim that the Act violates the unconstitutional conditions doctrine by requiring them to give up these alleged rights in order to access a public education. *Id.* ¶¶ 379-435. The City, for its part, brings one, separate claim for declaratory relief, asserting that the Act (or the State laws on which it is "based") violates the Fourteenth Amendment.  *Id.* ¶¶ 436-42.  The FAC again names Attorney General Bonta and Superintendent Thurmond as Defendants, but deletes Governor Newsom as a Defendant. *Id.* ¶¶ 199-200.

## LEGAL STANDARD

The party asserting federal subject matter jurisdiction bears the burden of establishing its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or based upon extrinsic evidence. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Zamani v. Carnes*, 491 F.3d 990, 996 (9th

---

[6] The Court denied the pending motion to dismiss as moot. ECF No. 55.

Cir. 2007). In considering if a complaint states a claim, a court must accept as true all of the material factual allegations in it, but need not accept as true allegations that contradict matters properly subject to judicial notice" or "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted).

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION

#### A.    The City Lacks Standing Because It Is a Political Subdivision of the State

The City lacks standing to bring its declaratory relief claim that the Act violates the Fourteenth Amendment. *See* FAC ¶ 440; *see generally id.* ¶ 436-42. The Ninth Circuit has consistently held that a political subdivision of the State lacks standing to sue the State itself or another political subdivision of the State to challenge State law on federal constitutional grounds in federal court. *See, e.g.*, *City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*, 625 F.3d 231, 233 (9th Cir. 1980) (noting it is well established that political subdivisions of a state "may not challenge the validity of a state statute under the Fourteenth Amendment"); *City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019) ("[W]e have consistently held that political subdivisions lack standing to challenge state law on constitutional grounds in federal court."); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) ("per se rule" that political subdivisions lack standing to challenge statutes of the state or one of its political subdivisions includes challenges under the Supremacy Clause); *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999) (political subdivision lacks standing to sue State "to the extent that its action challenges the validity of state regulations on due process and Supremacy Clause grounds").

The City's argument that it is exempt from this doctrine because of its status

as a charter city is patently frivolous. *See* FAC ¶¶ 330-331 345-354. The Ninth Circuit has expressly rejected this argument and applied the doctrine to charter cities. *See e.g.*, *Burbank-Glendale-Pasadena Airport Auth.*, 136 F.3d at 1364 (holding that "charter cities in California generally are defined as political subdivisions" and thus subject to *South Lake Tahoe*). In fact, both this Court and the Ninth Circuit have recently rejected the City's attempt to make this specious standing argument in another meritless lawsuit against the state. *See City of Huntington Beach v. Newsom*, 2024 WL 4625289 at *1 (9th Cir. Oct. 30, 2024) ("[O]ur precedent has applied *South Lake Tahoe*'s standing rule to California's charter cities"); *City of Huntington Beach v. Newsom*, 2023 WL 8043846, at *7 (C.D. Cal. Nov. 13, 2023) ("Nor is the standing analysis any different for a charter city as opposed to a general law city.")*.*

The City's alternative standing arguments are baseless. It alleges that as a charter city, it may assert *parens patriae* standing on behalf of its citizens. FAC ¶¶ 341-344. However, unlike states, "political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*." *See, e.g.*, *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *see also Burbank-Glendale-Pasadena Airport Auth.*, 136 F.3d at 1364 ("[C]harter cities in California generally are defined as political subdivisions").

Likewise, the City's argument that it has associational standing to bring suit on behalf of individuals within its jurisdiction under *Central Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002) lacks merit because, unlike in that lawsuit, the City does not fulfill the same function as a private trade association designed to serve the interests of its residents for which associational standing rules would apply. *Id.* at 951 n.8. Moreover, that case involved a state agency suing the *federal* government, and therefore did not address the *South Lake Tahoe* rule. In any event, the Court should reject the City's attempted end run around the *South Lake Tahoe* standing doctrine through its *parens patriae* and associational standing arguments,

1    given the Ninth Circuit's confirmation that the doctrine applies to charter cities.[7]

2        Furthermore, even if *South Lake Tahoe* did not apply, the City still has not

3    alleged sufficient injury to establish standing to sue. *See Lujan v. Defenders of*

4    *Wildlife,* 504 U.S. 555, 560 (1992). This is because AB 1955 applies to school-

5    based employees, but the City has not alleged that it employs or controls any

6    school-based staff. Accordingly, the City lacks standing and the fourth claim should

7    be dismissed in its entirety.

8        **B.    Parent Plaintiffs Lack Standing to Sue**

9        Parent Plaintiffs' claims also must be dismissed because they lack standing.

10    To establish standing, a plaintiff must show: (1) a concrete and particularized injury

11    in fact; (2) a causal connection to the defendant's conduct; and (3) a likelihood that

12    the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

13    Here, Parent Plaintiffs have not alleged any injury stemming from the Act, much

14    less one traceable to Defendants and redressable through this litigation.

15        **1.    Parent Plaintiffs Have Not Shown Any Concrete, Imminent**
          **Injury**
16

17        To show injury in fact, plaintiffs must demonstrate an invasion of a legally

18    protected interest that is both (1) "concrete and particularized" to them and (2)

19    "actual or imminent," not hypothetical or conjectural. *Lujan*, 504 U.S. at 560. A

20    plaintiff has not shown concrete injury if their claims rest solely on an "abstract

21    injury" stemming from "only a general legal, moral, ideological, or policy objection

22    to a particular government action." *Food & Drug Admin. v. All. for Hippocratic*

23

24    _____
     [7] The City also argues that it has standing due to its interest in "protecting its economic
25    viability" from alleged economic harm due to AB 1955 (FAC ¶¶ 333-335), and that it has
      standing as a municipality to sue to redress injury to its ability to regulate as a municipality and
     protect its own proprietary interests. *Id*. ¶¶ 336-340. Yet both arguments lack merit in light of
26    *South Lake Tahoe's* bar on the City's constitutional challenge to a state statute in federal court.
      Also, while Plaintiffs argue that this Court should conclude that the *South Lake Tahoe* rule does
     not bar municipalities from asserting third-party standing, based on statements in *Pioneers Mem'l*
27    *Healthcare Dist. v. Imperial Valley Healthcare Dist*., 2024 WL 3858135, *8 (S.D. Cal. Aug. 19,
      2024), they concede that the *Pioneers Mem'l* court "ultimately walked back from this conclusion"
28    because binding Ninth Circuit authority bars standing in that context. FAC ¶¶ 352-353.

1 | *Med.*, 602 U.S. 367, 381 (2024). In addition, "[a]llegations of possible future

2 | injury" are not enough; a "threatened injury must be certainly impending to

3 | constitute injury in fact." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)..

4 | None of the Parent Plaintiffs have alleged sufficient injury in fact to establish

5 | standing. Indeed, four of the plaintiff families do not allege that their children (3C,

6 | 6C, 9C, 10C, and 10D) are gender nonconforming or transgender such that they

7 | would be impacted by the Act. *See John and Jane Parents 1 v. Montgomery County*

8 | *Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2560 (2024)

9 | (holding parents lacked standing to challenge school gender identity policy because

10 | they failed to allege their children had gender support plans); *see also Doe v. Pine-*

11 | *Richland Sch. Dist.*, 2024 WL 2058437, *4-9 (W.D. Pa. May 7, 2024); *Short v.*

12 | *New Jersey Dep't of Educ.*, 2024 WL 3424729, *5-9 (D. N.J. July 16, 2024).

13 | In fact, according to their own allegations, these Parent Plaintiffs (3A, 6A, 9A,

14 | and 10A) merely fear the hypothetical impacts of the Act. For instance, 3A is

15 | allegedly concerned that 3C may be socially transitioned solely because the child

16 | has autism, but otherwise makes no allegation that 3C has shown any signs of

17 | wishing to express a different gender identity. *See* FAC ¶¶ 51-64. Allegations that

18 | the seven-year-old child has autism and "prefers to play with girls" while being

19 | "very interested in colors, patterns, symbols, and rainbows," *see id.* ¶54, do not

20 | plausibly indicate a likelihood that the 3C will identify as a different gender or that

21 | school staff will interact with the child as such. Parents 4A and 10A likewise allege

22 | that they have children (4D and 10C) that have been diagnosed with autism, but do

23 | not assert any facts that plausibly demonstrate that these children have or are likely

24 | to experience gender incongruence. *See id.* ¶¶ 82, 188-98.

25 | Parent 6A alleges that his child "has not displayed any issues with gender

26 | confusion" and that a child therapist has, in fact, confirmed that 6C exhibits "no

27 | signs of gender dysphoria, gender incongruence, or transgenderism." FAC ¶¶ 111,

28 | 120. Though he "fears" the Act's prohibition on forced-outing policies will injure

1    him because his ex-wife allegedly dressed their child in dresses in 2021, he

2    explicitly asserts that these actions have had no effect on 6C's gender identity. *Id.*

3        As for parent 9A, it is alleged in conclusory fashion that 9C has "questioned

4    his gender identity" and experienced "gender dysphoria" after interactions with a

5    gay teacher.  FAC ¶¶ 174, 181. The specific factual allegations, however, make

6    clear that the child's experience was limited to "questioning whether he might be

7    gay." *Id.* ¶ 179, 182.  Other than improperly conflating sexual orientation with

8    gender identity, the FAC provides no factual allegations that 9C is likely to

9    experience confusion with respect to gender identity. *See id.* ¶¶ 174-86.[8] Thus, in

10   the absence of any concrete allegations showing that their children are gender non-

11   conforming, each of these parents' "fears" are merely speculative and cannot

12   support standing in this Court. *See All. for Hippocratic Med.,* 602 U.S. at 381;

13   *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.*, 95 F.4th

14   501, 506 (7th Cir. 2024), *cert. denied* __ S. Ct. __, 2024 WL 5036271 (Dec. 9,

15   2024) (affirming dismissal of parent group's challenge to school district's student

16   gender identity policy because its "expressions of worry and concern do not suffice

17   to show that any parent has experienced actual injury or faces any imminent harm

18   attributable to the [policy]").

19       The remaining six Parent Plaintiffs (1A, 2A, 4A, 5A, 7A, and 8A) do allege

20   having gender non-conforming children in public school, but the specific

21   allegations in the FAC still fail to plausibly demonstrate a "certainly impending"

22   future injury to their constitutionally protected parental rights. *See Clapper v.*

23   *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This is because the Act is narrowly

24   focused on school policies requiring notification, and these parents are all

25   unequivocally aware of their children's gender identity at school. *See* FAC ¶¶ 11-

26   25, 35-46, 72-75, 94-101, 130-41, 153-59. Put another way, whatever

27       [8] Plaintiffs have narrowed their challenge to provisions of the Act "related to gender
identity and gender expression," deleting earlier challenges to the law as applied to sexual

28   orientation. *See* FAC ¶ 383; *see also id.*, Prayer for Relief ¶ 1.

disagreements these parents have with how schools interact with and respect their children's gender identity in the learning environment (what they term "social transitioning"), AB 1955 does not speak to that conduct.[9] The Parent Plaintiffs' asserted injuries are thus necessarily limited to the absence of notifications made pursuant to mandatory disclosure policies barred by the Act. Yet here, each parent of a gender non-conforming child has explicitly alleged awareness of and engagement with their child's gender incongruence in a manner that demonstrates an unfettered ability to exercise their constitutional rights to direct the child's upbringing. To the extent the Act bars notifications that may have occurred under prohibited forced disclosure policies, such lack of notification does not plausibly hinder these parents' rights.

Parent 7A, for example, fears that the Act "will only make [7C's gender incongruence] situation worse." FAC ¶ 146. But the FAC establishes that 7A has had repeated conversations with her child's school about her child's continued use of a male name and different pronouns at school. *See id.* ¶¶ 131-42. Though she may object to the way in which staff at 7C's school respects the child's gender identity, that is not at issue in this lawsuit (which challenges AB 1955) and these allegations make clear that 7A remains fully capable of engaging with and guiding her child on decisions around this issue. The same goes for parents 1A, 2A, 4A, 5A, 7A, and 8A, all of whom express similar concerns about AB 1955 making their pre-existing situations worse, but fail to allege any tangible interference that the Act will have on their ability to exercise their parental rights. To the contrary, these parents have communicated with their schools about their children's gender identity and/or exercised their right to select a school appropriate school for their children's needs, as well as discussed and intervened directly with their children on matters of

---

[9] The Parent Plaintiffs' specific allegations of how AB 1955 purportedly injures them for standing purposes focus repeatedly on the possibility that their children will be socially transitioned at school, with no recognition that the Act plays no role whatsoever with a school's policy decision to respect (or not respect) a student's gender identity. *See* FAC ¶¶ 355-78.

gender identity. *See id.* ¶¶ 11-12, 22-24 (1C discussed gender identity with parents, who later obtained agreement from child and school that 1C would use legal name and female pronouns), 37-39, 43, 46 (after suspecting that 2C was "having issues with gender confusion," parents placed child in therapy and strictly regulated internet activity; 2C later "came out" to parents and ultimately agreed to use legal name and female pronouns), 72-76 (after becoming aware of 4C's gender incongruence, parents transferred child to several different schools, before ultimately selecting a non-public, nonsectarian school), 94-100 (parents aware that 5C is "gender fluid," have made school selection choices, and actively intervened in child's behavioral problems), 155-71 (8A aware of 8C's gender incongruence, sought mental health services, ultimately found a therapist "aligned with their family's religious beliefs," exercise school choice to send other child, 8D, to a private Catholic schools).[10] In short, nothing in the FAC plausibly alleges that any of these parents are or will be hindered in their exercise constitutionally protected decision-making on account of AB 1955's bar on mandatory disclosure policies.

To the extent the FAC alleges that certain Parent Plaintiffs have or will suffer separate ancillary injuries associated with a lack of notification, these allegations are similarly deficient. Parent 1A, for instance, alleges that the agreement she reached with her child's school, including on disclosure, will become "more difficult" to enforce under AB 1955.  FAC ¶ 398. But this fear is wholly speculative because there is no allegation that the agreement actually conflicts with the Act's prohibition on blanket forced disclosure policies that apply to all students—much less an allegation that explains how it does so. Parent 2A worries that a hypothetical future social transition without notice "could" place 2C's academic record and

---

[10] Indeed, Plaintiffs 1A and 2A allege their children have agreed to return to using their given names and original pronouns at school, and there is no allegation that these parents have reason to believe their children will not honor this agreement and again request a new name and pronouns at school, prompting potential future privacy. *See e.g.*, FAC ¶¶ 24-25, 46; *see J&J Parents*, 78 F. 4th at 629-30 (rejecting speculative argument that "some of their own children could be" or "might soon be" students with a gender support plan).

1    mental health at risk. *See* FAC ¶¶ 44-48. But the FAC fails to allege how

2    ministerial errors concerning attendance records, *see id*.¶ 45 (one instance in which

3    a substitute marked 2C absent on account of the child's gender identity at school),

4    could have a lasting, non-correctable impact. Moreover, to the extent 2C exhibits

5    any mental health issues, state law explicitly permits non-consensual disclosure to

6    parents. *See e.g.*, Cal. Educ. Code ¶ 49602.[11]

7            **2.    Parent Plaintiffs Have Not Shown Causation or
8                 Redressability**

9         Even if Parent Plaintiffs had alleged a sufficiently concrete and imminent

10   injury, they still fail to establish causation and redressability. To satisfy the

11   causation requirement, a plaintiff must show that their alleged injury is "fairly

12   traceable" to defendant's alleged misconduct and not the result of third-party

13   conduct. *Lujan*, 504 U.S. at 560-61. The line of causation must be more than

14   attenuated and any links in the causal chain must remain plausible, rather than

15   hypothetical or tenuous. *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1142

16   (9th Cir. 2013). Causation is particularly challenging for plaintiffs to establish

17   when, as here, the challenged law does not regulate plaintiffs directly. *Lujan*, 504

18   U.S. at 562. A plaintiff may not "rely on speculation about the unfettered choices

19   made by independent actors not before the courts." *Clapper*, 568 U.S. at 415 n.5

20   (quotation marks omitted). Rather, they must show that the "third parties will likely

21   react in predictable ways" that will likely injure plaintiffs. *All. for Hippocratic*

22   *Med.*, 602 U.S. at 380 (citation omitted).

23        Plaintiffs fail to satisfy the causation requirement because any possible injury

---

24        [11] Plaintiffs' argument that several Parent Plaintiffs may be harmed by the Act because
25   they "have been threatened by their child when that child was being social transitioned at school"
is also baseless. FAC ¶ 371. Although the FAC alleges two families have been threatened by their
26   children in the past, *see* FAC ¶¶ 70, 96-99, there is no plausible inference that a school simply
respecting the youth's name and pronouns *caused* these threats or that a hypothetical future social
27   transition would "certainly" lead to future threats of violence. In fact, for one family, their child's
alleged threats came before the child began identifying as transgender, undermining any
28   possibility of causation. *Id.* ¶ 70-72.

to them would stem from either an individual educator or a policy in their local school districts, and not the Act itself. The Act only prohibits school districts from having forced-outing policies; it does not dictate the circumstances when this information can or cannot be shared, a decision that is ultimately set by local school districts and implemented by staff. In other words, AB 1955 does not prescribe what type of disclosure policy a district must adopt, but rather, simply prohibits a single type of policy—mandatory disclosure.

Parent Plaintiffs have not alleged that any school district policies are attributable to the Act or that, without the Act, their districts would have policies that would not allegedly harm them. In fact, as Plaintiffs explicitly acknowledge, school policies protecting the privacy of gender non-conforming students preexisted the Act. *See e.g.*, FAC ¶¶ 15, 42, 59, 75. Further, to the extent their hypothetical injuries were predicated on district policies that require student consent in most instances, the chain of causation would be doubly speculative and attenuated because it would depend not only on their district's independent policy-making decisions, but also the independent actions of their children not consenting to disclosure.

Parent Plaintiffs also fail to show redressability. While related to causation, redressability further examines the "connection between the alleged injury and requested judicial relief." *Bellon*, 732 F.3d at 1146. Here, enjoining the Act would not redress Parent Plaintiffs' hypothetical future injuries because the Act only prohibits forced-outing policies that do not exist at their schools. In other words, an injunction would have no effect on the actual local district policies that already exist and purportedly may injure the parents in the future. Indeed, it is clear that Plaintiffs' real dispute is not over the absence of forced school notification of their children's gender identity —information the Parent Plaintiffs all already have—but with their schools' willingness to provide a safe space by respecting students' gender identity and requested names and pronouns—a practice to which they

15

object. *See e.g.*, FAC ¶¶ 24, 38, 101, 141, 160, 163, 185, 376. But this is not relief they can obtain by attacking the Act, which does not dictate how schools respond to requests by students to use a different name or pronouns—or to requests by their parents not to do so. Put another way, even if AB 1955's prohibition on forced disclosure policies were enjoined, it does not follow that the Parent Plaintiffs' schools would be barred from recognizing students' gender identity, or would even be required to provide the notifications the Parent Plaintiffs claim are needed for full exercise of their protected parental rights. Simply put, the Act is not and will not be the source of these Plaintiffs' alleged injuries.

II.  **THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' CLAIMS BECAUSE THEY FAIL TO STATE COGNIZABLE CLAIMS AS A MATTER OF LAW**

A.  **Parent Plaintiffs' Substantive Due Process Claims Fail**

Parent Plaintiffs allege the Act violates their parental rights under the Due Process Clause, because it prohibits school districts from adopting or enforcing forced-disclosure policies. As a threshold matter, assuming such a right existed, Plaintiffs fail to meet the relevant standard for their facial challenge to the Act because there are instances where disclosure is permitted.

Parent Plaintiffs also fail to meet the requirements for their as-applied challenge based on their allegations that the challenged provisions of the Act violate the rights of Parent Plaintiffs 1A, 4A, 5A and 5B under the Due Process Clause of the Fourteenth Amendment. *See, e.g.,* FAC ¶¶ 397-403, pp. 70:3-6. The Act does not violate the Due Process Clause because parents do not have a fundamental right to force school staff to report their child's gender identity or gender expression. Also, the parental right regarding a student's medical care is not implicated because the Act does not involve medical treatment. And, even assuming any substantive due process right was implicated by the Act (and none is), it withstands constitutional scrutiny.

///

16

1
2

     **1.**     **Parent Plaintiffs' Facial Challenge Fails Because They Cannot Show the Act Would Be Invalid in Every Circumstance**

3       Parent Plaintiffs challenge the Act on its face, seeking to strike down Sections

4   5 and 6, as they pertain to prohibiting forced disclosure of students' gender identity

5   and gender expression, based on alleged parental substantive due process rights.

6   *See* FAC at 69:25-70:2 (seeking "injunctive relief preventing Defendants from

7   enforcing the challenged, severable provisions of AB 1955 §§ 5(a) and 6(a), as they

8   related [sic] to gender identity and gender expression"); *see also Foti v. City of*

9   *Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (facial challenge seeks to

10  "invalidate[] the law itself"). Plaintiffs' decision to bring a facial challenge "comes

11  at a cost." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). A facial

12  challenge is "the most difficult challenge to mount successfully, since the

13  challenger must establish that no set of circumstances exists under which the Act

14  would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

15      Parent Plaintiffs cannot meet that standard because the challenged portions of

16  the Act permit many scenarios through which information about their student's

17  gender identity and/or gender expression will be disclosed to parents, including at

18  least the following:

19         • When a school district adopts a policy requiring parental notification with

20            student consent, and school staff makes a disclosure with student consent.

21         • When a district adopts a policy permitting disclosure without student

22            consent if state law regarding student safety requires parental notification,

23            and information is conveyed to parents through that provision.

24         • When districts disclose information to parents to comply with

25            requirements imposed by state or federal law.

26         • When parents exercise their existing rights to visit schools and

27            classrooms, so they can be involved in school and their child's lives in

28            ways that would give them the ability to learn more about their child.

1          • When students and parents initiate conversations about gender identity

2              and expression with each other in the time and manner of their own

3              choosing; the Act promotes such family discussions through supports.

4              *See* Cal. Educ. Code, §217.

5          Thus, even assuming a due process right to compel schools to disclose to

6    parents that their child is presenting with a different gender expression, or using a

7    different name or pronouns than assigned at birth (which there is not), the Act does

8    not implicate such a right—and thus no there would be no violation—in these

9    circumstances. Because Parent Plaintiffs cannot meet their burden of showing "no

10   set of circumstances exists under which the Act would be valid," their claims

11   should be dismissed in their entirety. *See Salerno*, 481 U.S. at 745.

12             **2.    Substantive Due Process Does Not Require Schools to
                       Notify Parents of a Student's Gender Identity or
13                     Expression**

14         Parent Plaintiffs' claim that they have a substantive due process right to forced

15   disclosure by schools of information regarding their students' gender identity or

16   expression (FAC ¶¶ 417-422), fails because it is foreclosed by precedent. The Ninth

17   Circuit, based on longstanding Supreme Court precedent, has confirmed that while

18   parents have a substantive due process right to choose their child's educational

19   forum, they do not have a substantive due process right to direct their chosen

20   school's policies, administration, or curriculum. As such, courts have repeatedly

21   dismissed due process challenges to school policies across a range of contexts that

22   parents argued implicated important aspects of their child's upbringing.

23         There is no substantive due process right to compel schools to adopt a policy

24   that requires school staff to discriminate against transgender and gender

25   nonconforming students or place them in harm's way. The Due Process Clause of

26   the Fourteenth Amendment generally "protects an individual's fundamental rights

27   to liberty and bodily autonomy." *C.R. v. Eugene School Dist. 4J*, 853 F.3d 1142,

28   1154 (9th Cir. 2016). The Supreme Court has repeatedly made clear that parental

18

1   due process rights have "limited scope" in the educational context. *Norwood v.*
2   *Harrison,* 413 U.S. 455, 461 (1973); *Runyon v. McCrary*, 427 U.S. 160, 177
3   (1976). In *Runyon*, the Court rejected the claim that parental rights permitted
4   schools to discriminate against students, stating that parental rights to direct the
5   upbringing of their children—in the school context—are limited to the facts of
6   *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (right to send child to
7   private school) and *Meyer v. Nebraska*, 262 U.S. 390, 397, 403 (1923) (right to
8   provide instruction in languages other than English at private school). *Runyon*, 427
9   U.S. at 177. It has stressed that those precedents do not afford parents a
10  constitutional right to a "private school education unfettered by reasonable
11  government regulation." *Id*. at 163, 177-78. Thus, the rights recognized in *Pierce*
12  and *Meyer* do not support creating a parental right to force school staff to notify
13  parents of a student's gender identity or expression, or to constitutionally prohibit
14  the State from enacting law that forecloses such local policies.

15      Further, there is no infringement of a parental right where, as here, the Act
16  does not require or prohibit any action by parents, in contrast to the laws at issue in
17  *Meyer* and *Pierce*. *See, e.g., Anspach ex rel. Anspach v. City of Phila. Dep't of Pub.*
18  *Health,* 503 F.3d 256, 263-64 (3rd Cir. 2007) (no parental right at stake where
19  public health clinics gave contraception to minors without parental consent, because
20  clinics did not compel the minors in any way, including not forbidding them from
21  talking with their parents).

22      Following from this precedent, the Ninth Circuit has repeatedly held that a
23  parent has no substantive due process right to control the administration, policies,
24  curriculum, or operations of their student's school. *See Parents for Priv. v. Barr*,
25  949 F.3d 1210, 1231 (9th Cir. 2020); *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d
26  700, 711 (9th Cir. 2019); *Fields v. Palmdale Sch. Dist*., 427 F.3d 1197, 1204-1207
27  (9th Cir. 2005), *amended on denial of reh'g en banc*, 447 F.3d 1187 (9th Cir.
28  2006). A parent may choose their student's educational forum without state

19

1    interference, but once that decision is made, the parent's fundamental right to

2    control that education is "substantially diminished." *Fields*, 427 F.3d at 1206. A

3    parent has no substantive due process right to dictate how a school operates its

4    learning environment, even where a school's chosen policy conflicts with the

5    parent's beliefs about how best to raise their student. *See Parents for Priv.*, 949

6    F.3d at 1231 (parents are entitled to inform their child about sex and gender

7    identity, but have no substantive due process right to override school policy

8    allowing students to use facilities associated with their gender identity.) Allowing

9    this kind of claim would amount to imposing an obligation on schools to

10    "accommodate the personal, moral or religious concerns of every parent," which

11    "would not only contravene the educational mission of the public schools, but also

12    would be impossible to satisfy." *See Fields*, 427 F.3d at 1206.

13        District courts have applied this framework and precedent in a number of

14    recent challenges to school districts' policies or practices regarding social transition

15    of students, and held that parents do not have a substantive due process right to be

16    notified of their student's transgender or gender nonconforming identity by the

17    school district. *See, e.g., Regino v. Staley*, 2023 WL 4464845, at *3-4 (E.D. Cal.

18    July 11, 2023), *appeal docketed,* No. 23-1601 (9th Cir. July 21, 2023); *Foote v.

19    Town of Ludlow*, 2022 WL 18356421, at *5, 9 (D. Mass. Dec. 14, 2022), *appeal

20    docketed*, No. 23-1069 (1st Cir. January 17, 2023); *John & Jane Parents 1 v.

21    Montgomery Cnty. Bd. of Ed.*, 622 F. Supp. 3d 118, 130 (D. Md. 2022), *vacated

22    and remanded based on lack of standing*, 78 F.4th 622 (4th Cir. 2023), *cert. denied

23    sub nom. Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 144 S. Ct. 2560

24    (2024); *Blair v. Appomattox Cnty. Sch. Bd.*, 2024 WL 3165312 at *6 (W.D. Va.

25    June 25, 2024), *appeal docketed*, No. 24-1682 (4th Cir. July 24, 2024); *Doe v.

26    Delaware Valley Reg'l High Sch. Bd. of Educ.,* 2024 WL 5006711 at *17 (D.N.J.

27

28

20

1    Nov. 27, 2024)[12]

2

           **3.     The Act Does Not Implicate Parental Rights Related to The Refusal of Medical Care for Their Children**

3

4      Parent Plaintiffs also invoke the parental right to refuse medical treatment for

5 their minor children to support their argument for forced disclosure policies when

6 students "socially transition" at school.[13] Such parental rights are irrelevant here

7 because the Act does not address or impact medical treatment or care.

8      Medical treatment is what licensed healthcare professionals provide their

9 patients in the course of diagnosis and treatment, consistent with the regulated

10 practice of medicine. *See, e.g.*, *Shanks v. Blue Cross & Blue Shield of Wis.*, 979

11 F.2d 1232, 1233 (7th Cir. 1992). Thus, courts have recognized a parental

12 substantive due process right related to medical care for their children with respect

13 to in-patient hospitalization for mental illness, *Parham v. J.R.*, 442 U.S. 584, 604

14 (1979), medical examination of a child in protective custody, *Mann v. Cnty. of San

15 Diego,* 907 F.3d 115, 1162 (9th Cir. 2018), spinal taps, *Mueller v. Auker,* 700 F.3d

16 1180, 1186-89 (9th Cir. 2012), and blood draws to test for disease, *Kanuszewski v.

17 Michigan Dep't of Health and Hum. Serv.,* 927 F.3d 396, 411-16 (6th Cir. 2019).

18      By contrast, referring to a transgender or gender nonconforming person by

19 their chosen name and pronouns is not medical treatment—it is not regulated as a

20 form of medical care, nor does doing so require any diagnosis or licensure. Anyone

21

22     [12] Parent Plaintiffs also claim that "parents are entitled by law to their children's education records, and neither the child nor the state can thwart a parent in exercising this right." FAC ¶ 423 (citing FERPA). However, FERPA's right of access to written education records *upon request* (20 U.S.C. § 1232g(a)) is not implicated by AB 1955, which does not prohibit district personnel from providing education records to parents who request them under FERPA, even if the records contain information about a student's gender identity or expression. And, even if AB 1955 could somehow be construed to prohibit a district from providing parents access to their students' records when requested, its prohibitions are expressly limited by the phrase "unless otherwise required by state and federal law," which requires school districts to comply with FERPA. (Cal. Educ. Code, §§ 220.3, 220.5.)

27     [13] Plaintiffs use "social transitioning" to primarily refer to a student using a different first name and pronouns. *See, e.g.*, FAC at 3-4, ¶¶ 211-212, 398. This contrasts from medical treatments, such as "chemical and surgical transitioning" or the use of puberty blockers and hormones. *Id.* at ¶¶ 259, 270.

can respect a transgender or gender nonconforming person's identity, and doing so is a matter of courtesy and respect, not medical treatment. Parent Plaintiffs' allegation otherwise, *see* FAC ¶¶ 383, 385-86, is implausible. *See, e.g.*, *Foote*, 2022 WL 18356421 at *5 ("Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment . . . simply by honoring their requests to use preferred names and pronouns at school"); *Regino*, 2023 WL 4464845 at *3 (rejecting as conclusory the allegation that permitting social transitioning at school constitutes medical treatment).

Furthermore, having gender nonconforming expression or a transgender identity is not, in itself, a medical condition. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (while gender dysphoria is a recognized mental health disorder suffered by some gender nonconforming individuals, being transgender is "not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities"). Social transitioning is not limited to individuals who suffer from gender dysphoria.[14] Moreover, even for individuals with gender dysphoria, the mere fact that social transition has recognized benefits for their well-being does not render it medical treatment giving rise to a parental substantive due process right. For example, "aerobic exercise" has recognized benefits and is thus, at times, described as a "treatment." *Johnson v. Astrue*, 597 F.3d 409, 411 (1st Cir. 2009). But it is not credible to claim that schools perform medical treatment on students by permitting them to run on a playground. Because the Act does not

---

[14] Plaintiffs argue that the Ninth Circuit has recognized social transition as medical treatment. FAC ¶ 252 (citing *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024)). But the statement they cite is dicta in a footnote, unrelated to the issue in *Doe v. Horne* of whether transgender girls could play on school sports teams consistent with their gender identity. Moreover, the statement related to treatment for gender dysphoria, specifically, and also distinguished "social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents," from "medical transition, including puberty-delaying medication and hormone-replacement therapy" and "for adults, surgeries to alter the appearance and functioning of primary-and secondary-sex characteristics." *Doe v. Horne*, 115 F.4th at 1107 n.13.

implicate medical interventions, Parent Plaintiffs' reliance on parental rights related to their children's medical care is misplaced.

### 4.    The Act Survives Review, Whether Rational Basis or Strict Scrutiny Applies

Because there is no fundamental parental right to forced disclosure of Plaintiffs' children's gender identity or expression, there need only be a "reasonable relation to a legitimate state interest" to justify the Act. *Fields*, 427 F.3d at 1208 (applying rational basis review to parental substantive due process claim). The State has a legitimate, and even compelling, interest in protecting transgender and gender nonconforming students from bullying and harassment, and in fostering a safe and supportive school environment where students are not outed before they are ready. *See, e.g., New York v. Ferber*, 58 U.S. 747, 756 (1982) (state interest in "safeguarding the physical and psychological well-being of a minor" is compelling); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3rd Cir. 1980) (policy served compelling state interest in not discriminating against transgender students); *Parents for Priv.*, 949 F.3d at 1238 ("[T]he Student Safety Plan is rationally related to the legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status"); *Fields*, 427 F.3d at 1209; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (recognizing "long history of discrimination against transgender people") *cert. denied*, 143 S. Ct. 2414 (2023). The Legislature specifically enacted the Act to support and protect transgender, gender nonconforming, and gay students from such harms. *See* Background, § I, *supra*, at 2-5; RJN Ex. 1 at § 2 (setting forth Legislative findings for the Act).

The Act also supports the compelling governmental interest in protecting LGBTQ students' privacy. *See, e.g*., Cal. Const. Art. 1, §1; *Ngoun v. Wolf*, 517 F. Supp.2d 1177, 1191 (C.D. Cal. 2007) (student had "[c]onstitutionally protected privacy right with respect to disclosure of her sexual orientation" by school

1   administrators to her parents); RJN Ex. 1 at § 2(g); *In re M.T.,* 2024 WL 4614003 at

2   *7-9 (Cal. Ct. Appeal) (transgender person has a right to informational privacy in

3   limiting the timing and amount of the disclosure of confidential information).

4        Even if strict scrutiny applies here (and it does not), the Act would meet that

5   standard too. *Reno v. Flores,* 507 U.S. 292, 301-02 (1993) (government

6   infringement on "fundamental" right must be narrowly tailored to serve a

7   compelling state interest). It is narrowly tailored in furtherance of the State's

8   compelling interest in protecting students because, as previously discussed, it only

9   precludes districts from adopting and enforcing forced-disclosure policies, while

10  permitting mandatory disclosure when a student consents or in circumstances where

11  it would otherwise be required by state or federal law. Cal. Educ. Code, §§ 220.3,

12  220.5. The Act also allows districts to adopt policies that lay out other permissible

13  circumstances for parental disclosure. *See* Background, § I, *supra,* at 5, Argument,

14  § II, *supra*, at 17-18. Moreover, it supports families of LGBTQ students by offering

15  resources for them and their districts (Cal. Educ. Code, § 217), which may facilitate

16  open communications between LGBTQ students and their parents, with district

17  support.  Thus, the due process claims should be dismissed.

18       **B.    Parent Plaintiffs' Unconstitutional Conditions Claim Fails**
19            **Because It Is Derivative of Their Failed Due Process Claims**

20       Parent Plaintiffs further allege that the Act violates the "unconstitutional

21  conditions" doctrine. Specifically, they argue that the Act conditions "the benefit of

22  taxpayer funded education" on parents ceding their alleged "parental rights to

23  refuse medical treatment and make executive decisions for their child" to the state,

24  forcing them "to choose between removing their children from California's public

25  and charter schools or sacrificing the benefit of an education that they pay for with

26  their own tax dollars." FAC ¶¶ 408-12; *Koontz v. St. Johns River Water Mgmt.*

27  *Dist*., 570 U.S. 595, 604 (2013) ("the government may not deny a benefit to a

28  person because he exercises a constitutional right"). However, Plaintiffs first must

identify a fundamental right that the Act purportedly forces them to give up, which they cannot do. *See e.g., Parents for Priv.*, 949 F.3d at 1225 n.12 (because plaintiffs failed to show a violation of a substantive due process right, their unconstitutional condition argument based on that asserted right "also fails"). "If the asserted right is not protected by the Constitution," then any conditions allegedly placed on the asserted right "cannot be constitutionally impermissible." *Id.* (*citing Koontz*, 570 U.S. at 604.) Parent Plaintiffs' claim fails because it is wholly derivative of their deficient substantive due process claims.

### C.   The City's Declaratory Relief Claim Fails Because It Is Derivative of Parent Plaintiffs' Due Process Claims

The City alleges that under the Supremacy Clause, there is "no true conflict" between its Ordinance forbidding educators in the City from "withhold[ing] any information related to a child's sexual orientation, gender identity, or gender expression" from parents (FAC ¶ 320), and the Act, because the Act allegedly violates the Fourteenth Amendment. *Id.* ¶¶ 439-40. On that basis, the City requests a declaration that the Act (or the California statutes and constitutional provisions on which it is based), violate the Fourteenth Amendment, and "provides no obstacle" to the Ordinance. *Id.* ¶ 440. The City alternatively seeks a declaration that "disclosure of social transitioning, and issues regarding sexual orientation, gender identity, and gender expression to parents is required by federal law." *Id.* ¶ 441. But the City's claim fails too because it is derivative of the underlying substantive due process allegations. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1097 (N.D. Cal. 2022) (dismissing declaratory relief claim after all underlying claims were dismissed); *Martinez v. Newsom*, 46 F.4th 965, 972-973 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1782 (2023) (a claim for declaratory relief, standing alone, is insufficient to confer jurisdiction).

### CONCLUSION

Plaintiffs' claims should, therefore, be dismissed without leave to amend.

1    Dated:  January 8, 2025                    Respectfully submitted,

2                                               ROB BONTA
                                                Attorney General of California
3                                               DARRELL W. SPENCE
                                                Supervising Deputy Attorney General
4

5                                               *Jennifer Bunshoft*

6                                               JENNIFER A. BUNSHOFT
                                                Deputy Attorney General
7                                               *Attorneys for Defendants*

8    SA2024303201
     67341128.docx
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief contains 25 pages, which complies with the page limit set by the Judge Marshall's Standing Order, Section 7(c).

Dated:  January 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California

*Jennifer Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for Defendants*