# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CITY OF HUNTINGTON BEACH, a California Charter City and Municipal Corporation; and PARENTS 1A-9A,

      Plaintiffs,

v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his officially capacity as Attorney General of the State of California; TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction,

      Defendants.

Case No.: 8:24-cv-02017-CBM-JDE

**ORDER RE: DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

The matter before the Court is Defendants' Motion to Dismiss the First Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 58.)

## I.    BACKGROUND

This case involves a constitutional challenge to California's Assembly Bill 1955 ("AB 1955"), also known as the "Support Academic Futures and educators for Today's Youth Act ("SAFETY Act"). (*See* Ex. 1.)  AB 1955 was adopted by the California legislature in 2024 and took effect on January 1, 2025 as part of the California Education Code.[1]  *See* Cal. Educ. Code §§ 217, 220.1, 220.3, 220.5.  The law mandates that the state department of education shall develop resources and/or update existing resources to support LGBTQ students and their families, including affinity organizations, safe spaces, counseling services, staff who have received antibias and other training to support such students and families, and suicide prevention policies accessible to families.  *See* Cal. Educ. Code § 217.  Plaintiffs challenge only sections 5 and 6 of the law (the "Challenged Provisions").  (Dkt. No. 52 ("First Amended Complaint" or "FAC"), ¶ 383.)  These provisions read:

> 220.3 (a) An employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law.
> (b) Subdivision (a) does not constitute a change in, but is declaratory of, existing law.

> 220.5. (a) A school district, county office of education, charter school,

---

[1] Defendants' unopposed request for judicial notice of (1) a copy of AB 1955 (Ex. 1), and (2) the Assembly Committee on Education's report on AB 1955 (Ex. 2) is hereby **GRANTED**.  *See* Fed. R. Evid. 201; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (it is appropriate to take judicial notice of information "made publicly available by government entities" where there is no challenge to the authenticity or accuracy of the information).

state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, shall not enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law.

(b) Subdivision (a) does not constitute a change in, but is declaratory of, existing law.

(c) Any policy, regulation, guidance, directive, or other action of a school district, county office of education, charter school, or state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, that is inconsistent with subdivision (a) is invalid and shall not have any force or effect.

After AB 1955 was adopted, the City of Huntington Beach passed an ordinance designating the City as a "Parents' Right to Know" city and declaring that no educators in the City "shall withhold any information related to a child's sexual orientation, gender identity, or gender expression to Parents of said children with or without the child's consent." (Ex. 2, § 1.23.020.) The ordinance explicitly challenges AB 1955 and provides that with a majority vote by the City Council, the City Attorney "may initiate a legal action . . . to challenge AB 1955." (*Id.*, § 1.23.030.)

Plaintiffs are the City of Huntington Beach and ten parents (Parents 1A-10A) whose children either have experienced gender identity issues, have mental health conditions that allegedly place them at a "higher risk" of experiencing gender identity issues, or have allegedly been influenced or "pushed" by their schools to question their gender identity. (FAC, ¶¶ 7-198.) Only one of the Parents, Parent 10A, are alleged to live in Huntington Beach. (*Id.*, ¶ 187.) Defendants are California Attorney General Rob Bonta and California State Superintendent of Public Instruction Tony Thurmond.[2] (*Id.*, ¶¶ 199-200.) Plaintiffs bring the

---

[2] In the initial Complaint, Plaintiffs also named Governor Gavin Newsom as a

following claims: (1) a Fourteenth Amendment Due Process claim for violation of parental right to refuse treatment of their minor children; (2) a Fourteenth Amendment "unconstitutional conditions" claim for forcing parents to forfeit their parental rights; (3) a Fourteenth Amendment Due Process claim for violation of parental right to information; and (4) a claim for declaratory judgment that either AB 1955 violates the Fourteenth Amendment of the U.S. Constitution, or "disclosure of social transitioning, and issues regarding sexual orientation, gender identity, and gender expression to parents is required by federal law." (FAC, ¶¶ 379-442.) Only the parents bring claims (1)-(3), while only the City brings claim (4). On December 3, 2024, Plaintiffs filed a First Amended Complaint. On January 8, 2025, Defendants filed the instant Motion. On April 2, 2025, the Court held a hearing on the Motion.

## II.    STATEMENT OF THE LAW

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. Defendants here mount a facial attack on the FAC on the grounds that both the City and the Parent Plaintiffs lack standing to bring their claims. "[T]he burden of establishing [subject matter jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." "A complaint may be dismissed for failure to state a claim only when it fails to state a

---

Defendant. (Dkt. No. 1.) Plaintiffs appear to have dropped Governor Newsom from the case in the FAC.

cognizable legal theory or fails to allege sufficient factual support for its legal theories. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The Court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics, Inc.*, 824 F.3d at 1159 (citation omitted). But a plaintiff must provide "more than labels and conclusions" to state the grounds for the relief he seeks, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## III.    DISCUSSION

### A.    Standing

#### 1.    *Huntington Beach*

Defendants contend that the City lacks standing to bring the declaratory relief claim because, as a political subdivision of the State, it cannot sue the State to challenge state law on federal constitutional grounds. (Mot. at 15.) Plaintiffs concede that "its *direct* claims as an entity are foreclosed" by *City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*, 625 F.3d 231 (9th Cir. 1980), but notes that it "preserves the issue" for appellate review, including the question of whether a charter city is a political subdivision of the State. (Opp. at 21.) Plaintiff argues that in any case, "no binding precedent precludes a city from asserting third-party standing on behalf of its residents," and that it has associational standing under

1   *Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002).

2       "It is well established that political subdivisions of a state may not challenge
3   the validity of a state statute under the Fourteenth Amendment." *South Lake Tahoe*,
4   625 F.2d at 233; *see also In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
5   481 F.2d 122, 131 (9th Cir. 1973) (political subdivisions such as cities and counties
6   "cannot sue as *parens patriae*").  "This is true whether the defendant is the state
7   itself or another of the state's political subdivisions." *Id.*; *see also Palomar*
8   *Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999).  The Ninth
9   Circuit has interpreted *South Lake Tahoe* as establishing a "per se" bar against a
10  political subdivision's standing to challenge the constitutionality of state laws in
11  federal court.  *See City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*, 937 F.3d
12  1278, 1280 (9th Cir. 2019); *Burbank-Glendale-Pasadena Airport Auth. v. City of*
13  *Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998).  The Ninth Circuit has not
14  recognized any exception to this per se rule, and in fact has expressly rejected the
15  argument that charter cities are not political subdivisions of the State.  *See Burbank-*
16  *Glendale-Pasadena Airport*, 136 F.3d at 1364 ("charter cities in California
17  generally are defined as political subdivisions along").

18      The FAC alleges that the City has standing on several grounds: (1) as a
19  charter city, it is an independent political organization that does not "pretend to
20  exercise any functions of the state," (2) AB 1955 will economically harm the City;
21  (3) AB 1955 injures the City's "ability to function as a municipality in regulating
22  persons and property within its jurisdictional control," (4) the City has standing to
23  sue to protect its proprietary interests, (5) the City has *parens patriae* standing on
24  behalf of its citizens, and (6) the City is an association of its residents.  (FAC,
25  ¶¶ 330-351.)  These allegations directly contradict Ninth Circuit precedent that the
26  City has no standing here.  Plaintiffs' attempt to distinguish direct standing from
27  associational standing is unpersuasive.  It is Plaintiffs' burden to prove that
28  jurisdiction exists, and Plaintiffs provide no authority that associational standing is

an exception to *South Lake Tahoe*'s per se standing bar in this context.[3]  As a political subdivision, the City lacks standing to bring its claim against the State in this case.  *See City of Huntington Beach v. Newsom*, 2024 WL 4625289, at *1 (9th Cir. Oct. 30, 2024) ("No matter how California categorizes charter cities, they remain subordinate political bodies, not sovereign entities").

Accordingly, the Court **GRANTS** Defendants' 12(b)(1) Motion as to the City for lack of standing.

### 2.    Parents

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  Defendants challenge the Parent Plaintiffs' allegations on all three elements.  (Mot. at 17–24.)

### a)    Injury-in-fact

An injury in fact is one that is "concrete and particularized." *Lujan*, 504 U.S. at 560 (internal quotations omitted).  The "concrete" and the "particularized" analyses are separate—"[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way," while "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–340 (2016).  "Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial

---

[3] *Central Delta Water Agency* involved two state agencies that "perform[ed] the functions of a traditional trade association representing the Washington apple industry" and sought to "protect interests germane to their purposes."  306 F.3d at 951.  The City does not represent an industry, nor does it function like a traditional trade association.

risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  However, allegations of *possible* future injury are not sufficient.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

While the Ninth Circuit has not analyzed standing in such a case, other circuit courts have reviewed school district policies allowing schools to withhold information about gender support plans under certain circumstances and found that parents lacked standing to raise constitutional challenges to those policies.  *See, e.g., John and Jane Parents 1 v. Montgomery County Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2560 (2024) (finding parents lacked standing because they did not allege their children had gender support plans or discussed gender identity issues with school officials, nor did they allege they suspected the children were considering gender transition or were at heightened risk of doing so); *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wisconsin,* 95 F.4th 501, 506 (7th Cir.), *cert. denied*, 145 S. Ct. 14 (2024) (relying on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) to find that parents' "expressions of worry and concern" over gender support plans were insufficient to establish actual or imminent injury).[4]

---

[4] Some district courts, however, have come to the opposite conclusion.  *See, e.g., Mirabelli v. Olson*, 2025 WL 42507, at *6 (S.D. Cal. Jan. 7, 2025) (finding standing where parents alleged that school staff were not truthful about child's gender identity change, school told parents they were not permitted to disclose identity because of State Department of Education's FAQ guidance, parents feared placing other children in public schools in light of schools withholding this information, and parents could not afford private school); *Doe v. Delaware Valley Reg'l High Sch. Bd. of Educ.*, 2024 WL 5006711, at *8 (D.N.J. Nov. 27, 2024) (finding injury where they alleged the school referred to child by preferred name and pronouns without parent's knowledge or consent, that the defendants would continue to comply with the policy, and that parent intended for child to return to the school rather than transfer her to a school with a different policy); *Lee v. Poudre Sch. Dist.*, 2023 WL 8780860, at *5 (D. Colo. Dec. 19, 2023) (finding injury where parents alleged they had strong and sincere religious convictions regarding gender identity, defendants

Here, the FAC alleges sufficient facts that the Parent Plaintiffs' alleged injuries are particularized, and Defendants do not argue otherwise. As for the "concrete" requirement, the FAC alleges the Parent Plaintiffs face "imminent harm" from AB 1955 in the following ways—(1) they "will be injured when information . . . about their children is withheld from them"; (2) they "will be harmed in their ability to parent their children"; (3) they "will be harmed if their children receive medical treatment without their knowledge and consent, including through social transitioning"; (4) they "will be harmed by having a state wide policy in place that prohibits schools from requiring government school employees to inform parents if they plan to offer medical treatment to their children"; (5) certain Parent Plaintiffs "suffer imminent harm specific to their circumstances" (Parents 1A, 6A, and 10A); (6) "at least some Parent Plaintiffs suffer immediate harm" given that AB 1955 took effect at the beginning of this year (Parent 3A); and (7) they "will be harmed in their constitutionally protected right to parent their child, including to reject the treatment of social transitioning." (FAC, ¶¶ 356-376.) None of these allegations establish a current injury—thus, Parent Plaintiffs can only establish standing if the alleged future injury is "certainly impending" or "there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158.

AB 1955 is mandatory rather than permissive—*i.e.*, it *prohibits* school staff from sharing social transitioning information from parents unless and until the child gives their consent, as opposed to *allowing* school staff to withhold information under certain circumstances. This takes some of the "guesswork" out of the chain of events that must occur for the Parent Plaintiffs to suffer the alleged injuries. *John and Jane*, 78 F.4th at 631. Even so, the chain of events leading to injury is still

---

improperly taught "sexually themed matters" to children without notice or opportunity to opt out, parents would have opted their child out if they had notice, and defendants violated their fundamental parental right to make decisions regarding upbringing, education, custody, care, and control).

considerably attenuated for the parents who do not allege their children have questioned or are questioning their gender identity.  Parent 6A explicitly pleads that his child "has no signs of gender dysphoria" and "has not displayed any issues with gender confusion."  (FAC, ¶¶ 111, 120.)[5]  Parent 9A only alleges facts indicating that 9C has questioned their sexual orientation, not their gender identity—and Plaintiffs do not allege they will be injured by AB 1955's prohibition on disclosure of sexual orientation without student consent.  (*Id*., ¶ 179.)  While Parents 3A and 10A allege that their children's diagnoses of autism spectrum disorder places them at "higher risk of gender dysphoria" (FAC, ¶¶ 53, 188)[6], they do not allege facts indicating that the entire chain of events is certainly impending or at a substantial risk of occurring, particularly as to step (3).[7]  For these parents to suffer the alleged harm, (1) their child must decide they are transgender or gender nonconforming; (2) the child must inform the school of their gender identity and/or desire to socially transition; and (3) the child must hide this information from their parents.  The allegations do not establish that this chain of events is certainly impending or at a substantial risk of occurring for these parents.  Another court analyzing standing in

---

[5] 6A's allegations that his child's mother dressing the child in girl's clothing does not establish that the alleged injury is "certainly impending" or at substantial risk of occurring, particularly given the contradictory allegations expressly stating the child shows no signs of gender identity issues.  (FAC, ¶ 114, 116.)

[6] 3A's allegations that her child, a biological boy, prefers to play with girls and that he is "very interested in colors, patterns, symbols, and rainbows," and that untrained teachers may mistake his friendships and interests as "indications of gender confusion," also do not support the conclusion that the child is likely to question his gender identity, much less that the whole chain of events is certainly impending.

[7] 3A has also alleged that she has begun discussing gender issues with her child at a "much earlier age than she would have otherwise" because of AB 1955, and that the "anticipation of AB 1955 going into effect has thus caused [her] to alter her parenting in ways she is not comfortable with but feels are necessary."  (FAC, ¶¶ 62-63.)  However, the Supreme Court has held that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416.

a lawsuit challenging AB 1955 has recently concluded the same. *See Chino Valley Unified Sch. Dist. v. Newsom*, 2025 WL 1151004, at *5 (E.D. Cal. Apr. 17, 2025) (finding parents failed to show injury-in-fact where they did "not allege that their own child has acted in a way—i.e., requesting to by a different name or pronoun— that would implicate AB 1955's restriction on informing parents of their children's decision to use a different name or pronouns"). Instead, the allegations suggest these parents "might only have a general legal, moral, ideological, or policy objection to a particular action," which is insufficient to establish Article III standing. *All for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs argue that Parent 10A has alleged injury to his procedural right under the City's ordinance, which prohibits educators from withholding information about a child's gender identity. (Opp. at 15; FAC, ¶¶ 197–98, 372.) The single case they cite, *Spokeo, Inc. v. Robins*, only states that "violation of a procedural right granted by statute *can* be sufficient *in some circumstances*" to constitute injury. 578 U.S. 330, 342 (2016) (emphasis added). *Spokeo* also involved the FCRA—a federal statute—and Plaintiffs cite to no authority holding that a city ordinance can serve as a basis for injury, particularly given that AB 1955 preempts the ordinance. *See Conejo Wellness Ctr., Inc. v. City of Agoura Hills*, 214 Cal. App. 4th 1534, 1552 (2013) (under the California Constitution, "[o]therwise valid local legislation that conflicts with state law is preempted and therefore void"). Therefore, Parent 10A has not sufficiently pled an injury-in-fact.[8]

For the six remaining families who have alleged their children are

---

[8] Plaintiffs also argue that some of them lived in communities requiring schools to inform parents of social transitioning, and AB 1955 ends those policies. (FAC, ¶¶ 366-367.) It is unclear to which of the parents this applies, but in any case, the cases cited in the FAC are inapposite as they involved challenges under the Equal Protection Clause, not the Due Process Clause. *See Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007); *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1163 (9th Cir. 2024).

transgender or gender nonconforming or have questioned their gender identity, the FAC alleges sufficient facts to establish injury.  The facts vary as to each family, but broadly speaking, they indicate that each child has questioned and/or continues to question their gender identity, that (in some cases) the schools have already been using the children's preferred pronouns and gender identities, and that AB 1955 will prevent the parents from being notified of any changes to their children's gender identities.  (FAC, ¶¶ 7-29 (Parent 1A); 30-50 (Parent 2A); 65-80 (Parent 4A); 87-104 (Parent 5A); 126-146 (Parent 7A); 147-170 (Parent 8A).)[9]  Crucially, the allegations reflect that the parents and children are at odds with each other regarding how to address these gender identity issues, resulting in difficulties parenting the children in the manner the parents want to raise them.  Defendants argue that these Parent Plaintiffs cannot show injury in fact because AB 1955 "is narrowly focused on school policies requiring notification, and these parents are all unequivocally aware of their children's gender identity at school."  (Mot. at 19.)  However, Plaintiffs allege that identifying as transgender is not an "immutable characteristic," that some transgender or gender nonconforming individuals revert to identifying with their biological sex, and that the "loss of information is not a one-time event." (FAC, ¶¶ 267-284; 357-358.)  Taken together and construed in favor of Plaintiffs, the allegations establish a substantial risk that these children may change gender identities in the future, that they may choose to socially transition to that identity at school, and that they would refuse consent for the school to inform the parents. Therefore, these parents have sufficiently alleged injury-in-fact.

        b)    <u>Causation and redressability</u>

Causation and redressability "are often flip sides of the same coin."  *All. for*

---

[9] However, Plaintiffs have not alleged standing based on 4D, 5D, or 8D.  Plaintiffs have not alleged that these children show any signs of questioning their gender identity, and thus, there is no injury-in-fact based on 4D, 5D, or 8D.  (FAC, ¶¶ 105-110.)

*Hippocratic Med.*, 602 U.S. at 380 (internal quotations omitted).[10]  "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id*. at 381.  "[W]hen . . . a plaintiff challenges the government's "unlawful regulation . . . of someone else, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id*. at 382 (internal quotations omitted).   For plaintiffs who are "unregulated parties," "causation ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id*. at 383 (internal quotations and brackets omitted).  Plaintiffs must show that the "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id*. (internal quotations omitted).  "Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action." *Id*.

Because Parents 3A, 6A, 9A, and 10A have not alleged injury, the Court does not reach causation or redressability as to these Parents.

The FAC sufficiently alleges causation and redressability as to Parent 1A— the FAC alleges that she had a prior agreement with the school to notify her if her child questions their gender identity in the future (which contradicted district policy, *see* FAC, ¶ 15), and that AB 1955 expressly prevents the school from so notifying 1A without her child's consent.

Parent 2A alleges that school staff were already withholding information about her child's gender identity and social transition before AB 1955.  (FAC, ¶¶ 42, 44 (alleging that teachers began using a male name and pronouns for 2C at school but concealed this from the parents by using 2C's female name and pronouns in

---

[10] Causation for standing purposes requires that the injury be fairly traceable to the challenged action of the defendant, and not the "result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.  Redressability must be "likely, as opposed to merely speculative." *Id*. at 560 (internal quotations omitted).

emails to the parents).)  While AB 1955 may "exacerbate[]" the risks of social transition and nondisclosure (FAC, ¶ 50), 2A has not pled any facts indicating that without AB 1955, the school would be amenable to disclosing any changes to 2C's gender identity without the child's consent.  In other words, even if the Court finds that prohibiting disclosure is unconstitutional, that does not necessarily mean 2C's school is *required* to disclose the information to 2A under any circumstances.  Thus, even if 2A has pled causation, she has not pled redressability.

For Parents 4A, 5A, 7A, and 8A, construing the allegations in favor of Plaintiffs, it is plausible that without AB 1955, the schools may disclose their children's gender identity or social transition information to them even without student consent.  Plaintiffs allege that some of them lived in districts with policies "requiring schools to inform parents if the school had been asked to facilitate social transitioning." (FAC, ¶ 367.)  This further supports that AB 1955 plausibly changed how some districts handle these issues, and that without AB 1955, the districts might be willing to inform these parents of social transition or gender identity information regardless of student consent.[11]  Therefore, these parents have sufficiently pled both causation and redressability.

       c)    Conclusion

Accordingly, the Court finds that Parents 2A, 3A, 6A, 9A, and 10A lack standing to bring their claims based on the current allegations, and **GRANTS** Defendants' 12(b)(1) Motion to Dismiss as to these Plaintiffs.  The Court **DENIES** the 12(b)(1) Motion as to Parents 1A, 4A, 5A, 7A, and 8A.

---

[11] Defendants' arguments that any injury would stem from school staff or districts are unpersuasive because "standing [does not] require the defendant's action to be the sole source of injury."  *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013).  "A 'causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.'"  *Id*.  Parents 4A, 5A, 7A, and 8A have sufficiently pled that AB 1955 is one cause in a chain that will likely result in nondisclosure and social transition without their consent.

**B.    Due Process Parental Right to Refuse Medical Treatment (Count 1)**

Because Parents 1A, 4A, 5A, 7A, and 8A have established standing, the Court proceeds to Defendants' 12(b)(6) Motion as to these Plaintiffs.  Plaintiffs' first claim is for violation of their parental rights to refuse medical treatment under the Due Process Clause.  (FAC, ¶¶ 379-403.)  To state a claim for relief in an action brought under § 1983, a plaintiff must show that (1) they were "deprived of a right secured by the Constitution or laws of the United States," and (2) "the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).

Only the first element is at issue here.  Defendants argue that (1) Plaintiffs fail to show that there are *no* set of circumstances under which the Challenged Provisions would be valid, as required for a facial challenge to the law; (2) the provisions do not implicate parental rights to refuse medical treatment of their children; and (3) the provisions survive both rational basis and strict scrutiny review.  (Mot. at 25–32.)  The Court addresses each of these arguments in turn.

*1.    Facial Attack*

"A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (when a plaintiff chooses to bring a facial attack on a law, "that decision comes at a cost").  Defendants contend that Plaintiffs cannot meet the standard for a facial attack on AB 1955 sections 5 and 6 because the provisions "permit many scenarios through which information about their student's gender identity and/or gender expression will be disclosed to parents." (Mot. at 25.)  Defendants provide several examples— (1) when districts require disclosure when the student provides consent, (2) when districts permit disclosure without student consent if state laws regarding safety requires disclosure, (3) when districts disclose in order to comply with requirements

of federal or state law, (4) when parents visit the schools or classrooms to be involved "in ways that would give them the ability to learn more about their child," and (5) when students and parents initiate their own conversations about gender identity in a time and manner "of their own choosing." (*Id.*)

The FAC alleges that the "imposition of a communications barrier between teachers and parents regarding their child's gender identity . . . impairs parents' ability to raise their children," and that without information about "their child's gender dysphoria" or "desire and attempt to socially transition," they "suffer the loss of their exclusive decision-making authority over whether the medical treatment of socially transitioning their child is in their child's best interest and how best to help their child through that difficult situation." (FAC, ¶ 386.) Thus, Plaintiffs' theory is that in any scenario, AB 1955 deprives them of their alleged constitutional right to make decisions regarding their children's medical treatment. In all of Defendants' scenarios, the child decides whether they socially transition and whether the school informs the parents of that decision. Thus, these scenarios do not demonstrate that Plaintiffs' facial challenge fails. In any case, Plaintiffs clarify that they also bring as-applied challenges to AB 1955. (Opp. at 31.) Accordingly, this is not a basis to dismiss Plaintiff's claim.[12]

### 2. Substantive Due Process Right

"The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property, without due process of law." *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022) (internal quotations and brackets omitted). This includes the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v.*

---

[12] Defendants' cases do not suggest otherwise and are also inapposite as they involve facial challenges under the First (*Moody*, 603 U.S. 707; *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)) and Fifth (*Salerno*, 481 U.S. 739) Amendments.

*Granville*, 530 U.S. 57, 66 (2000).  That right, however, "is not without limitations." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005), *opinion amended on denial of reh'g en banc*, 447 F.3d 1187 (9th Cir. 2006).  The Supreme Court has cautioned that courts must "exercise the utmost care whenever we are asked to break new ground in this field." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  In line with this admonition, courts, including the Ninth Circuit, have rejected attempts to expand the contours of this parental right into areas not recognized by Supreme Court precedent.  *See Fields*, 427 F.3d at 1207 (rejecting parental right to "exclusive control" over their children's exposure to sexual subjects" because parental rights do not "extend beyond the threshold of the school door"); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1233 (9th Cir. 2020) (affirming district court's dismissal of claim that "Student Safety Plan" allowing transgender students to use "any of the bathrooms in the building to which [they] identif[y] sexually" violated parental right to direct care, education, and upbringing of children because the law did not recognize the "specific rights asserted by Plaintiffs); *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 263 (3d Cir. 2007) (providing a minor with emergency contraceptive pills without parents' knowledge or consent did not violate parental substantive due process rights).

More recently, however, the Ninth Circuit has clarified that "a right need not have been expressly recognized as fundamental in caselaw for it to be deeply rooted in our history and tradition and implicit in the concept of ordered liberty," and that its precedent does not require plaintiffs "asserting a substantive due process claim [to] show that existing precedent clearly establishes the asserted fundamental right." *Regino v. Staley*, 133 F.4th 951, 962 (9th Cir. 2025).  In *Regino*, a case that also involved a student who began using a different name and pronouns at school with the help of a school counselor and without the parent's knowledge, the Ninth Circuit vacated the district court's dismissal of the plaintiff's constitutional claims

(including a substantive due process claim) because the district court "imposed the qualified immunity standard instead of applying the established test for determining whether an asserted right is fundamental." *Id*. at 962.  However, the circuit did not reach the issue of whether the plaintiff alleged the infringement of a fundamental right—instead, it instructed the district court to consider the issue by "follow[ing] the 'established method' of substantive due process analysis." *Id*. at 964.  The circuit provided the following guidance for conducting this analysis:

> (1) The analysis "begins by 'carefully formulating' the asserted fundamental right," which "require[s] the court to examine [the plaintiff's] articulation of the particular fundamental right she asserts"—in doing so, "the court must eschew sweeping generalizations, and instead 'adopt a narrow definition of the interest at stake'" by "consult[ing] 'both the scope of the challenged regulation and the nature of [the plaintiff's] allegations'";

> (2) "After formulating the asserted fundamental right, the district court must consider whether the asserted right itself, or one in which it is encompassed, is 'objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'"

*Id*. at 964–65.  The circuit further noted that neither the plaintiff's position "that parental rights are nearly unlimited" nor the defendant's position that the "child's right to make decisions is nearly unrestricted" was correct.  *Id*. at 965.  Finally, the circuit directed the district court's attention to several Supreme Court and Ninth Circuit cases articulating the bounds of such parental rights.  *Id*, at 965–66.

The Court now conducts this analysis as articulated by the Ninth Circuit.

### a)    Asserted fundamental right

The FAC alleges that the parents' right "to make medical, including mental health, decisions for their children" is encompassed within their "fundamental right to direct their children's upbringing."  (FAC, ¶¶ 381-82.)  The FAC alleges that AB 1955 violates this right because it "unconstitutionally prohibits schools from

informing parents when medical treatment is occurring at school" without the child's consent. (*Id*., ¶ 385.) The "medical treatment" at issue is social transitioning, which the FAC alleges is "medical care and treatment" that is sometimes used to treat "[g]ender dysphoria and gender incongruence" and defines as including "changing a person's pronouns, name, clothes, bathroom, or sports team, and in some cases, breast-binding or genital-tucking." (*Id*., ¶ 252.) The FAC alleges that without information about their children's "symptoms of gender dysphoria and/or gender incongruence or . . . desire and attempt to socially transition," the "parents suffer the loss of their exclusive decision-making authority over whether the medical treatment of socially transitioning their child is in their child's best interest and how to best help their child through that difficult situation." (*Id*., ¶ 386.)

Plaintiffs challenge only sections 5 and 6 of AB 1955. Those provisions prohibit schools and school district employees from disclosing "any information related to a pupil's . . . gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." Cal. Educ. Code, §§ 220.3, 220.5. The scope of these provisions prevents parents whose children do not disclose their desire to socially transition from intervening in or objecting to any attempts by the child to socially transition at school, or more broadly, from making the ultimate decision about whether the child socially transitions at school. Additionally, AB 1955 "make[s] no distinction between children who are six and those who are seventeen." *Regino*, 133 F.4th at 963.

Therefore, Plaintiffs appear to assert a fundamental right to decide whether their child socially transitions to the child's desired gender identity—more specifically, the right to prevent the child from socially transitioning to a desired gender identity.[13]

---

[13] Plaintiffs also appear to assert a fundamental right to have their child's school notify them of any changes to the child's gender identity or attempts to socially

b)    <u>Whether the asserted right is rooted in this Nation's history and tradition</u>

Having formulated the asserted fundamental right, the Court now considers whether this right is "deeply rooted in this Nation's history and tradition" and therefore guaranteed by the Due Process Clause. *Regino*, 133 F.4th at 965. Several problems arise for Plaintiffs at this step.

First, despite Plaintiffs' ample allegations that social transition is a "medical treatment," it is not clear to the Court how social transitioning, as described in the FAC, entails actions that are "medical" in nature. Changing pronouns, names, clothes, bathrooms, or sports teams does not require the involvement of any medical personnel or procedure. Breast-binding and genital-tucking, while perhaps more physical in nature, are not medical procedures, nor do they require medical personnel (or anyone other than the person socially transitioning, for that matter). Plaintiffs attempt to overcome this obstacle by alleging that the Ninth Circuit has recognized social transitioning as "medical care and treatment"; Plaintiffs also include multiple citations to articles regarding social transitioning. (Compl., ¶¶ 253-261.) However, none of the quoted language from these sources characterizes social transition as a *medical* treatment, as opposed to a non-medical "treatment," "decision," "active intervention," or "psychological change[]" that can be part of a broader care plan that also includes medical treatments and procedures.[14]    (*Id*.) Plaintiffs' own allegations appear to acknowledge that social transition differs from other interventions that are medical in nature. (*See* FAC, ¶¶ 262 (describing "chemical and surgical" transition), 270 (describing "medical treatment" as

---

transition—this separate and distinct right is addressed under their second due process claim.

[14] *Doe v. Horne*, the Ninth Circuit case cited in these allegations, distinguished "social transition" from "medical transition," even though it stated that social transition could be part of an overall "medical treatment" plan. 115 F.4th 1083, 1107 n. 13 (9th Cir. 2024). Further, the quoted language appears in a footnote in the decision and is dicta. *Horne* did not hold that, from a legal standpoint, social transition is a "medical treatment."

"puberty blockers, hormones, or surgeries"), 273-274 (separating "social transition" from "medical transitions").) While the Court is required to accept all allegations as true at this stage, it is not required to accept unwarranted deductions of fact or implausible theories. *Sprewell*, 266 F.3d at 988; *Ashcroft*, 556 U.S. at 678. Courts have found it appropriate to dismiss similar due process claims at the 12(b)(6) stage where the alleged conduct does not plausibly constitute "medical treatment." *See Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 96 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 570 (2024) (affirming district court's dismissal of due process claim after finding that the alleged medical treatment, wearing a face mask, "is neither a medical treatment nor a restraint so onerous as to merit heightened constitutional scrutiny" and finding no authority indicating mask mandate violated parental right to make medical decisions); *Forbes v. Cnty. of San Diego*, 2021 WL 843175, at *8 (S.D. Cal. Mar. 4, 2021) (dismissing due process claim without leave to amend for lack of plausibility because "[t]he Court . . . doubts that requiring people to wear a mask qualifies as 'medical treatment' within the meaning of the Due Process Clause" and noting a mask mandate was "a far cry from compulsory vaccination . . . and other comparable intrusions into personal autonomy").

The Court finds *Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025) instructive in this regard. There, the parents argued that school staff performed a "psychosocial treatment" on their child by accepting the child's social transition because social transition is "recognized as a medical/mental health treatment for children with gender dysphoria." *Id*. at 349. Pursuant to a policy of nondisclosure like the one in AB 1955, the school did so without parental consent—the parents argued that therefore, the school had "usurped" their "fundamental right to direct medical treatment for their child." *Id*. The First Circuit held that these allegations were not sufficient to state a violation of the right to direct medical treatment because "their allegations as stated do not suffice to describe medical treatment at all." *Id*. at 350. The circuit concluded that "using the Student's chosen

name and pronouns -- something people routinely do with one another, and which requires no special training, skill, medication, or technology – without more," could not "be reasonably viewed as evidencing some indicia of medicalization." "The Parents, for example, failed to allege that Ludlow's use of the Student's requested pronouns involved a 'treatment plan' of any sort." *Id.* at 349.

So too here—there are no allegations suggesting that AB 1955 allows schools to implement a medical treatment plan for children without parental consent. Plaintiffs do not allege, for example, that schools will implement a plan for their children to undergo hormone therapy or weekly sessions with a clinical therapist,[15] while also socially transitioning, without parental consent because of AB 1955. Further, the statute does not require schools to facilitate a student's social transition (let alone medical interventions)—all it requires is that schools do not disclose a student's gender identity information to parents without student consent. Nondisclosure is not "medical treatment"—for this reason alone, Plaintiffs' facial challenge fails. Plaintiffs 1A, 5A, and 7A allege that their children's schools have already used their children's preferred names and pronouns without their knowledge or over their objections in the past. (FAC, ¶¶ 14-19, 101, 138-141.) Thus, as applied to those parents, AB 1955 may result in social transition without their consent.[16] But without something more that "transform[s] the alleged conduct into a medical intervention," these Plaintiffs similarly have not pled a "plausible" theory that AB 1955 allows schools to violate their right to refuse medical treatment. *Foote*, 128 F.4th at 349–50 ("we need not abandon our 'judicial experience and common sense'

---

[15] 7A's allegations regarding 7C's counseling sessions with the school counselor is not sufficient to allege medical treatment—the FAC does not allege the counselor is a clinical therapist or acting as a clinical therapist in her sessions with 7C.

[16] 4A also alleges that 4C's prior school used a different name and pronouns for 4C, but alleges that 4C is now in a different school. 4A does not allege the new school has used 4C's preferred name or pronouns without 4A's knowledge.

in our scrutiny of allegations pled").[17]

Second, the Court finds that the articulated fundamental right is not deeply rooted in this country's history or tradition. To be sure, "[t]he Supreme Court has long recognized 'the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" *Regino*, 133 F.4th at 965 (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Cases have defined this right to include parental rights to make decisions about the physical custody of the child[18] and the type and extent of education the child receives.[19] Cases have also established a parental right to make decisions about a child's medical care. *See Parham v. J. R.*, 442 U.S. 584, 604 (1979) (recognizing parental right to have child committed to hospital for mental illness, but noting parents "cannot always have absolute and unreviewable discretion" to do so); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (complaint sufficiently alleged violation of

---

[17] To the extent AB 1955 may prohibit schools from informing parents about their child seeking medical treatment elsewhere, any parental right to refuse medical treatment would exist against the provider of that treatment. AB 1955 does not regulate anyone's conduct other than school districts and staff. In such a scenario, the right potentially implicated would be a parental right to information about their child, which the Court addresses under Plaintiffs' second claim.

[18] *See Troxel*, 530 U.S. at 72 (statute that subjected any parental decision regarding visitation of their child to state-court review infringed on parental right to make decisions concerning care, custody, and control of children); *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972) (law that compelled separation of unwed fathers from their children upon the death of the mother infringed on parental right to custody of children).

[19] *See Wisconsin v. Yoder*, 406 U.S. 205, 232–33 (1972) (law compelling high school attendance of Amish children infringed on parental right to guide "religious future and education of their children"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925) (law compelling public school attendance of children ages 8 to 16 years old infringed on parental right to direct upbringing and education of children, including to choose private schooling for children); *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (law prohibiting teaching foreign language to children who had not passed eighth grade infringed on parental right to control child's education).

parental right to notice of medical exam of children, right to parental consent in advance of exam, and right to be present at exam, where exam included genital and anal inspection, urine and blood tests, and/or vaccinations); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (county infringed on parental right to notice and consent to county conducting medical examinations on children, including gynecological and rectal exam and collecting blood and urine samples); *Greene v. Camreta*, 588 F.3d 1011, 1037 (9th Cir. 2009) (defendant violated familial rights for "parents and children to be with each other during potentially traumatic medical examinations" absent a valid reason); *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000) (recognizing parental right to make important medical decisions and "be with their children while they are receiving medical attention" in the context of "invasive vaginal and anal medical examinations").[20]

But unlike the above cases, social transition as defined in the FAC does not involve any type of "intrusions upon the bodily integrity of the child or other conduct with clinical significance -- whether through a medical procedure, examination, or hospitalization," by a state actor. *Foote*, 128 F.4th at 350. If Plaintiffs alleged that because of AB 1955, their children's schools may now provide some kind of treatment that intrudes upon their child's bodily integrity (however minor that intrusion may be), this may be sufficient to implicate a recognized parental right to direct medical care. As pled, there is no such conduct attributable to the schools or school staff.[21] Plaintiffs cite no binding authority

[20] *See also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 420 (6th Cir. 2019) (department infringed on parental right to direct medical care when they stored children's blood samples "indefinitely for further use by the state or third parties" without informed parental consent); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203–04 (10th Cir. 2003) (finding that defendant's physical examination of children, including blood test and genital exam, may have implicated parental due process rights).

[21] Ninth Circuit case law highlights the implausibility of Plaintiffs' theory of "medical treatment." *Benavidez*, *Mann*, *Greene*, and *Wallis* all recognized the

holding their due process right to refuse medical treatment can be violated where there is no such intrusion.[22]

Further, cases striking down laws as unconstitutional found parental rights were violated where the State replaced the parent as the decision-maker for what would serve the child's best interests.  *Troxel*, 530 U.S. at 72; *Stanley*, 405 U.S. at 651–52; *Yoder*, 406 U.S. at 232–33; *Pierce*, 268 U.S. at 534; *Meyer*, 262 U.S. at 401.  In contrast, AB 1955 does not substitute the State for the parents as decision-makers.  No state actors decide whether a child socially transitions—only the child makes that decision.  Plaintiffs appear to assert that they have the right, over their children, to decide whether the children socially transition.  This presupposes that parents have the right to control a child's expression of gender that supersedes how the child wishes to express their gender.  But the Court's review of the relevant case law reveals no constitutional basis for such a right, and Plaintiffs cite no other sources indicating that this right is "objectively, deeply rooted in this Nation's history and tradition."  *Regino*, 133 F.4th at 960 (internal quotations omitted).

Accordingly, the Court finds that Plaintiffs have not alleged a fundamental right.

### 3.    *Rational Basis*

Given that Plaintiffs have not alleged a fundamental right, the Challenged

---

parental right to make medical care decisions included a right to be with their children when children receive medical care—yet here, it would be impracticable for the parents to be with their children anytime someone used the child's preferred name or pronouns.

[22] The singular case Plaintiffs cite recognizing a parental right on similar facts, *Mirabelli v. Olson*, acknowledged that "[t]here are no controlling decisions for this Court to follow in this case" and proceeded to expand parental constitutional rights into an area not previously recognized.  761 F. Supp. 3d 1317, 1332 (S.D. Cal. 2025).  *Mirabelli* also appeared to recognize a parental right to information about a child's gender identity, not a parental right to refuse medical treatment based on social transition—while the court found that gender incongruence is a "matter of health," it did not find that social transitioning is a medical treatment.  *Id.*

Provisions are subject to rational basis review.  To satisfy this standard, the provisions must be "rationally related to a legitimate state interest."  *Fields*, 427 F.3d at 1208.

Section 2 of AB 1955 declares the state legislature's findings that reflect a rational basis for the provisions.  (*See* Ex. 1, § 2.)[23]  Other courts applying rational basis review to this issue have found that policies requiring student consent to share their gender identity with their parents are reasonably related to a legitimate government interest.  *See Foote*, 2025 WL 520578 at *16 ("The Protocol plausibly creates a space for students to express their identity without worrying about parental backlash.  By cultivating an environment where students may feel safe in expressing their gender identity, the Protocol endeavors to remove psychological barriers for transgender students and equalizes educational opportunities."); *Regino*, 2023 WL 4464845 at *4 (finding school district had "legitimate state interest in creating a zone of protection for transgender students and those questioning their gender identity from adverse hostile reactions, including, but not limited to, domestic abuse and bullying.").  Plaintiffs do not argue that the provisions fail rational basis review.

Accordingly, the Court finds that AB 1955 is reasonably related to a legitimate state interest.  Therefore, the Court **GRANTS** Defendants' 12(b)(6) Motion as to Plaintiffs' first cause of action (violation of parental right to refuse medical treatment).

---

[23] Broadly, the relevant findings state that choosing when to "come out" is a deeply personal decision that impacts students' health, safety, and important relationships; studies confirm that forcing young people to share their full identities before they are ready can be harmful; policies that forcibly out students without their consent "remove opportunities" for students and families to "build trust and have these conversations when they are ready"; students have a right to express their identity "without fear, punishment, or retaliation," including forced outing; students have a constitutional right to privacy of sensitive information about themselves; and affirming school environments "significantly reduce the odds of transgender youth attempting suicide."  (Ex. 1, § 2.)

**C.    Due Process Parental Right to Information (Count 3)**

Plaintiffs also allege a violation of their substantive due process parental right to information.  (FAC, ¶¶ 416-435.)  Defendants argue that (1) Plaintiffs fail to mount a facial attack on the Challenged Provisions; (2) the parental right to information does not require schools to notify parents of a student's gender identity; and (3) the provisions survive both rational basis and strict scrutiny review.

*1.    Facial Attack*

Defendants' arguments regarding Plaintiffs' facial challenge are the same arguments made under the first cause of action.  For the same reasons as explained above, these arguments are unpersuasive.

*2.    Substantive Due Process Right*

The FAC alleges that the parents are injured when schools withhold information they need to make informed decisions about their child's safety, that they cannot exercise their constitutional rights to make decisions about their child's medical care "when the government deliberately withholds critical medical, mental, educational, and religious information from them," that their right to information "is at its apex when it concerns the physical and mental wellbeing of their children," particularly when medical treatment is involved, and that they are injured when schools withhold information they need to "make informed decisions about their child's safety." (FAC, ¶¶ 417-422.)  The FAC also alleges that parents are entitled to "complete access to all of their children's education records." (*Id.*, ¶ 423.)[24]  The FAC alleges that gender dysphoria and incongruence are psychological issues, that these psychological conditions "involve profound medical moral concerns," and that parents cannot "participate in the companionship, care, custody, and

---

[24] The FAC also cites Cal. Fam. Code § 6922 to support that California's own laws recognize parents must consent to the medical care of their children unless the child is 15 years or older and certain other conditions are satisfied, and that the law states medical professionals may advise parents of treatment "given or needed whether or not the minor patient consents."  (*Id.*, ¶¶ 423-424.)

management of their children" regarding these concerns when the state withholds information such as a child's "preferred name and pronouns" from them. (*Id.*, ¶¶ 425-430.) The FAC then alleges that when parents have this information, some may decide a social transition is not in their child's best interests or decide professional therapy is necessary, but AB 1955 "unconstitutionally presume[s] that parents will not act in the best interest of their children." (*Id.*, ¶¶ 431-432.) Finally, the FAC alleges that the injury to parents' "notice and consent rights" is "separate and distinct from injuries sustained when schools in fact engage in social transitioning." (*Id.* ¶ 433.)

Considering these allegations and the scope of the Challenged Provisions, Plaintiffs appear to assert a fundamental right to information about their children's gender identity. Importantly, this asserted right imposes an affirmative duty on schools to inform parents of their children's gender identity, to the extent they possess such information.

Courts have recognized a parental right to notice and consent of medical examinations of their children. *See Benavidez*, 993 F.3d at 1150; *Mann* 907 F.3d at 1161; *Greene*, 588 F.3d at 1037; *Wallis*, 202 F.3d at 1142. As noted above, however, Plaintiffs do not allege any conduct that can be considered a "medical examination" or provision of "medical" treatment to their children. This key difference renders the above cases inapposite, as they involved physical exams that intruded upon a child's bodily integrity.

Medical treatment or not, parents may nonetheless have a right to information about their child's gender identity or social transition efforts because such knowledge affects their right to direct the upbringing of their children. However, the right to make decisions concerning the care, custody, and control of children is "not without limitations" and "does not reside exclusively with parents"—instead, it is "subject to regulation by the State 'in the public interest.'" *Regino*, 133 F.4th at 966. In *Regino*, the Ninth Circuit noted that both parental rights to make medical

decisions and parental rights "in the education context" are "not unbounded." 133 F.4th at 966. "[P]arents have the right to choose the educational forum, but not what takes place inside the school." *Id*. (citing *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020)). Parents "also lack constitutionally protected rights to direct school administration more generally." *Id*. (citing *Parents for Priv. v. Barr*, 949 F.3d 1210, 1231 (9th Cir. 2020)). For example, the Ninth Circuit has held that the "right to limit what public schools or other state actors may tell their children regarding sexual matters, is not encompassed within the *Meyer–Pierce* right to control their children's upbringing and education." *Fields*, 427 F.3d at 1207. In *Parents for Privacy*, the Ninth Circuit rejected attempts to create a "parental right to determine whether and when their children will have to risk being exposed to opposite sex nudity at school" when parents challenged a school's Student Safety Plan for transgender students to use the bathroom and locker room reflecting their gender identity. 949 F.3d at 1232–33.

Crucially, AB 1955 neither requires nor prohibits conduct by either the parents or their children. Similar to the policy in *Regino*, the Challenged Provisions here "are not proactive, but reactive; District staff are not directed to force students to adopt transgender identities or keep their identities secret from their parents." *Regino v. Staley*, 2023 WL 4464845, at *4 (E.D. Cal. July 11, 2023), *vacated and remanded*, 133 F.4th 951. Again, *Foote* is instructive. There, the parents argued that the district's nondisclosure protocol "restricted their right to direct their child's upbringing" as the protocol "deceived them and . . . deprived them of information about" their child. 128 F.4th at 353. The First Circuit rejected these arguments in part because the protocol "lack[ed] the 'coercive' or 'restraining' conduct that other courts have found to restrict parental rights in this context," and there were no allegations of coercive conduct by any school staff towards the student. *Id*. Moreover, the circuit observed, "it is clear to us from precedent that in attempting to establish a constitutional deprivation of this sort, it is not enough for the Parents

to allege that the nondisclosure Protocol makes their parenting more challenging." "[T]he Supreme Court has made clear that the Due Process Clause 'cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.'" *Id*. at 354 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)).

The Third Circuit's decision in *Anspach* provides further clarity as to the boundaries of parental rights. There, parents challenged a health center's failure to inform them that their daughter had sought emergency contraception, arguing this violated their parental rights to familial relations and to notification. *Id*. at 259. The Third Circuit rejected the asserted rights, noting that the public health clinic did not "become involved in [the minor's] reproductive health decisions without invitation," and the clinic's actions "fail[ed] to suggest that [the minor] was in any way compelled, constrained, or coerced into a course of action she objected to." *Id*. at 266. The circuit further observed that "[t]he real problem alleged by Plaintiffs is not that the state actors *interfered* with the Anspachs as parents; rather, it is that the state actors did not *assist* the Anspachs as parents or affirmatively foster the parent/child relationship. However, the Anspachs are not entitled to that assistance under the Due Process Clause." *Id*. (emphasis in original).

These cases illustrate that constitutional parental rights are not so broad as to impose an affirmative duty on third parties to inform parents of their children's actions, where those actions are done voluntarily and not initiated by the third party. Ninth Circuit case law, which has recognized a parental right to information where the defendants initiated medical exams on the children, is not to the contrary.

In this case, Plaintiffs' asserted right would not only prohibit laws like AB 1955 that hinge gender identity disclosure on student consent, but in fact *require* schools to disclose a student's gender identity to the parents, regardless of whether the student objects. Other courts analyzing this issue have declined to recognize a fundamental parental right. *See Foote*, 128 F.4th at 355 (protocol "merely instructs

teachers not to offer" gender identity information "without a student's consent," but parents "remain free to strive to mold their child according to the Parents' own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools"); *Short v. New Jersey Dep't of Educ.*, 2025 WL 984730, at *18 (D.N.J. Mar. 28, 2025) (teachers "merely respected the wishes of [plaintiff's] child to recognize their stated identity," and "[t]o find a violation of [plaintiff's] parental rights in these actions would be to stretch substantive due process beyond that which is protected by the Constitution"); *Delaware Valley*, 2024 WL 5006711 at *12 ("To find that a policy directing a school district to respect an individual student's preferred name and pronouns infringes on Plaintiff's constitutional due process rights" would require "significantly expand the scope of parental rights articulated in *Meyer* and *Pierce*, which would contradict the Supreme Court's warning that courts are to 'exercise the utmost care' when asked to break new ground in the field of substantive due process"). This Court agrees and finds that Plaintiffs have not asserted a fundamental right to support their facial attack on AB 1955.

As applied to the Parent Plaintiffs, none of the parents allege that any school staff coerced their children into adopting a different gender identity or socially transitioning, nor do they allege that staff prohibited the children from sharing this information with their parents. The most the FAC alleges is that 7C's school counselor would "regularly pull 7C out of class" for counseling sessions, which 7A alleges caused 7C to miss class or lunchtime, and that the counselor reported 7A to Child Protective Services for emotional abuse. (FAC, ¶¶ 135-136, 142.) It is unclear on what basis the counselor reported 7A or whether it was related to 7C's gender identity issues at all. It is likewise unclear whether the counseling sessions had anything to do with 7C's gender identity issues or whether the counselor pulled 7C out of class for sessions at the request of 7C or on the counselor's own initiative. 9A alleges that 9C's teacher "used his position of trust to tell pre-pubescent children

that they might be gay." (*Id.*, ¶ 182.)  First, questioning sexual orientation is a separate issue from questioning gender identity—9A does not allege any facts suggesting the teacher told 9C to question 9C's gender identity.  Second, the facts supporting this allegation do not indicate that the teacher told 9C or other students they might be gay—the FAC alleges that the teacher explained to the students that "he brought the LGBTQ+ flags to the classroom because there were gay children their same age . . . and he wanted to support them." (*Id.*, ¶ 177.)  These allegations are not sufficient to show coercion.  Thus, Plaintiffs have not pled an as-applied challenge to AB 1955.

Finally, to the extent Plaintiffs allege a broader right to direct the upbringing and education of their children (which is not explicitly pled as a claim), Ninth Circuit case law is dispositive that parents do not have a fundamental right to "direct school administration more generally" (*Parents for Priv.*, 949 F.3d at 1231) or choose "what takes place inside the school" (*Torlakson*, 973 F.3d at 1020).  *See also Fields*, 427 F.3d at 1207 ("the *Meyer–Pierce* right does not extend beyond the threshold of the school door").  Plaintiffs have no constitutional right to dictate how schools operate administratively, including whether staff respect a student's wishes to use their preferred name and pronouns.

### 3.    Rational Basis

Given that Plaintiffs have not sufficiently pled a fundamental right to information about their children's gender identity, the Challenged Provisions are subject to rational basis review.  As explained under the first cause of action, the provisions survive rational basis review.   Accordingly, the Court **GRANTS** Defendants' 12(b)(6) Motion as to the third cause of action.

### D.    Unconstitutional Conditions and Declaratory Judgment (Counts 2, 4)

Because it is clear the City has no standing, it cannot maintain its declaratory judgment claim; therefore, the Court does not reach the merits of this claim. Because the parents have failed to state a substantive due process violation, their

unconstitutional conditions claim also fails.  Accordingly, the Court **GRANTS** Defendants' Motion as to the second and fourth causes of action.

**E.    Leave to Amend**

"Rule 15(a) of the Federal Rules of Civil Procedure provides that "leave (to amend) shall be freely given when justice so requires." *J. B. Williams Co. v. Le Conte Cosms., Inc.*, 523 F.2d 187, 193 (9th Cir. 1975).  "Leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (internal quotations omitted).

Plaintiffs request leave to amend in the event the Court finds they have not adequately pled their claims.  But because Plaintiffs' claims are "premised on the violation of an asserted right that, as a matter of law, is not protected by the Fourteenth Amendment's Due Process Clause, amendment of these claim[s] would be futile." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020).  Further, the City lacks standing to bring its claim against Defendants as a matter of law; therefore, amendment of its claim would be futile for that additional reason.

## IV.  CONCLUSION

Notwithstanding the Court's conclusion that no fundamental rights are implicated in Plaintiffs' claims, the Court acknowledges the serious and important parental interests at stake here and echoes the comments of other courts that have taken up this issue.  *See Regino*, 2023 WL 4464845 at \*4 ("While reasonable minds may certainly differ as to whether [these] policy preferences are advisable, this Court is not the venue for this political debate."); *Foote*, 128 F.4th at 355 ("Indeed, we are sympathetic to the Parents' interest in having as much information as possible about their child's well-being and behavior in school revealed to them. Nonetheless, as we have explained, our survey of Due Process Clause jurisprudence suggests that this canon does not require governments to assist parents in exercising their fundamental right to direct the upbringing of their children, and the Parents'

objections to the Protocol here in large part take issue with that principle as we understand it to be."); *Delaware*, 2024 WL 5006711 at *17 (declining to find due process right to notification because of the "lack of legal authority recognizing any such right, and because such a finding would 'place the matter outside the arena of public debate and legislative action'"); *see also John & Jane*, 78 F.4th at 636 ("The . . . fundamental point— "[t]he issue of whether and how grade school and high school students choose to pursue gender transition is a family matter, not one to be addressed initially and exclusively by public schools without the knowledge and consent of parents—may be compelling," but because parents had not alleged injury, "their remedy lies in the ballot box, not the jury box."). As in *Regino*, "[t]he issue before this Court is not whether it is a good idea for school districts to notify parents of a minor's gender identity and receive consent before using alternative names and pronouns, but whether the United States Constitution mandates such parental authority." 2023 WL 4464845 at *4. In line with other courts that have taken up this issue, this Court concludes that the Constitution does not mandate such a right.

Accordingly, the Court rules as follows:

- Defendants' 12(b)(1) Motion to Dismiss is **<u>GRANTED</u>** as to the City of Huntington Beach without leave to amend; **<u>GRANTED</u>** as to Parent Plaintiffs 2A, 3A, 6A, 9A, and 10A; and **<u>DENIED</u>** as to Parent Plaintiffs 1A, 4A, 5A, 7A, and 8A.
- Defendants' 12(b)(6) Motion to Dismiss is **<u>GRANTED</u>** without leave to amend on the grounds that Plaintiffs have not alleged a fundamental right and AB 1955 survives rational basis review.

**IT IS SO ORDERED.**

DATED: June 16, 2025

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE